Michelle BRAUN, On Behalf of Herself
and All Others Similarly Situated,
Appellee

v.

WAL–MART STORES, INC., a Delaware
Corporation, and Sam's Club, an Op-
erating Segment of Wal–Mart Stores,
Inc., Appellants.

Dolores Hummel, On Behalf of Herself
and All Others Similarly Situated,
Appellee

v.

Wal–Mart Stores, Inc., a Delaware Cor-
poration and Sam's Club, an Operat-
ing Segment of Wal–Mart Stores, Inc.,
Appellants.

Superior Court of Pennsylvania.

Argued Aug. 19, 2009.

Filed June 10, 2011.

Reargument Denied Aug. 11, 2011.

William H. Lamb, West Chester, for appellants.

Judith L. Spanier, New York, NY, Michael D. Donovan, Philadelphia, Rodney P. Bridgers, Aurora, CO, and Gerald L. Bader, Jr., Denver, CO, for appellees.

BEFORE: MUSMANNO, DONOHUE, and FITZGERALD,* JJ.

OPINION PER CURIAM.

Appellants, Wal–Mart Stores, Inc. and Sam's Club (collectively, "Wal–Mart"), appeal from a judgment in the amount of $187,648,589.11 entered in the Philadelphia County Court of Common Pleas in favor of Appellees, Michelle Braun ("Braun"), Dolores Hummel ("Hummel") (we refer to Braun and Hummel collectively as "Appellees"), and the certified class.[1] This appeal arises from claims against Wal–Mart by its hourly employees, alleging, *inter alia,* claims for breach of contract, unjust enrichment, and statutory violations. Under these unique facts and the liberal construction of Pennsylvania's class action rules, we hold the record substantiates the trial court's certification of the class and discern no denial of due process. We conclude that monetary payments for contractual rest breaks qualify as "wages" under the Pennsylvania Wage Payment and Collection Act ("WPCL").[2] Further, we hold the trial court construed 43 P.S. § 260.10 correctly to permit recovery of statutory liquidated damages and Appellees are entitled to recover under the WPCL. We also hold there was sufficient evidence in the record for a fact finder to conclude there was a breach of contract, unjust enrichment, violation of the Pennsylvania Minimum Wage Act ("MWA"),[3] and violation of the WPCL. Finally, we hold the trial court erred in calculating some of Appellees' counsel's fees by enhancing the lodestar to reflect contingent risk when the lodestar already accounted for contingent risk. Accordingly, we affirm the judgment in part as modified, reverse in part, and remand for further proceedings.

Class representative Braun was an hourly employee of a Wal–Mart store located at Franklin Mills, Pennsylvania, from November 1998 to January 1999. R.R. at 1626a.[4] Class representative Hummel was an hourly employee of a Sam's Club store located near Reading, Pennsylvania, from 1992 to 2002. R.R. at 1635a.

At the beginning of Appellees' respective employment, Wal–Mart gave them an employee handbook; both signed an acknowledgment page stating: "[T]he policies and benefits presented in this handbook are for your information only and do not constitute terms or conditions of employment.... This handbook is not a contract." R.R. at 6734a–36a, 6785a–86a. During the course of Appellees' employment, Wal–Mart had several policies in place regarding rest breaks and off-the-clock work. The rest break policy is known as PD–07 and the off-the-clock work policy is known as PD–43. Pls.' Ex.

---

* Former Justice specially assigned to the Superior Court.

1. As discussed *infra,* the court inadvertently miscalculated the amount of the total judgment.

2. 43 P.S. §§ 260.1–260.12.

3. 43 P.S. §§ 333.101–333.115.

4. The certified record, particularly the notes of testimony, is voluminous, as is the reproduced record. We have attempted in most instances *infra* to cite to both the reproduced record and the notes of testimony. In some instances, however, we cite to only one or the other, either for ease of citation, lack of one in the reproduced record, or the reader's benefit.

4c; R.R. at 6987a–89a; Pls.' Ex. 27a; R.R. at 7020a–26a. PD–07 states in pertinent part that hourly associates [5] who work between three and six hours will be given one, fifteen-minute, paid, rest break, and those who work more than six hours will be given two, fifteen-minute, paid, rest breaks. Pls.' Ex. 4c; R.R. at 6987a–89a.

PD–07 was revised several times during the class period of March 19, 1998, through May 1, 2006. Pls.' Exs. 4a–4d; R.R. at 6974a–92a. Early versions stated that "[h]ourly associates whose break or meal periods [are] interrupted to perform work will receive compensation for the entire period at their regular rate of pay and be allowed an additional break or meal period." Pls.' Ex. 4a; R.R. at 6975a–76a. After February 10, 2001, that statement was omitted. Pls.' Ex. 4b; R.R. at 6984a–85a.

The version of PD–07 governing paid rest breaks became effective in May of 2004. Pls.' Ex. 4c; R.R. at 6987a–89a. It states:

> Associates will be provided breaks. . . . Associates are to take full, timely, uninterrupted breaks. . . . Associates will also be subject to disciplinary action for missing breaks or taking breaks that are too long, too short, or untimely. . . .
>
> \* \* \*
>
> This policy applies to all hourly Associates. . . .
>
> Break Periods ("Breaks")
>
> Length Break periods are 15 uninterrupted minutes in length. . . .
>
> Compensation Associates receive compensation for break time at the applicable rate of pay. Associates are not required to clock out or clock in for breaks. . . .
>
> Providing Breaks The Associate's immediate supervisor is responsible for providing breaks. Supervisors and salaried members of management will be subject to disciplinary action for failing to provide breaks in accordance with this policy and state laws.
>
> \* \* \*
>
> Interruption of Breaks And Meal Periods
>
> Supervisors and salaried members of management may not require nor request Associates to perform work during their breaks. . . .
>
> \* \* \*
>
> Compliance
>
> Break Exception Definition: Each occasion an Associate misses a break, takes a break that is too long or too short, or takes a break that is untimely will be measured as a "break exception."

Pls.' Ex. 4c; R.R. at 6987a–88a.

In addition to paying for non-working time on rest breaks under PD–07, Wal-Mart had a policy, PD–43, purporting to pay for all hours worked. PD–43 stated in part: "It is against Wal-Mart policy for any Associate to perform work without being paid. We are committed to compensating every Associate for the work they perform." Pls.' Ex. 27a; R.R. at 7020a. The Wal-Mart 2006 Associate Benefits Book also described all available benefits to employees under the heading "My Money":

> Pay Programs
>
> In addition to the pay you receive for a regular day's work, there are other programs and benefits that can supplement your income.
>
> \* \* \*
>
> Paid Break Periods
>
> Take a break and get paid for it!

---

5. Wal-Mart employees are referred to as "associates."

Defs.' Ex. 146; R.R. at 6902a–03a; *see also id.;* R.R. at 6790a, 6901a.

Wal–Mart employees used a time clock.[6] In order to keep track of their hours, Appellees were required to "swipe" or "punch" their badges in and out for breaks. Pls.' Ex. 4a; R.R. at 6975a. Wal–Mart's Time Clock Punch Exception Report ("TPER") generated a daily listing of every employee whose punches or swipes established that they took too few breaks, short breaks, or no breaks. Pls.' Ex. 2b; R.R. at 6970a–73a; Pls.' Ex. 54; R.R. at 7264a; Pls.' Ex. 90; 7443a–91a. Wal–Mart tracked employees' breaks and recorded their time from Wal–Mart's Time Clock Archive Report ("TCAR"). Pls.' Ex. 54; R.R. at 7286a–87a. This report detailed total hours worked and "total break" time. Pls.' Ex. 45; R.R. at 7086a. On February 10, 2001, Wal–Mart officially ended its policy of requiring hourly employees to swipe in and out for rest breaks. N.T., 9/12/06 (afternoon), at 25; R.R. at 1529a; Pls.' Ex. 142; R.R. at 7612a–13a; *see also* Pls.' Ex. 4c; R.R. at 6987a–89a. TPER and TCAR were used in the regular course of Wal–Mart's business. *See, e.g.,* N.T., 9/9/04, at 75–76; N.T., 9/10/04, at 82–85; R.R. at 342a–45a.

Meanwhile, Wal–Mart retained data reflecting which employees were operating cash registers and, during their shifts, when they were logged onto and actively operating the cash registers. N.T., 9/21/06, at 30–36; R.R. at 1758a–63a. Wal–Mart's internal audit department used TPER and TCAR to conduct internal audits of employees' compliance with the rest-break policies. Pls.' Ex. 97; R.R. at 7493a–7501a. If the audits revealed violations of the policies, then managers or employees could be subject to discipline up

to and including termination. Pls.' Ex. 4c; R.R. at 6989a; Pls.' Ex. 27a; R.R. at 7020a.

Appellees alleged that Wal–Mart failed to compensate them for rest breaks and off-the-clock work as mandated in its policies. As a result, Ms. Braun and Ms. Hummel filed separate complaints against Wal–Mart. On March 21, 2002, approximately two years after her employment ended with Wal–Mart, Ms. Braun filed a complaint, on behalf of herself and all others similarly situated, against the store manager and district manager of the Franklin Mills, Pennsylvania, Wal–Mart store. Ms. Braun filed an amended complaint on March 26, 2002, and a second amended complaint on May 28, 2002. Ms. Braun alleged a "systematic scheme of wage abuse against its hourly employees in Pennsylvania." Braun's Second Am. Compl., at 2. More specifically, Ms. Braun alleged causes of action for breach of contract, restitution, and unjust enrichment for off-the-clock work and missed or shortened rest breaks, along with violation of the MWA, violation of the WPCL, and tortious interference with contractual relations. *Id.* at 4–5.

Ms. Hummel filed a petition to intervene in the Braun suit, which the trial court denied on August 26, 2004. R.R. at 396a. On August 27, 2004, the court granted summary judgment in favor of Wal–Mart and against Ms. Braun on her claims for violation of the MWA and WPCL, and for tortious interference with contractual relations. Order, 8/27/04; R.R. at 311a.

On August 30, 2004, Ms. Hummel filed a complaint on behalf of herself and all others similarly situated. The Hummel complaint alleged that Wal–Mart required its

---

6. A time clock records "information as to the time of employees' presence on the employer's premises." *Schooley v. Cmwlth., Unem-* *ployment Comp. Bd. of Review,* 43 Pa.Cmwlth. 383, 402 A.2d 1109, 1110 (1979).

employees to miss or cut short rest breaks and work off-the-clock. Hummel Compl. at 1–2. The Hummel action contained causes of action for breach of contract, restitution, and unjust enrichment for off-the-clock work and missed or shortened break periods, along with violations of the MWA and WPCL. Wal–Mart denied these allegations and asserted, *inter alia,* that it did not intend to contract with its employees related to breaks. Further, Wal–Mart claimed that missed swipes did not equate to missed or skipped breaks, and sometimes employees voluntarily missed or skipped breaks for reasons unrelated to workplace demands. *See, e.g.,* N.T., 9/19/06 (afternoon), at 79–80, 96; R.R. at 1691a–92a, 1694a.

The trial court held two class-certification hearings, one in September 2004 for the Braun action, and the other in October 2005 for the Hummel action. The court evaluated hundreds of exhibits regarding Wal–Mart's policies, practices, and record-keeping, and considered arguments, testimony, and Appellees' expert reports by Drs. Scott Baggett and Martin Shapiro analyzing Wal–Mart's business records. Relying primarily on the experts' analyses, the court concluded Appellees demonstrated the systemic loss of contractual break time. The court held that Appellees established the existence of common questions of law and fact, and that common issues predominated.

On December 27, 2005, the court granted class certification for both actions. The certified class in each case consisted of "all current and former hourly employees of Wal–Mart in the Commonwealth of Pennsylvania from March 19, 1998 to the present." Trial Ct. Order, 12/27/05, at 1. On March 20, 2006, Wal–Mart petitioned this Court for interlocutory review of the class-certification decision and a stay of proceedings pending appellate review. This Court denied Wal–Mart's petition on April 26, 2006. The trial court consolidated both cases for trial.

On July 17, 2006, prior to trial, Wal–Mart filed a motion for partial summary judgment on the issue of whether meal periods and rest breaks are wages, "fringe benefits," or wage supplements under the WPCL. The court granted in part that motion on September 7, 2006.

The jury trial began on September 8, 2006, and lasted for thirty-two days. Both sides introduced evidence of Wal–Mart's business practices and procedures, and fact and expert witnesses testified. The evidence focused on Wal–Mart's break and off-the-clock policies and practices. Appellees called eighteen fact witnesses and three expert witnesses: Dr. Frank Landy, Dr. Baggett, and Dr. Shapiro.

Dr. Landy, an industrial organizational psychologist, testified that Wal–Mart, by means of its uniform, written, corporate policies, promised employees paid rest breaks during which they were to perform no work, and receive pay for all hours worked. *See, e.g.,* N.T., 9/12/06 (afternoon), at 61–64; R.R. at 1540a–41a. He opined that paid rest breaks were a benefit. N.T., 9/12/06 (afternoon), at 11–12; R.R. at 1525a; N.T., 9/13/06 (morning), at 45–46; R.R. at 1556a–57a. Dr. Landy testified that a reasonable employee would understand the uniform disclaimer in Wal–Mart's handbook as disclaiming only the intent to form anything other than an "at will" employment. N.T., 9/13/06 (morning), at 49–51; R.R. at 1560a–61a. The employees, he testified, would not understand the disclaimer as disclaiming paid, rest-break benefits and receiving pay for all hours worked. *Id.* at 51–52; R.R. at 1561a–62a. Dr. Landy asserted that, based on Wal–Mart's numerous, mandatory statements, notices, postings, and labor guidelines, a reasonable employee would

have understood that Wal–Mart offered and promised benefits, and that employees would receive those benefits upon working the specified number of hours. N.T., 9/12/06 (afternoon), at 76–77; R.R. at 1545a–46a.

Dr. Landy also discussed understaffing in Wal–Mart stores. He opined that Wal–Mart's "preferred scheduling" program was the "root cause" of understaffing in the stores. N.T., 9/11/06 (afternoon), at 100–02; R.R. at 1496a–98a. There is a correlation, Dr. Landy stated, between understaffing and employees' ability to receive breaks: the more understaffed the stores, the greater the pressure on managers not to provide breaks and on employees not to take breaks. N.T., 9/12/06 (afternoon), at 52–53; R.R. at 1537a. He explained how the pressure to reduce payroll costs led to understaffing. See, e.g., N.T., 9/13/06 (morning), at 106–08; R.R. at 1596a–98a. Dr. Landy noted that the Wal–Mart store-manager-bonus system had a "negative effect" on compliance with Wal–Mart's policies on breaks and pay. See, e.g., id. at 81–82; R.R. at 1589a–91a. Lastly, Dr. Landy testified that after Wal–Mart conducted its Shipley Audit,[7] Wal–Mart eliminated the requirement that employees punch the time clock for rest breaks; he opined that Wal–Mart eliminated "smoking gun" evidence of its policy violations to limit its liability. N.T., 9/12/06 (afternoon), at 57–58; R.R. at 1539a.

In contrast, Wal–Mart's retail expert, Wade Fenn, testified that he analyzed Wal–Mart's business practices and procedures. N.T., 10/3/06 (morning), at 90–91. He claimed that Dr. Landy applied the wrong mathematical calculation between man-hour and store profitability. Id. at 93–94. Mr. Fenn testified that he did not believe there was a link between Wal–Mart's compensation program and rest breaks. Id. at 95. He stated that Wal–Mart's practices were consistent with other "big box" retailers. Id. at 100.

Dr. Baggett, a statistical-analysis expert, also testified for Appellees regarding rest breaks. N.T., 9/19/06 (morning), at 29; R.R. at 1656a. He conducted a computerized, statistical analysis using Wal–Mart's reports to determine the number of missed rest breaks by Pennsylvania hourly employees. Id. at 21; R.R. at 1653a; N.T., 9/19/06 (afternoon), at 11–15; R.R. at 1671a–74a. He analyzed swipes for rest breaks from 1998 to February 2001. N.T., 9/19/06 (afternoon), at 11; R.R. at 1671a. For the period after February 2001, Dr. Baggett statistically extrapolated the number of missed or shortened rest breaks. Id. at 14–15; R.R. at 1673a–74a. He testified that damages from missed rest breaks totaled $68,412,107. Id. at 9. Dr. Baggett calculated that damages from shortened rest breaks totaled $7,561,968. Id. at 26; R.R. at 1677a. He asserted that his calculations were based in part on a clause in PD–07 and Wal–Mart's rest-break policy providing for an additional break if a man-

7. On July 14, 2000, several members of Wal–Mart's upper-level management were sent the results of the Shipley Audit. Pls.' Ex. 429; R.R. at 7887a. The Shipley Audit sought to determine Wal–Mart's compliance with its policies and state laws regarding the staffing and scheduling of its employees. Id. Wal–Mart had previously conducted approximately ten other internal audits since September 1999 that indicated widespread break violations. N.T., 9/12/06 (morning), at 62–64; R.R. at 1502a–04a. The Shipley Audit oc-

curred at a national level, unlike the earlier audits. Id. at 66; R.R. at 1506a. For two weeks, auditors visited 128 stores across the United States, including some in Pennsylvania. Pls.' Ex. 429; R.R. at 7888a. The Shipley Audit found 76,472 meal- and wage-break violations over a one-week period. Id. The Shipley Audit reported that 21%, or 15,705, of these violations involved "too few meals" while 79%, or 60,767, of these violations involved "too few breaks." Id.

ager or supervisor required or requested an employee to work during his or her break. *Id.* at 46, 52–53; R.R. at 1684a, 1687a–88a.

Dr. Baggett, however, admitted he could not explain why a rest break was missed or shortened, or ascertain whether a manager caused an employee to shorten or miss a break. *Id.* at 47–48; R.R. at 1685a–86a. His affidavit was based on an analysis of records produced by Wal–Mart. Trial Ct. Order, 10/3/07, at 10. Dr. Baggett concluded that hourly employees of the class each experienced an average of twenty-five break violations. Further, he averred that 98.81% of those employees experienced at least one rest-break violation. Decl. of L. Scott Baggett, at 3; R.R. at 2478a.[8]

Wal–Mart's expert, Dr. Denise Martin, rebutted Dr. Baggett's conclusion. N.T., 10/5/06, at 36. Dr. Martin opined that because Dr. Baggett extrapolated data that did not exist or was incorrect, his conclusion was flawed. *Id.* at 45–48, 59, 67. First, she asserted Dr. Baggett improperly assumed that a missed rest-break swipe always meant the employee did not actually take a rest break. *Id.* at 47. Second, Dr. Martin testified that Dr. Baggett incorrectly assumed an employee was denied a rest break if the employee worked over six hours. *Id.* at 49. She claimed it is statistically improper to make these assumptions and, therefore, Dr. Baggett's analysis was inaccurate and unreliable. *Id.* at 64. She opined that it was not reasonable or professionally appropriate for Dr. Baggett, as a statistician, to assume missed rest breaks when he admittedly did not know whether an employee voluntarily or involuntarily missed a rest break. *Id.* at 60–62.

Dr. Shapiro, a statistical expert, also testified for Appellees about off-the-clock work. He analyzed records from a sample of sixteen Wal–Mart stores in Pennsylvania to determine the amount of off-the-clock work and pre-off-the-clock work. N.T., 9/21/06 (afternoon), at 48, 54–56; R.R. at 1767a, 1769a–71a.[9] Dr. Shapiro calculated the amount of off-the-clock work by analyzing the amount of time cashiers were logged onto operator-accountable cash registers but not logged into the time-keeping system. *Id.* at 27; R.R. at 1754a–55a. He also analyzed records from 2001 through part of 2006, and extrapolated data for 1998 through 2000. *Id.* at 59–60. Additionally, Dr. Shapiro statistically extrapolated data for the other Pennsylvania Wal–Mart stores not included in the analysis. *Id.* at 65.

Dr. Shapiro testified that the off-the-clock data he analyzed established the rate of rest-break violations. *Id.* at 61–62; R.R. at 1772a–73a. He assumed employees worked off-the-clock whenever cashiers logged onto their cash registers but were not logged into the time clock. *Id.* Dr. Shapiro, after extrapolating his findings to include all Pennsylvania Wal–Mart stores, calculated total, off-the-clock, work damages of $2,993,063.32. *Id.* at 76; R.R. at 1775a.

Dr. Martin rebutted Dr. Shapiro's statistical conclusions. She stated that his analysis was not an appropriate method to determine whether a cashier actually worked off-the-clock. N.T., 10/5/06, at 70. Dr. Martin noted that because other employees testified an employee sometimes logged onto a cash register using another employee's identification number, she disa-

---

8. The class damages were calculated only for actual missed or shortened rest breaks and off-the-clock work reflected by Wal–Mart records. Pls.' Exs. 512–15; R.R. at 7947a–50a.

9. The court ultimately struck Dr. Shapiro's testimony relating to pre-off-the-clock work. N.T., 9/22/06 (morning), at 43.

greed with Dr. Shapiro's underlying assumption that no employee did so. *Id.* at 70–71. Dr. Martin also claimed Dr. Shapiro's analysis was flawed because he merged the cash-register data with the time-clock data in order to reach his conclusion regarding off-the-clock work. *Id.* at 71–72. She discounted his analysis by conducting her own test in one Pennsylvania store, where she found that a cashier appeared to be logged onto a register for at least twenty-one hours. *Id.* at 72. Thus, Dr. Martin opined that Dr. Shapiro's entire analysis was unreliable. *Id.* at 79–80.

On October 12, 2006, the jury returned a verdict in favor of Wal–Mart on all claims related to meal periods, and returned a verdict in favor of Appellees on the claims related to rest breaks and off-the-clock work. Jury Verdict Interrog.; R.R. at 2181a–85a. Specifically, the jury found for Appellees on their WPCL claims, finding that Wal–Mart failed to pay employees for all the work they performed and failed to allow employees to take their paid, mandatory, rest breaks. Trial Ct. Op., 11/14/07, at 2. Wal–Mart, the jury found, required its employees to work without pay by directing them not to record their hours on Wal–Mart's computerized pay system, resulting in a savings of $1,031,430 to Wal–Mart. *Id.* The jury also found that Wal–Mart prohibited employees from taking their promised, paid, rest breaks, which resulted in Wal–Mart's saving $48,258,111. *Id.* Further, the jury concluded that Wal–Mart did not have a good-faith reason for refusing to pay its employees everything they had earned. Trial Ct. Op., 11/14/07, at 2. The jury awarded damages of $2,494,340.35 for the off-the-clock work claims and $75,974,075.00 for the rest-break claims. Jury Verdict Interrog.-Damages, at 1–2; R.R. at 2186a–87a.

Also on October 12, 2006, Appellees moved for statutory, mandatory, liquidated damages. Appellees sought only a single, WPCL, statutory penalty per class member. Trial Ct. Op., 11/14/07, at 10. Appellees relied on the affidavit of Dr. Baggett, which averred that 98.81% of the class experienced at least one rest-break violation and calculated the statutory, liquidated damages in the amount of $62,253,000. *Id.*

Wal–Mart countered with an affidavit from Dr. Martin, who criticized Dr. Baggett's conclusion. Dr. Martin opined: "At best [Dr. Baggett's method] can only approximate the number of associates to include in a calculation of liquidated damages using extrapolated data and a probabilistic approach." *Id.* at 11. She stated that she did not believe Dr. Baggett's method, calculating liquidated damages using extrapolated data, was appropriate. *Id.* Dr. Martin, however, opined in her report that if every one of the 125,304 class members were entitled to liquidated damages, the statutory award should be $62,652,000. *Id.* at 11. On October 3, 2007, the court ordered statutory, liquidated damages in the amount of $62,253,000.

In addition to statutory, liquidated damages, the court awarded $45,694,576 in attorneys' fees. The trial court allocated the total-fee award based on recovery for the WPCL and non-WPCL claims. Trial Ct. Op., 11/14/07, at 21. The court ordered Wal–Mart to pay attorneys' fees of $33,813,986.24, with the remaining amount of $11,880,589.76 paid from the common fund. The total judgment follows:

| | |
|---|---|
| WPCL verdict: | $ 49,568,541.00 |
| Common Law verdict: | $ 29,178,873.35 |
| Statutory Interest: | $ 10,163,863.00 |
| WPCL penalty: | $ 62,253,000.00 |
| WPCL attorney fees: | $ 33,813,986.24 |
| WPCL expenses: | $ 2,670,325.52 |
| Total: [51] | $187,648,589.11 |

[51] Attorney fees in the amount of $11,880,589.76 and expenses of $938,222.48 shall be paid from the Common Law [sic] fund created.

*Id.* at 22.[10] Wal–Mart timely filed post-trial motions, which the court denied on November 14, 2007. This timely appeal followed.

Wal–Mart raises the following issues:

Did the trial court disregard class action requirements by certifying and refusing to decertify a class of approximately 187,000 current and former Wal–Mart employees for claims of breach of contract, unjust enrichment, and violations of the WPCL and MWA without a method of class-wide proof that could show Wal–Mart's liability to each class member and with a vague and overbroad class definition?

Did the trial court deprive Wal–Mart of due process by eliminating its right to try inherently individual issues on liability?

Did the trial court err by refusing to dismiss [Appellees'] claim under the WPCL when, as a matter of law, rest breaks are not "wages, wage supplements, or fringe benefits" within the meaning of the statute, and further err by awarding liquidated damages under the WPCL when [Appellees] could not establish that they met the requirement for liquidated damages under the WPCL, when Wal–Mart established as a matter of law its good faith in contesting or disputing [Appellees'] wage claim, and when [Appellees] could not identify the specific individuals entitled to liquidated damages?

Did the trial court err by entering a judgment of $187,648,589.11 in favor of the class on its claims for breach of contract, unjust enrichment, and violations of the WPCL and MWA, where

[Appellees] failed to establish elements of their claims?

Did the court err in awarding $45.6 million in attorneys' fees following its application of a 3.7 contingency multiplier that improperly double-counted factors already included in the lodestar?

Wal–Mart's Brief at 4–5 (re-ordered to facilitate disposition).

"An appellate court will reverse a trial court's grant or denial of a JNOV only when the appellate court finds an abuse of discretion or an error of law." *Dooner v. DiDonato*, 601 Pa. 209, 218, 971 A.2d 1187, 1193 (2009). "Our scope of review with respect to whether judgment n.o.v. is appropriate is plenary, as with any review of questions of law." *Shamnoski v. PG Energy, Div. of S. Union Co.*, 579 Pa. 652, 659, 858 A.2d 589, 593 (2004).

In reviewing a motion for judgment n.o.v., the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor. Moreover, a judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner. Further, a judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations.

There are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judgment as a matter of law, ... and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should

---

**10.** The trial court, however, erred in calculating damages by using the figure of $1,310,430, instead of the correct figure of $1,031,430. *See* Jury Verdict Interrog.-Damages, at 2; R.R. at 2187a. Thus, contrary to the court's judgment, the jury rendered a WPCL verdict for $49,289,541, not $49,568,541.

have been rendered in favor of the movant[.] With the first a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Moure v. Raeuchle,* 529 Pa. 394, 402–03, 604 A.2d 1003, 1007 (1992) (citations and quotation marks omitted). "Questions of credibility and conflicts in the evidence are for the [fact-finder] to resolve and the reviewing court should not reweigh the evidence." *Shamnoski,* 579 Pa. at 659, 858 A.2d at 593 (citation omitted). "If there is any basis upon which the jury could have properly made its award, the denial of the motion for judgment n.o.v. must be affirmed." *Smith v. Renaut,* 387 Pa.Super. 299, 564 A.2d 188, 191 (1989); *accord Simon v. Wyeth Pharms., Inc.,* 989 A.2d 356, 365 (Pa.Super.2009).

With respect to a request for a new trial, our standard and scope of review follows:

To review the two-step process of the trial court for granting or denying a new trial, the appellate court must also undertake a dual-pronged analysis. A review of a denial of a new trial requires the same analysis as a review of a grant. First, the appellate court must examine the decision of the trial court that a mistake occurred.

At this first stage, the appellate court must apply the correct scope of review, based on the rationale given by the trial court. There are two possible scopes of review to apply when appellate courts are determining the propriety of an order granting or denying a new trial. There is a narrow scope of review: where the trial court articulates a single mistake (or a finite set of mistakes), the appellate court's review is limited in scope to the stated reason, and the appellate court must review that reason under the appropriate standard.

Conversely, if the trial court leaves open the possibility that reasons additional to those specifically mentioned might warrant a new trial, or orders a new trial in the interests of justice, the appellate court applies a broad scope of review, examining the entire record for any reason sufficient to justify a new trial.

Even under a narrow scope of review, the appellate court might still need to examine the entire record to determine if there is support for any of the reasons provided by the trial court.

The appropriate standard of review also controls this initial layer of analysis. If the mistake involved a discretionary act, the appellate court will review for an abuse of discretion. If the mistake concerned an error of law, the court will scrutinize for legal error. If there were no mistakes at trial, the appellate court must reverse a decision by the trial court to grant a new trial because the trial court cannot order a new trial where no error of law or abuse of discretion occurred.

If the appellate court agrees with the determination of the trial court that a mistake occurred, it proceeds to the second level of analysis. The appellate court must then determine whether the trial court abused its discretion in ruling on the request for a new trial. Discretion must be exercised on the foundation of reason. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will. A finding by an appellate court that it

would have reached a different result than the trial court does not constitute a finding of an abuse of discretion. Where the record adequately supports the trial court's reasons and factual basis, the court did not abuse its discretion.

When determining whether the trial court abused its discretion, the appellate court must confine itself to the scope of review, as set forth in our preceding discussion. If the trial court has provided specific reasons for its ruling on a request for a new trial, and it is clear that the decision of the trial court is based exclusively on those reasons, applying a narrow scope of review, the appellate court may reverse the trial court's decision only if it finds no basis on the record to support any of those reasons. As a practical matter, a trial court's reference to a finite set of reasons is generally treated as conclusive proof that it would not have ordered a new trial on any other basis. Alternatively, where the trial court leaves open the possibility that there were reasons to grant or deny a new trial other than those it expressly offered, or the trial court justifies its decision on the interests of justice, an appellate court must apply a broad scope of review and affirm if it can glean any valid reason from the record.

*Harman ex rel. Harman v. Borah*, 562 Pa. 455, 467–69, 756 A.2d 1116, 1122–24 (2000) (citations, quotation marks, and alterations omitted). This Court may affirm on any basis. *Donnelly v. Bauer*, 553 Pa. 596, 611, 720 A.2d 447, 454 (1998).

■ We address the first two issues together. Wal–Mart raises a number of claims regarding its challenge to the class certification. Wal–Mart contends the trial court disregarded class action requirements by certifying and refusing to decertify a class of approximately 187,000 current and former Wal–Mart employees for claims of breach of contract, unjust enrichment, and violations of the WPCL and MWA without a method of class-wide proof that could show Wal–Mart's liability to each class member and with a vague and overbroad class definition. Wal–Mart requests judgment notwithstanding the verdict or, in the alternative, a new trial. Wal–Mart is not entitled to relief.

A trial court is vested with broad discretion in determining whether the criteria for maintaining a class action have been met, and its decision will not be disturbed on appeal unless the court neglected to consider the requirements of the rules governing class certification, or unless the court abused its discretion in applying the class certification rules. Moreover, it is the strong and oft-repeated policy of this Commonwealth that, in applying the rules for class certification, decisions should be made liberally and in favor of maintaining a class action.

*Liss & Marion, P.C., v. Recordex Acquisition Corp.*, 937 A.2d 503, 505 (Pa.Super.2007) (emphasis added and citations and quotation marks omitted); [11] *accord*

---

**11.** *Compare Cutler v. Wal–Mart Stores, Inc.*, 175 Md.App. 177, 927 A.2d 1 (2007), and cases cited therein, denying class certification where the courts do not liberally construe the class action rule.

Maryland does not share the liberal construction of the class action rule espoused by the Ninth Circuit in *Dukes [v. Wal–Mart, Inc.*, 474 F.3d 1214 (9th Cir.2007) ] and by

the Supreme Court of New Jersey in *Iliadis [v. Wal–Mart Stores, Inc.*, 191 N.J. 88, 922 A.2d 710 (2007) ]. The more exacting analysis of the class certification requirements in [*Wal–Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 557 (Tex.App.2002) ], *Basco [v. Wal–Mart Stores, Inc.*, 216 F.Supp.2d 592 (E.D.La.2002) ], *Petty [v. Wal–Mart Stores, Inc.*, 148 Ohio App.3d 348, 773 N.E.2d 576

*Debbs v. Chrysler Corp.*, 810 A.2d 137 (Pa.Super.2002); *Weismer by Weismer v. Beech–Nut Nutrition Corp.*, 419 Pa.Super. 403, 615 A.2d 428, 431 (1992); *D'Amelio v. Blue Cross of Lehigh Valley*, 347 Pa.Super. 441, 500 A.2d 1137, 1141 (1985); *Janicik v. Prudential Ins. Co. of Am.*, 305 Pa.Super. 120, 451 A.2d 451, 454 (1982); *Bell v. Beneficial Consumer Discount Co.*, 241 Pa.Super. 192, 360 A.2d 681, 688 (1976). "This is because such suits enable the assertion of claims that, in all likelihood, would not otherwise be litigated. *Bell, supra.*" *Debbs*, 810 A.2d at 153.

 This Court recently stated:

Pa.R.C.P. 1702 governs class actions in Pennsylvania and states, in pertinent part:

> One or more members of a class may sue or be sued as representative parties on behalf of all members in a class action only if
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class;
>
> (4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in Rule 1709 [12] and;
>
> (5) a class action provides a fair and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.[13]

(2002)], *Harrison [v. Wal–Mart Stores, Inc.*, 170 N.C.App. 545, 613 S.E.2d 322 (2005)] is more closely aligned with the Court of Appeals's interpretation of Md. Rule 2–231 articulated in [*Philip Morris Inc. v. Angeletti*, 358 Md. 689, 752 A.2d 200 (2000)] and *Creveling [v. GEICO*, 376 Md. 72, 828 A.2d 229 (2003)].
*Id.* at 14. Courts liberally construing class action rules have certified similar classes based upon similar issues as those in the case *sub judice. See, e.g., Salvas v. Wal–Mart Stores, Inc.*, 452 Mass. 337, 893 N.E.2d 1187, 1207 (2008) (the court would abuse its discretion in denying certification "by imposing, at the certification stage, the burden of proof that will be required of the plaintiffs at trial"). Class certification would not be denied "simply because affirmative defenses may be available against individual members." *Braun v. Wal–Mart, Inc.*, No. 19–CO–01–9790, 2003 WL 22990114, at *7 (D.Minn. Nov. 3, 2003) (holding, "Predominance will be found where generalized evidence may prove or disprove elements of a claim," even if "there may be individual facts unique to particular class members"); *see also Hale v. Wal–Mart Stores, Inc.*, 231 S.W.3d 215, 221 (Mo.Ct.App.2007) ("Likewise, '[b]ecause class certification is subject to later modification, a court should err in favor of, and not against, allowing maintenance of the class action.' "); *Armijo v.*

*Wal–Mart Stores, Inc.*, 142 N.M. 557, 168 P.3d 129, 142 (2007) (affirming the principle "that it is proper to err in favor of approving the class"); *Barnett v. Wal–Mart Stores, Inc.*, No. 55491–3–I, 2006 WL 1846531, at *2, 2006 Wash.App. LEXIS 1437, at *4–5 (Wash.Ct. App. July 3, 2006) (favoring liberal interpretation of class action rules).

**12.** Rule 1709 provides:
**Rule 1709. Criteria for Certification. Determination of Fair and Adequate Representation**
In determining whether the representative parties will fairly and adequately assert and protect the interests of the class, the court shall consider among other matters
(1) whether the attorney for the representative parties will adequately represent the interests of the class,
(2) whether the representative parties have a conflict of interest in the maintenance of the class action, and
(3) whether the representative parties have or can acquire adequate financial resources to assure that the interests of the class will not be harmed.
Pa. R.C.P. 1709.

**13.** Rule 1708 states in pertinent part:
**Rule 1708. Criteria for Certification. Determination of Class Action as Fair and Efficient Method of Adjudication**

Pa.R.C.P. 1702; *see* Pa.R.C.P. 1708 and 1709.

At a class certification hearing, the burden of proof lies with the proponent; however, since the hearing is akin to a preliminary hearing, it is not a heavy burden. The proponent need only present evidence sufficient to make out a prima facie case from which the court can conclude that the five class certification requirements are met. This will suffice unless the class opponent comes forward with contrary evidence; if there is an actual conflict on an essential fact, the proponent bears the risk of nonpersuasion.

At issue in this case are the second and third prerequisites for class certification—whether there are questions of law and fact common to the class and whether the claims or defenses of the parties are typical of the claims or defenses of the class. Common questions of law and fact will generally exist if the class members' legal grievances are directly trace-able to the same practice or course of conduct on the part of the class opponent. The common question of fact requirement means precisely that the facts must be substantially the same so that proof as to one claimant would be proof as to all. This is what gives the class action its legal viability. While the existence of individual questions of fact is not necessarily fatal, it is essential that there be a predominance of common issues, shared by all the class members, which can be justly resolved in a single proceeding.[14]

The typicality requirement is similar to the requirements of commonality and the adequacy of representation. The purpose of the typicality inquiry is to determine whether the class representative's overall position on the common issues is sufficiently aligned with that of the absent class members to ensure that her pursuit of her own interests will advance those of the proposed class

In determining whether a class action is a fair and efficient method of adjudicating the controversy, the court shall consider among other matters the criteria set forth in subdivisions (a) . . .

(a) Where monetary recovery alone is sought, the court shall consider

(1) whether common questions of law or fact predominate over any question affecting only individual members;

(2) the size of the class and the difficulties likely to be encountered in the management of the action as a class action;

(3) whether the prosecution of separate actions by or against individual members of the class would create a risk of

(i) inconsistent or varying adjudications with respect to individual members of the class which would confront the party opposing the class with incompatible standards of conduct;

(ii) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

(4) the extent and nature of any litigation already commenced by or against members of the class involving any of the same issues;

(5) whether the particular forum is appropriate for the litigation of the claims of the entire class;

(6) whether in view of the complexities of the issues or the expenses of litigation the separate claims of individual class members are insufficient in amount to support separate actions;

(7) whether it is likely that the amount which may be recovered by individual class members will be so small in relation to the expense and effort of administering the action as not to justify a class action.

Pa.R.C.P. 1708(a).

14. *Accord Salvas*, 893 N.E.2d at 1207; *Iliadis v. Wal–Mart Stores, Inc.*, 191 N.J. 88, 922 A.2d 710, 721 (2007); *Barnett*, 2006 WL 1846531, at *7, 2006 Wash.App. LEXIS 1437, at *25–26; *Braun*, 2003 WL 22990114, at *7.

members. Where there exists various intervening and possibly superseding causes of the damage, liability cannot be determined on a class-wide basis because individual issues would predominate issues of fact and law that are common to the class and the representatives of the class.

*Clark v. Pfizer Inc.*, 990 A.2d 17, 24–25 (Pa.Super.) (some citations, quotations, and punctuation marks omitted), *appeal denied*, 13 A.3d 473 (Pa.2010).[15] "Unlike its federal counterpart at Fed.R.Civ.P. 23(b), Pennsylvania's rule does not require that the class action method be 'superior' to alternative modes of suit." *Weinberg v. Sun Co.*, 740 A.2d 1152, 1162–63 (Pa.Super.1999) (citations omitted), *rev'd in part on other grounds*, 565 Pa. 612, 777 A.2d 442 (2001).[16] In *Janicik*, this Court held that "[t]he existence of individual questions essential to a class member's recovery is not necessarily fatal to the class, and is contemplated by the rules. *See* Pa. R.Civ.P. 1708(a)(1)." *Janicik*, 451 A.2d at 457.

In Pennsylvania all class members are plaintiffs in the action upon the filing of the complaint. A trial court is empowered to require parties wishing to be excluded from a particular class to file of record, by a specific date, a written election to be excluded from the class. The United States Supreme Court has sanctioned the use of this opt-out procedure for all types of class action plaintiffs, explaining: If the plaintiff's claim is sufficiently large or important that he wishes to litigate it on his own, he will likely have retained an attorney or thought about filing suit, and should be fully capable of exercising his right to opt out.

*Prince George Ctr., Inc. v. U.S. Gypsum Co.*, 704 A.2d 141, 145 (Pa.Super.1997) (citations and punctuation marks omitted). "Moreover, class members can assert a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are subject to the same harm will suffice." *Baldassari v. Suburban Cable TV Co.*, 808 A.2d 184, 191 n. 6 (Pa.Super.2002).

Class certification is a mixed question of law and fact. Courts should not dispose of class issues such as numerosity and

---

**15.** *Cf. Wal–Mart Stores, Inc. v. Bailey*, 808 N.E.2d 1198, 1199 (Ind.Ct.App.2004) (reversing trial court's grant of certification, finding "the class definition includes individuals who have no standing in the litigation"); *Cutler*, 927 A.2d at 14 ("[A]ppellants' claims did not affect the entirety of the class"); *Alix v. Wal–Mart Stores, Inc.*, 16 Misc.3d 844, 838 N.Y.S.2d 885, 889 (N.Y.Sup.Ct.2007) (all members of class must be aggrieved); *Harrison*, 613 S.E.2d at 327 (stating trial court's holding that "the proposed class included individuals who were not subject to the wage and hour violations that are the basis of Plaintiffs' claims"); *Petty*, 773 N.E.2d at 580 (class encompassed employees who were not subject to alleged violations). These jurisdictions do not construe class action certification rules liberally, as Pennsylvania does.

**16.** *Cf. Basco*, 216 F.Supp.2d at 600 (noting that federal rule requires class action be the superior method to resolve dispute); *In re Wal–Mart Wage & Hour Employment Practices Litig.*, No. 2:06–CV–00225–PMP–PAL, 2008 WL 3179315, at *21 (D.Nev. June 20, 2008) (denying class certification because class action was not superior method for adjudication of controversy); *Bailey*, 808 N.E.2d at 1202 (addressing issue of superiority for purposes of remand, although that was not dispositive finding); *Cutler*, 927 A.2d at 9 (rule requires class action be superior method to resolve dispute); *Alix*, 838 N.Y.S.2d at 902 (denying class certification in part because plaintiffs did not establish superiority of class action method); *Petty*, 773 N.E.2d at 577 (concluding record demonstrates superiority); *Lopez*, 93 S.W.3d at 560 (denying class certification in part based upon the fact that the rule "requires the class action to be superior to other available methods").

typicality based on the perceived adequacy or inadequacy of the underlying merits of the claim. On the other hand, courts may need to examine the elements of the underlying cause of action in order to dispose of class issues properly. [*See Weinberg v. Sun Co.*, 565 Pa. 612, 618, 777 A.2d 442, 446 (2001) ] (because false advertising claims under the UTPCPL require individualized proof of reliance, causation, and proof of loss, individual claims predominated over common issues; therefore, "the certification requirements of commonality and numerosity were not met").

*Debbs*, 810 A.2d at 154 (some citations omitted).

Wal–Mart contends that the trial court disregarded class action requirements "by certifying a class that lacked commonality and predominance and was defined imprecisely." Wal–Mart's Brief at 16. Further, Wal–Mart challenges the class certification of each of Appellees' claims, *viz.*, breach of contract, unjust enrichment, violations of the WPCL and the MWA. We thus state the required elements of each.

■■■■ A breach of contract action involves: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) damages. *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 716 (Pa.Super.2005). While every element must be pleaded specifically, it is axiomatic that a contract may be manifested orally, in writing, or as an inference from the acts and conduct of the parties. *Id.* (citation omitted).

■■■■ With respect to unjust enrichment, "[w]here one party has been unjustly enriched at the expense of another, he is required to make restitution to the other. In order to recover, there must be both (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is de-

nied." *Meehan v. Cheltenham Twp.*, 410 Pa. 446, 449, 189 A.2d 593, 595 (1963) (citing *Bailis v. Reconstruction Fin. Corp.*, 128 F.2d 857 (3d Cir.1942); Restatement, Restitution § 1, comment a (1936)). As amplified by this Court:

> The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. Whether the doctrine applies depends on the unique factual circumstances of each case. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

> Moreover, the most significant element of the doctrine is whether the enrichment of the defendant is *unjust.* The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff.

*Styer v. Hugo*, 422 Pa.Super. 262, 619 A.2d 347, 350 (1993) (quotation marks omitted).

*Stoeckinger v. Presidential Fin. Corp. of Del. Valley*, 948 A.2d 828, 833 (Pa.Super.2008). It is long-settled that "the quasi-contractual doctrine of unjust enrichment is inapplicable when the relationship between parties is founded on a written agreement or express contract." *Schott v. Westinghouse Elec. Corp.*, 436 Pa. 279, 290, 259 A.2d 443, 448 (1969); *accord Sevast v. Kakouras*, 591 Pa. 44, 53 n. 7, 915 A.2d 1147, 1153 n. 7 (2007). "Quasi-contracts may be found in the absence of any expression of assent by the party to be charged and may indeed be found in spite

of the party's contrary intention." *Schott*, 436 Pa. at 290–91, 259 A.2d at 449.

The WPCL is a statute permitting employees to recover unpaid wages. *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 968 (Pa.Super.), *appeal denied*, 602 Pa. 668, 980 A.2d 609 (2009). 43 P.S. § 260.9a states in relevant part:

(a) Any employe or group of employes, ... to whom any type of wages is payable may institute actions provided under this act.

(b) Actions by an employe, ... to whom any type of wages is payable to recover unpaid wages and liquidated damages....

\* \* \*

(f) The court in any action brought under this section shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow costs for reasonable attorneys' fees of any nature to be paid by the defendant.

43 P.S. § 260.9a(a), (b), (f).

The WPCL defines "wages" as follows:

§ 260.2a. **Definitions**

"**Wages.**" Includes all earnings of an employe, regardless of whether determined on time, task, piece, commission or other method of calculation. The term "wages" also includes fringe benefits or wage supplements whether payable by the employer from his funds or from amounts withheld from the employes' pay by the employer.

43 P.S. § 260.2a. "Fringe benefits" are defined:

"**Fringe benefits or wage supplements.**" Includes all monetary employer payments to provide benefits under any employe benefit plan, as defined in section 3(3) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.; as well as separation, vacation, holiday, or guaranteed pay; re-imbursement for expenses; union dues withheld from the employes' pay by the employer; and any other amount to be paid pursuant to an agreement to the employe, a third party or fund for the benefit of employes.

*Id.* (footnote omitted).

Section 260.3 of the WPCL requires that employers pay or provide the fringe benefits or wage supplements:

§ 260.3. **Regular payday**

\* \* \*

(b) Fringe benefits and wage supplements. Every employer who by agreement deducts union dues from employes' pay or agrees to pay or provide fringe benefits or wage supplements, must remit the deductions or pay or provide the fringe benefits or wage supplements, as required, within 10 days after such payments are required to be made to the union in case of dues or to a trust or pooled fund, or within 10 days after such payments are required to be made directly to the employe, or within 60 days of the date when proper claim was filed by the employe in situations where no required time for payment is specified.

43 P.S. § 260.3(b).

The Minimum Wage Act provides:

Employes are employed in some occupations in the Commonwealth of Pennsylvania for wages unreasonably low and not fairly commensurate with the value of the services rendered. Such a condition is contrary to public interest and public policy commands its regulation. Employes employed in such occupations are not as a class on a level of equality in bargaining with their employers in regard to minimum fair wage standards, and "freedom of contract" as applied to their relations with their employers is illusory. Judged by any reasonable

standard, wages in such occupations are often found to bear no relation to the fair value of the services rendered. In the absence of effective minimum fair wage rates for employes, the depression of wages by some employers constitutes a serious form of unfair competition against other employers, reduces the purchasing power of the workers and threatens the stability of the economy. The evils of unreasonable and unfair wages as they affect some employes employed in the Commonwealth of Pennsylvania are such as to render imperative the exercise of the police power of the Commonwealth for the protection of industry and of the employes employed therein and of the public interest of the community at large.

43 P.S. § 333.101. The statute establishes the minimum wage as $7.15. 43 P.S. § 333.104. The MWA guarantees overtime pay equivalent to one-and-one-half times the regular hourly pay. 43 P.S. § 333.104(c).

Appellees contend Wal–Mart's business practices, policies, business records, and their own policy of enforcing those policies by disciplining managers and associates who violate them, were uniform among all employees, and therefore common issues of fact predominate. Additionally, common issues of law predominate, *viz.*, whether the associates relied on the employee handbook and Wal–Mart's policies concerning off-the-clock work and rest breaks resulting in a unilateral contract which Wal–Mart breached. Instantly, a careful review of the voluminous record reveals the common questions of law and fact are directly traceable to Wal–Mart's corporate policies and practices as well as Wal–Mart's witnesses' testimony regard-

ing the proliferation and strict enforcement of those corporate polices. The common questions of fact rely on common questions of law. *See Clark*, 990 A.2d at 24–25.

Canetta Ivy Reid was director of corporate employment compliance for Wal–Mart. N.T., 9/28/06 (morning), at 58.[17] She testified about Wal–Mart's policy regarding rest breaks, denominated as PD–07:

Q: How are Wal–Mart associates informed about the rest break and meal period policy?

A: Well, from day one, they hear about it in orientation when they—their first day at work. It's also in the handbook that they receive. There are posters. There is a computer-based learning, CBL, module. Managers cover it in talking points with associates. It's emphasized throughout the business.

Q: You said CBL. What actually are those?

A: Well, it's computer-based learning. And basically, it's where an associate will sit down at a computer terminal, and there is what we call a module that will be loaded on to that computer, and it will give them a video, and it will also give them text. Somebody will be talking and explaining different policies and different concepts. And throughout that video, they may be asked questions, or they may be asked questions at the end to test their knowledge in that particular area.

*Id.* at 70–71; R.R.1963a–64a. To facilitate compliance with Wal–Mart's policies, she testified that they conducted training for associates:

Q: What is this document, Mrs. Reid?

**17.** Although we attempt to cite, as much as possible, to the notes of testimony and the reproduced record, where there is only a cita-

tion to the original record, the notes of testimony were not included in the reproduced record.

A: These are the talking points that I was referring to that we rolled out along with the policy revisions.

Q: If you can go to the fourth page. What is this page?

A: Well, our talking points, the way that they were formatted was there was information for managers, and then we said here are the things you specifically need to cover, as it says here, with all associates on all shifts, go through this specific information with them.

Q: And who was this document sent to?

A: This went to all managers. It went to, at that time, district managers. And again, the facility managers were the ones who instructed to cover it with associates in the facility.

Q: By facility managers, you mean store managers and Sam's Club managers?

A: Correct.

Q: So Wal–Mart stores and Sam's, just to be clear?

A: Correct, correct.

Q: So it was across the company. Let's go through these talking points that the managers were instructed to go through. If you'll look down to the one that starts managers and supervisors. This provision, Mrs. Reid, what does it convey to the associates?

A: The last bullet?

Q: Yes, ma'am.

A: Well, I mean, it was always our policy that managers should not interrupt associates on their breaks and their meal periods for any work-related reason. And this was just reemphasizing that and making sure that our hourly coworkers also didn't interrupt our associates while they were on breaks and meals.

Q: Let's go to the next bullet. This next provision says, "Although it has been our practice to coach supervisors and managers who repeatedly interrupt or fail to provide associates with their breaks and/or meals periods, it will now be an expressly stated part of the policy that performance coaching will occur in these instances. . . ."

Q: Does Wal–Mart want its employees to take their meal and rest breaks?

A: Absolutely. I mean, that's why we have the policy.

Q: And why is that?

A: I mean, again, it's something that we think is good for our associates. It's the right thing to do for our associates. And for as long as I've been here, we've done it that way. And if associates want that time to rejuvenate, we think they should have it.

Q: Now, since 2003, you've had this provision in the policy that says managers need to approve skipping these breaks; is that right?

A: That's correct. . . .

Q: Let's talk a little bit about the revisions to PD–07 that you've made. Let's look at demonstrative 91. This is going back to the March 2003 policy that we looked at a little bit before, but can you generally explain the changes that were made in 2003?

A: Yeah. One of the first things we did is, we added state-specific drop down boxes to the policy to cover what the state's specific requirements were for those states that had state-specific requirements. We then, as we talked about with the talking points, emphasized our expectations for our associates in terms of compliance with our policy on breaks and meal periods. We reemphasized managers' responsibilities and our expectations for them. And we also emphasized the potential disciplinary action for both managers and associates. But then we also provided that clarifica-

tion about associate's abilities to skip a meal period or a break, provided they had approval from their manager....

Q: And off-the-clock is also important here, so let's talk about Wal–Mart's policy against off-the-clock work. What is Wal–Mart's policy, just in simple terms?

A: Well, our policy is plain and simple. Off-the-clock work is not allowed. Associates are to be paid for all time worked, and so they should not be working off-the-clock. They should not be directed to work off-the-clock. They should not be allowed to work off-the-clock, and we've written a policy on that.

Q: Has that policy been the same since you joined Wal–Mart in 1996?

A: That part has always been very clear.

Q: Let's look at the actual language of the policy. Plaintiffs' Exhibit 27A. Look at that first paragraph. It says, "It is against Wal–Mart policy for any associate to perform work without being paid." Now, Mrs. Reid, does that mean they also shouldn't voluntarily also do off-the-clock work?

A: That is correct.

Q: We are committed—it continues. "We're committed to compensating every associate for the work they perform. No Wal–Mart associate should perform work for the company without compensation...."

Q: It continues: "It's a violation of the law and company policy to work off-the-clock or for a supervisor or manager to request that associates work off-the-clock. If a violation is recorded, a proper and thorough investigation will be implemented and corrective action taken when necessary. Associates who work off-the-clock will be paid for such time. The coaching policy will be used to correct violations. And the facility manag-

er must ensure associates are properly compensated...."

Q: Now, it talks in here about reporting any violations of the off-the-clock policy. How does an associate go about reporting something like this happening?

A: Well, again, they can report it to any member of management. They can report it using the ethics hotline, which is a 1–800 number that they call, and it comes into the home office. They can report it to—again, they can report it, use our open-door and report it to any member of management, not just the ones in their facility. They can call somebody in Bentonville as well.

Q: You mentioned the ethics hotline. For [sic] long has that 1–800 been in existence for employees to call to report anything going on in their stores?

A: Well, the concept of the 1–800 number for the associates to call has been around again since before I joined the company. It was renamed Ethics Hotline in 2004. But it was available, and it was the same, essentially the same number before then.

Q: How are employees made aware they have a phone number to call?

A: Well, that policy you just reviewed, it's in there. This information is covered with associates again during orientation. It's in the computer-based learning, CBL, module. It's on posters throughout the facility. The ethics office advertises that.

*Id.* at 73–75, 81–82, 92–93, 120–23. She testified that there were posters over the time clocks which reiterated the policy of not working off-the-clock:

Q: We have an old version of that poster, and let's take a look at it. It's Plaintiffs' 37. It says: "Clock in. We appreciate dedication, but do not volunteer off-duty time to work." Under no circumstances should you perform work

without being compensated. "It is against Wal–Mart policy for an hourly associate to work off-the-clock for a supervisor or to request or require an associate to work off-the-clock or for a supervisor to take insufficient action when they know an associate is working off-the-clock."

*Id.* at 126. She testified further:

Q: Do you understand that you are the designated representative for Wal–Mart most knowledgeable about several topics?

A: I do, yes.

Q: One of those being PD–07, rest and meal break policy, including but not limited to enforcement and revisions to that policy. Do you understand that?

A: Yes, I do.

Q: Do you understand that you were designated as the person most knowledgeable to speak on behalf of Wal–Mart regarding PD–43, the off-the-clock policy including but not limited to enforcement and any revisions to that policy?

A: I do.

Q: And do you understand that the third item for which you were designated as the person most knowledgeable at Wal–Mart to testify in regard to, is Wal–Mart's computerized reports and the use of those reports to ensure compliance with company policy and applicable laws?

A: Yes. . . .

N.T., 9/28/06 (afternoon), at 54–55. When she did not concede that paid rest breaks were a benefit of employment, a video of her deposition testimony in another case involving Wal–Mart was played for the jury:

(The following video clip is played for the jury:)

"Q: The paid rest breaks are a benefit of employment, right?

A: I think they could be viewed as a benefit, yeah. . . ."

Q: Does that refresh your recollection that you have testified under oath that paid rest breaks and unpaid meal periods are a benefit of employment at Wal–Mart?

A: Well, certainly that's what I said, yeah. . . .

Q: You testified earlier that at orientation the hourly associates are told they get paid rest breaks and unpaid meal periods; correct?

A: They are told about our policy regarding breaks and meal periods, yes.

Q: Have you ever looked at Wal–Mart's benefits handbook?

A: The SPD? Yes.

Q: Does it not state under Benefits, you receive paid rest breaks?

A: I don't know the answer to that question. . . .

Q: My Money and My Financial Future. Do you see the second item there?

A: Yes, My Money and Financial Future.

Q: What does it state as a benefit of employment at Wal–Mart?

\*　　\*　　\*

THE WITNESS: I don't see where it says Benefits is what I am missing. . . .

Q: Let me read it for you. "Many people think the word 'benefits' refers only to medical insurance. Not so at Wal–Mart and Sam's Club. We are proud to offer you a comprehensive benefits package ranging from profit sharing to medical insurance to child care discounts. Below you will find many benefits and opportunities for which you may be eligible." Did I read that correctly?

A: Yes.

Q: What's the second item under My Money and My Financial Future that Wal–Mart says in its own handbook is a benefit of employment?

A: The break periods?

Q: Yes. Do you now agree that break periods are a benefit of employment at Wal–Mart?

A: Again, as I said before, I did not mean benefits in the sense of a ERISA benefits. But yes.

Q: So rest breaks and meal breaks are a benefit of employment promised to the hourly associates when they come to work at Wal–Mart, right?

A: It is certainly beneficial to Associates, yes.

*Id.* at 60–63. Mrs. Reid was asked about the Shipley report:

Q: You agree that Wal–Mart's internal, independent audit staff stopped doing audits for rest and meal break compliance after the Shipley report in July of 2000, right?

A: I agree the Internal Audit Department did not do more audits.

*Id.* at 78. Mrs. Reid proceeded to testify about the timeclock lockout:

Q: The first one is Timeclock Lockout. There is two [sic] Timeclock lockouts, right? One that keeps an employee off the clock for a 30–minute meal. Correct?

A: Actually, one is clockout-lockout, and the other is a meal period time lockout.

Q: Which one is this?

A: This is the meal period timeclock lockout.

Q: All right, so this is not where the employees are locked off the computerized devices such as cash registers, CBL terminals, TL and E kiosk machines while they are off the clock, right?

A: That is accurate.

Q: You know the reason that that lockout was put into place was litigation, correct?

A: No.

Q: You don't know that?

A: I don't agree with that, no.

\* \* \*

Q: This is an E-mail from Greg Campbell to Carol Mosely, correct?

A: Yes, it looks like.

Q: A carbon copy to Tracey Engelbrecht, correct?

A: Yes.

Q: The subject was log-in verification, correct?

A: Correct.

Q: It's talking about locking the employees off the CBLs, the SMART telxons, the pharmacy log-ins, the Tire, Lube and Express log-ins, the vision center log-ins, and the POS, which is the cash register. Correct?

A: Yes.

Q: All right.

\* \* \*

Q: "Please help us as you are aware of this hot topic with all the current litigation we are involved in." Did I read that right?

A: Yes.

Q: It's a true statement, is it not, that these log-ins to prevent people from operating the electronic devices at Wal–Mart was done for litigation purposes?

A: I disagree.

Q: This suggestion came out of a task force that was put into place in late 2002, correct?

A: This suggestion? Yes.

Q: Yes. And it was put into place at the period of time when you were the Director of Special Projects, correct?

A: This was actually rolled—yes, by then I was in the new role.

Q: All right. You were involved with the role (sic) out of this new project, were you not?

A: We were informed of the roll out, but we did not do the roll out. My team did not do the roll out.

Q: The team that came up with this suggestion was formed to help Wal–Mart's lawyers respond to litigation involving off-the-clock allegations, correct?

A: That was one of the purposes of this team, yes.

Q: The other purpose was to identify instances where Wal–Mart employees were working off the clock, correct?

A: Certainly that would have been something they would have wanted to work on, yes.

*Id.* at 82–85. Mrs. Reid testified that, pursuant to the policy known as PD–43, managers were not required to report employee complaints:

Q: You do not know how many associates in the State of Pennsylvania in the last eight years have reported to store managers that they have been forced to work off the clock in violation of PD–43; correct?

A: That's correct.

Q: And the reason is, there is no requirement upon a manager to forward that complaint made by an associate to upper levels of management; true?

A: I disagree with that statement.

Q: Okay. Let's talk about what happens if a store manager reports that he has forced an employee to work off the clock. That manager is subject to discipline, is he not, or she not?

A: Yes, certainly.

Q: And if a member of salaried management reports that one of their fellow managers is making employees work off

the clock, that manager who is making associates work off the clock is subject to discipline, correct?

A: Of course.

Q: Wal–Mart requires its hourly associates to be team players, does it not?

A: I don't know where that's written, but certainly, yeah, teamwork is great.

Q: Wal–Mart requires its salaried management to be team players, correct?

A: Again, I have not seen that written anywhere, but teamwork is great.

Q: It's true, is it not, that a member of salaried management cannot apply for promotion if there is a coaching within the last twelve months in their file?

A: Yeah, that's our policy.

Q: Right, so a manager who self reports that, I am forcing an associate to work off the clock or work through their rest breaks or through their meal breaks, is subject to being disciplined and therefore not eligible for promotion, correct?

A: They probably would be fired, so yeah, they would not get that promotion.

Q: Similarly, if Store Manager Bob reports that Co–Manager Steve is making employees work off the clock through their rest breaks and meal periods, Co–Manager Steve can't apply for a promotion, correct?

A: If Co–Manager Steve is coached, that would be accurate.

*Id.* at 94–96.

Mrs. Reid testified further about Wal–Mart's policy of not working off the clock:

Q: You also stick up all sorts of posters like we saw all over the place, Do not work off the clock. Right?

A: We certainly do.

Q: You put it in policies?

A: Yes.

Q: And the reason that you do all that, why Wal–Mart does all that, is because you know you got a widespread problem with employees working off the clock, correct?

A: That is absolutely not true.

Q: If you didn't have a widespread problem why do you go through all these measures?

A: Because we choose to educate our Associates about our policies and our expectations, and we want to make sure that they are aware of our off-the-clock policy and what our expectations are for them in terms of paying them for every minute that they work.

*Id.* at 97–98.

The jury also heard testimony from Mrs. Reid regarding understaffing and missed breaks by cashiers:

Q: Okay. Well, let's go to Plaintiff's Exhibit 480.... This is the Dallas meeting highlights, and I believe the date would be in 1999. Were you at that meeting?

A: I do not remember.

Q: Tom Coughlin, again, that's the CEO and Vice Chairman of Wal–Mart, the last we heard from him, correct?

A: I am sorry, in '99?

Q: Well, the last we heard from Mr. Coughlin in sworn testimony, that's what his job titles were, correct?

A: Yes.

Q: All right. "Top Five Reason Cashiers Quit". Do you see that?

A: I do.

Q: What are the first two bullet points?

A: It says, Can't get breaks, and Understaffed.

Q: Do you disagree with Mr. Coughlin that the top five reasons Wal–Mart cashiers quit are they can't get their breaks and the stores are understaffed?

A: I don't know.

N.T., 9/29/06 (morning), at 32. Mrs. Reid was also questioned about an internal memorandum from a holiday meeting which occurred in 2002. *Id.* at 65–66.

Q: What's the document?

A: It appears to be notes from either a year beginning meeting or a holiday meeting.

Q: And the holiday meetings or the year beginning meetings are the top key executives get together and they discuss what they want to do with Wal–Mart during the year. Correct?

A: No, actually, it's when they bring in the managers and they kind of set the direction for the year, and they show them merchandise and talk about the plans for the year.

\* \* \*

Q: First page, General Session One. Jim Hayworth addresses the gathering. Correct?

A: These are notes from a speech—it looks like its notes from a speech he made.

\* \* \*

Q: You would agree with me that what's being reported in this gathering is that Wal–Mart's turnover rate is high. Correct?

A: High for Wal–Mart, yeah.

Q: Well, the statement is, "Why is Wal–Mart's turnover high," correct?

A: Yes.

Q: And it says, "44 percent of turnover is because of Management and its practices." Correct?

A: I see that.

*Id.* at 68–69.

Coleman H. Peterson was executive vice president of human resources, known as People Division. He was responsible for

human resources world-wide when he retired from Wal–Mart in 2004. N.T., 10/5/06 (afternoon), at 153. He reported to the president and chief executive officer. N.T., 10/6/06 (morning), at 15. He was questioned about a memo dated August 3, 1998, from Kendall Schwindt that went to district managers, regionals, and to Tom Coughlin, president of Wal–Mart at the time the memo was sent. *Id.*

Q: In 1998 Mr. Schwindt was reporting to senior levels of management that a major issue from the Grass Roots was that the Associates were not receiving scheduled breaks and lunches. Correct?

A: That's what the memo reports, yes.

*Id.* at 16. Mr. Peterson testified that he did not agree with this assessment. *Id.* at 15.

A: Twice a year Wal–Mart has what we call major meetings. At the beginning of the year there is something called the Year Beginning meeting, and in the fall there is something called the Back–to–School meeting or the Holiday meetings. And all store managers, in some cases assistant store managers, but then all the district managers, regional vice presidents and kind of top management of Wal–Mart are present there.

*Id.* at 16. He stated that he believed he was present when Mr. Coughlin discussed with the group the five reasons cashiers quit. *Id.* at 17.

Q: You heard, did you not, that Mr. Coughlin stated the top reason cashiers quit is they can't get their breaks. Do you remember that?

A: No, sir, I don't think that that's accurate. That's not what he said.

Q: And the second bullet point under here for the top five reasons cashiers quit is that the stores are understaffed. Do you remember him saying that?

A: No, sir, I do not.

Q: This is an internal Wal–Mart document, is it not?

A: Yes, sir, that's correct, it is.

Q: I mean it's posted on your Workbench, correct?

A: Yes, sir, but what he said and what the memo says are two different things.

THE COURT: What does posted on your Workbench mean?

MR. BRIDGERS: That's what I was going to ask.

THE COURT: Okay, good.

Q: Tell the jury what the Workbench is?

A: There is an internet system within Wal–Mart where all Wal–Mart associates can read. It doesn't go to the outside but it's inside. And so after meetings, generally what is done is just kind of a summary of what took place at meetings and then it's kind of put on the website so that management people who were not able to make the meeting can go to that website and kind of see what was talked about and what the key points were.

Q: And when this was put on the Workbench, that was for every Associate with access to a Wal–Mart computer to find out what Mr. Coughlin said at that meeting, correct?

A: That would be correct, yes.

*Id.* at 17–19. Mr. Peterson was then questioned about a memo dated October 9, 2000, from Mr. Oneil Clark to Don Harris. *Id.* at 20.

Q: Sir, now that we are on the same page, do you now remember when you originally saw this four months after the Shipley Audit that you were advised that meal and break exceptions was a chronic problem and the exceptions were running between 300 and 600 daily?

A: No, sir, I was not particularly struck by that. I was not, no.

Q: And you understand that 300 to 600 daily means per store. Do you not?

A: That's what the memo reports, yes.

Q: Rather than putting in the salaried personnel manager, what Wal–Mart did instead was eliminate rest break punching so there wouldn't be so many exceptions to investigate, correct?

A: I am not sure I understand the relationship between the two so I would say no, sir.

Q: Well, you know that—let's see, October, November, December, January, three months later, Mr. Harris is advising the Wal–Mart Management that we are going to eliminate rest break punching. You know that, don't you?

*Id.* at 27.

Dr. Baggett testified about Wal–Mart's business records:

Q: The records show the swipes made by employees, correct? . . . .

A: No, sir. They're a reflection of the activity of the associates.

Q: That's my point. And the activity of the associate is to either go to the time clock and swipe to create a record of a break, right?

A: Yes, sir.

Q: And whether the associate does that, you can see how much time there is between they swipe out for a meal or a break and when they swipe back in, correct?

A: Yes, sir, that's correct.

Q: And that's measurable by you and your computer program as a statistician, correct?

A: Yes, sir, that's correct.

Q: The other thing that the records show is in many instances, that the employee did not swipe for a meal break or arrest [sic] break at all on a given today [sic], right?

A: Yes, sir, that's correct.

Q: And that's identifiable objectively from those swiping records, correct?

A: Yes, sir, along with other support information from Wal–Mart that validates those records.

Q: And you are able to and have counted up all the times that an associate either didn't swipe at all or did swipe but swiped back in sooner than 30 minutes for a meal break or sooner than 15 minutes for a rest break, correct?

A: Yes, that's correct.

N.T., 9/19/06 (morning), at 18–19; R.R. at 1650a–51a.

After being qualified as an expert, Dr. Baggett testified:

Q: And were you given an assignment by plaintiff's counsel in this litigation?

A: Yes.

Q: Can you tell the jury [what] that assignment was?

A: The assignment was to take a large, and I emphasize large, amount of data that was provided by Wal–Mart and condense it down and present it in a form that is easy for the jury to understand.

Q: And I note that your binding has just been put before you. Glad to see it made it up there. Dr. Baggett, did you in fact summarize and finalize hourly employee time records for all 139 Wal–Mart stores in the State of Pennsylvania from 1998 through the beginning of 2006?

A: Yes, I did.

Q: And were all those—did all that data—that's data provided by Wal–Mart?

A: Yes . . . .

Q: My question is, as a general matter so the jury can understand what Wal–Mart does with this document, does the

Payroll Scheduling Guide set out how Wal–Mart's time-keeping system works?

A: Yes.

Q: And you see the six steps we have up in the demonstrative on the screen?

A: Yes.

Q: Can you just run through those steps? Are those all in the Payroll Scheduling Guide in great detail?

A: Yes. Well, first, the employee will clock—will swipe a time card whenever they go for a break or lunch or swipe in at the first of the day or swipe out when they go home.

Q: And we saw that in the PD–07 just now when we looked at it, the obligation to punch in and out for rest breaks and meal breaks?

A: Yes, that's correct. And then there's time, something called a time clock punch exception report that's generated, and this report contains information like missed meals, missed rest breaks, short meals, and short rest breaks, among other things.

And then the Payroll Scheduling Guide specifies that the store managers investigate the exceptions and reconcile those. And after those are reconciled, the time clock archive report is generated in its finalized version right here.

Q: What happens next?

A: What happens after that is, payroll is generated. And again, this is in the Payroll Scheduling Guide. And once the store managers receive the checks, they reconcile the hours on the check with what's on item four, the time clock archive report, and—

Q: I'm sorry.

A: —if those match, they then assign the—they give the check to the employee.

Q: The ultimate activity, the employee gets paid?

A: Yes.

Q: I'd like to take just a few minutes, hopefully only a few minutes, and go through some of the specific sections in the Payroll Scheduling Guide. If I could direct your attention, Dr. Baggett, I want to go step by step through these things we've identified in the demonstrative. If I can direct your attention, sir, to Section 809 of the Payroll Scheduling Guide. . . . Dr. Baggett, what about Payroll Scheduling Guide section 809, the time clock punch exception report, was important to you in formulating your opinion?

A: Well, there's two parts of this that are important to me. The first part is that this is Wal–Mart's own guide in their own language where it describes the things that you will find in the time clock punch exceptions report. And among those are about meal, short break, too few meals and too few breaks.

Q: Now those are Wal–Mart's own words about how it reads the punches in the time-keeping system in its own guide for the time-keeping systems; is that correct?

A: Yes, that's correct.

Q: And Dr. Baggett, was there anything else in the Payroll Scheduling Guide Section 809 that was important to you?

A: Yes, at the bottom of this same page.

Q: What about that section?

A: It states what's supposed to be done with the report, and it states specifically management should use this report to monitor associates and the type of exceptions that occur. . . .

Q: Dr. Baggett, I'd like to put up an actual sample of time clock punch exception report so the jury can see closely what we're all talking about when we talk about time clock punch exception report. . . . Dr. Baggett, can you tell me

what was important about Plaintiffs' Exhibit 2–b?

A: Yes. Yes. At the top of the page, it states that the following rules apply to all hourly associates.

Q: And do you understand that all the rules that are referred to in this legend to the time clock punch exception report are the same rules Mr. Campbell was speaking about yesterday in his video deposition?

A: Yes.

Q: And these are based upon Wal–Mart's corporate policies?

A: Yes.

Q: Dr. Baggett, is there anything else that you found important in Plaintiffs' Exhibit 2–b?

A: Yes. The rules include, among other things—and these are things that show up on the exception report—short break, short meal, too few breaks, and too few meals.

Q: Again, Wal–Mart's own words in its time clock punch exception report?

A: Yes.

Q: Dr. Baggett, if we can take a look now at the actual—this is the legend to the report. Can you explain what a legend is?

A: Yes. It is a guide to help you interpret the report.

Q: And now can we take a look, still as part of Plaintiffs' Exhibit 2–b.... Was there anything in particular that was important to you in formulating your opinions in this case on this page?

A: Yes.

Q: What was it?

A: Well, this is important in that this is an example of the exceptions report, and what it lists are the actual exceptions that occurred for a day. And what's interesting about this one is, we have Dolores Hummel identified with too few meals and too few breaks for one shift on May 30, 2000.

\* \* \*

Q: Dr. Baggett, what about this excerpt from [Appellee]s' Exhibit 83, Ms. Hummel's time clock are [sic] archive report for May 30th, 2000, is important to you?

A: Well, down below is, this number is the total hours worked. There's a legend over here to the side that indicates what those two rows are. And these are in hundredths of hours. So 6.5 would be six-and-a-half hours, for example. So she's worked for 6.82 hours and had .2 hours of meal breaks. But within—so that shift earned two breaks and one meal, but only one break is recorded. So this is in military time. She clocked in the morning at 8:01, went to her break at 10:06, came back from her break at 10:18. It was a 12–minute rest break. And then clocked out at the end of the today [sic] at 2:50. Is that 2:50? 2:50.

Q: Now, Dr. Baggett, under Wal–Mart's policy, corporate policy, PD–07, based upon your review of that policy, did Ms. Hummel earn—was she promised two rest breaks or that shift and meal period?

A: Yes, based upon PD–07 and if she works over six hours for that shift, then during that shift, she earned two rest breaks and one meal.

\* \* \*

Q: Dr. Baggett, up on the screen is Payroll Scheduling guide 701. What about this document was important to you?

A: Well, this section all the way up through I believe the Payroll Scheduling Guide, Section 705, describes how the time-keeping record is maintained and edited.

Q: And does Payroll Scheduling Guide 701 explain how adjustments and edits are made on the computer system for individual punches?

A: Yes.

Q: If you can turn, Dr. Baggett, to Section 702? That's at page WMB–204. What about Payroll Scheduling Guide 702 was important to you?

A: Well, this describes the punch error report. And basically a punch error is just an odd number of punches in a day. For example, if you just clock in in the morning and clock out, say, a couple of hours later, that would be two punches. And if it's just one punch then there's a problem with it.

Q: Now, we can turn, Dr. Baggett, to Section, Payroll Scheduling Guide Section 703. That starts at page WMB–211. What about this section of the Payroll Scheduling Guide was important to you?

A: This describes how the time clock record can be edited by Wal–Mart personnel in order to maintain its accuracy.

Q: We can go on to Section 704 of the Payroll Scheduling Guide. That starts at page WMB–220. That's titled, Editing and Finalizing Payroll, Finalize Daily. [Sic] About this section was important to you?

A: This section just describes a little bit more about editing and also about finalizing the payroll or finalizing the time clock archive record for the paychecks to be written off of it.

Q: This section's called Finalize Daily?

A: Yes.

Q: Is this for finalization of the specific days' payroll hours the following day?

A: Yes.

Q: And if I could direct your attention, sir, to Section 705 which starts at WMB–222. What about this section was important to you, Finalize Weekly?

A: This is the same thing as the daily, only it's a weekly finalization. So when—what the definition of finalized weekly is, it means all of the errors are removed from the time clock record via the reports that are printed out that go with it.

Q: Now see the sentence that Ryan highlighted? "Finalizing weekly payroll hours transmits the payroll hours for your store associates to the home office." Do you have an understanding, sir, what the home office is as it's used in this Payroll Scheduling Guide?

A: Yes.

Q: What's that?

A: That would be Bentonville.

Q: Wal–Mart's corporate headquarters?

A: Yes.

Q: Dr. Baggett, if we could look at Section 805 of the Payroll Scheduling Guide that starts at WMB–232 and that section entitled Time Clock Archive Report. Those are the records you've worked with on behalf of Plaintiffs' counsel, is that correct?

A: Yes. The time clock archive report is generated from the same records that I worked with.

Q: Now, what about Payroll Scheduling Guide, Section 805, was important to you in formulating your opinion?

A: Well, it defines what the time clock archive report is and which very simply shows the total time worked by day during the pay period, both actual and edited, for each associate.

Q: And this is a definition in Wal–Mart's own manual, Wal–Mart's Bible of the Payroll Scheduling Guide, of what the time clock archive report is; is that correct?

A: That's correct.

Q: Dr. Baggett, is there anything else in Section 805 that was important to you?

A: Yes. There's a retention time stated that the time clock archive report—again, that's the same data that I work with and that the exceptions, Wal-Mart's exceptions report, is printed from, that those records are to be retained for five years.

Q: So Wal–Mart keeps this data as a general matter for five years?

A: Yes.

Q: And do you have any understanding, sir, as to why they do that?

A: Well, yes. I understand that these types of records need to be maintained as part of law, because—

\* \* \*

A: And my understanding is that they're kept because tax information is provided, withholding tax, Social Security information's, [sic] provided to the federal government from these records.

Q: And to the government of the state of Pennsylvania?

A: Yes.

Q: The Commonwealth of Pennsylvania.

A: Yes.

Q: Dr. Baggett, if I could direct your attention next to six 706—I'm sorry. Well, let's go to the 706 of the payroll [scheduling] guide that begins at page 224 of Plaintiffs' Exhibit 54. Now Doctor Baggett, can you tell me with [sic] what was important, with [sic] what was important about Payroll Scheduling Guide seven on '06 in your formulation of your opinions?

A: Well, this is the section that deals with where a store supervisor verifies the hours on the check that we talked about a little while ago and confirms those hours with the time clock record itself.

Q: Wal–Mart doesn't pay its associates unless the numbers on the time clock archive report and the numbers on the paychecks match; is that correct?

A: That's correct. There's a direct link, of course, between the hours and the paycheck. . . .

Q: How many shifts did you have in your data?

A: There were about 46 million shifts.

Q: And were those all the shifts that the employees in the State of Pennsylvania worked during the period between 1998 and 2006?

A: No. Those were all the shifts that I received from Wal–Mart.

Q: Did Wal–Mart provide all of the shifts, the data on the shifts worked by employees?

A: No.

Q: Do you have any understanding as to why some of the shifts were missing, some of the data on the shifts?

A: There's some data that's just completely missing, and I don't know why that's missing. But there's other data that, as you saw in one of the slides before, that's just too hard to read to be able to key in. So that was—we—I considered this as missing as well.

Q: Dr. Baggett, did Wal–Mart maintain this data, the time clock archive data, and punches in two different formats during the course of the period from 1998 to 2006?

A: Yes. . . .

Q: And prior to January 2001, was all this time clock archive data, was that kept in paper?

A: Yes. . . .

Q: And starting in about January of 2001, did Wal–Mart begin maintaining its time clock data in different format?

A: Yes.

Q: Can you explain to the jury what that format was?

A: Well, after January of—after about January of 2001, they started keeping data on computer, so it was in an electronic form that was easier to interpret by a computer.

Q: And in connection with the work that you did on the data, did you have to combine the information on the paper data with the information in the electronic date [sic]?

A: Yes.

Q: Can you explain just generally how that was accomplished?

A: Yes. Since the paper data couldn't be handled by computer, we have to have the paper data, the time clock record on paper, translated into an electronic format, to it was hand-keyed in.

Q: And were there all sorts of—strike that. Ultimately was all of the data provided by Wal–Mart keyed in?

A: Yes.

Q: And were you able then to review that data in your computer using statistical methods and computer programming?

A: Yes....

Q: And I'd like to just direct your attention to, I think the next one in your book is Plaintiff's Exhibit 142 for identification. It's a document dated January 4, 2001, from Don Harris, changes in payroll processes. What about that was important to you in formulating your opinion?

A: On the third paragraph down, this is a directive from Don Harris from Wal–Mart. Says: ["]Secondly, effective February 10th, we will no longer require hourly associates to clock in or out for their break periods...."

Q: Dr. Baggett, I'd like to direct your attention to Exhibit 437.... Dr. Bag-

gett, did you review this document, this part of Plaintiff's 437, which is a memo from Pat Harris to Nancy Bass entitled Break Hours, and it's dated December 4, 2000?

A: Yes.

Q: And can you tell the jury what you found important about this document? And I don't know if everyone—perhaps you could read the text in it because it's still a little hard to make out in that size.

A: It says these numbers are based on computing one day's worth of break time over 15 minutes by the number of stores across the country, I think, times 365 and divided by 60....

Q: Dr. Baggett, why was this document important to you? ...

A: Because it's a calculation by Wal–Mart across the country, and that amount is the value that they dock employees for rest breaks over 15 minutes.

Q: And do you know that because there's an answer to one of Plaintiffs' Interrogatories in this Plaintiffs' 437 [sic] that describes that?

A: Yes....

Q: What about this explanation was important to you in understanding the document?

A: Well, it described how that number was calculated. And it begins—

Q: I'm sorry to interrupt. The numbers we're talking about was the 26 million dollar number that was handwritten on that document.

A: Yes....

Q: And can you explain to the jury what those 3,185,444 hours were that were being discussed in this document.

A: That's number of hours across the United States or 3,000 stores at the time that Wal–Mart docks its employees for rest breaks over 15 minutes.

\* \* \*

Q: And I'd like to direct you still in your binder to Plaintiffs' Exhibit 46, Plaintiffs' Trial Exhibit 46. This is a document dated April 17, 2000, and it's from Greg Campbell. We saw Mr. Campbell testify yesterday as part of the information systems division at Wal–Mart, the computer people at Wal–Mart. What about this document, Dr. Baggett, is, was, of importance to you in formulating your opinions?

A: Well, this is one example of Wal–Mart's reliance on the time clock punch exception report. And that's the same report that lists the missed breaks and meals and short breaks and meals. And in particular, item two down below states the time clock punch exception report is a report that reported any kind of labor violation that could have some legal repercussions. . . .

Q: Dr. Baggett, what does the document state with regard to why it was sent?

A: Up at the top, it says: "There has been a bit of confusion in relation to the exception reporting. I am hoping to clear it up with this e-mail."

Q: Now, Dr. Baggett, the date of this document, April 17, 2000, was that significant to you for any reason?

A: Well, it's close to the time of the Shipley [A]udit.

Q: And was the Shipley [A]udit, Plaintiffs' Exhibit 88, was that another document you relied on in forming your opinions in this case?

A: Yes. . . .

Q: Dr. Baggett, can you tell me what about the Shipley [A]udit was important to you in formulating your opinions?

A: Well, this audit was done using the same data that I use to generate my numbers for the work that I do in this case, and they came up with the same conclusion that I did.

Q: Do you understand what data was used in the Shipley Audit, the time clock punch exception reports?

A: Yes.

Q: Are those the same time clock punch exception reports referred to in Plaintiffs' Exhibit 46 by Mr. Campbell?

A: Yes.

Q: Those are the reports that reported any kind of labor violation that could have some legal repercussion; is that correct?

A: That's correct.

Q: Going back to the Shipley Audit, Dr. Baggett, Plaintiffs' Exhibit 88, can you tell me what in particular in the Shipley [A]udit was important to you in forming your opinions in this case?

A: Yes. On the second page of the audit, there's a particular section on breaks and meals which was part of the Shipley [A]udit. And it specifically states: Stores were not in compliance with company and state regulation concerning the allotment of breaks and meals, as 76,472 exceptions were noted in 127 stores reviewed for a one-week period. . . .

Q: Dr. Baggett, if I could direct your attention to Plaintiffs' Exhibit 89. What about this document, Dr. Baggett, was important to you in forming your conclusions in this matter?

A: Well, this document has the individual stores, of which there were five in the State of Pennsylvania. . . .

Q: Dr. Baggett, can you explain exactly what's shown on Plaintiffs' Exhibit 89?
. . .

A: These are numbers for two of the five stores. This is store number 2252 in the first column and store number 1623 in the second column. And Wal–Mart has indicated the number of missed meals and the number of missed

breaks that they recorded in the exception report for each of those two stores.

Q: And does the balance—Dr. Baggett, what about the third page of Plaintiffs' Exhibit 89 was important to you?

A: These are two additional stores, store number 2287 and store number 2597, of which, all of these are in Pennsylvania. And again, for those two stores, the same numbers are indicated. In other words, Wal–Mart recorded too few meals and two few breaks and wrote those numbers down in these two columns for each of those two stores.

Q: Do you understand that those are the actual computations done as part of the Shipley Audit in these four stores?

A: Yes.

Q: Now, Dr. Baggett, you mentioned a fifth store. We don't—are the numbers for the fifth store in this document, Plaintiffs' Exhibit 89?

A: No.

Q: Did you receive any information about the fifth store?

A: I did, but you couldn't read it. . . .

Q: I'd like to direct your attention, Dr. Baggett, to Defendant's Exhibit 78. Is this a document you reviewed in connection with formulating your opinion?

A: Yes.

Q: And what about this document was important to you?

A: Well, there's a couple of parts of this. The top section says: "Providing break and meal periods is part of our culture. It is the right thing to do for our associates. We've also updated our breaks and meals period policy." And then the section down or the bullet point down from that right here states that: "Due to the importance of associates taking their breaks and meal periods timely and completely, associates are subject to performance coaching for repeatedly failing to clock in or out for meal periods, missing breaks and/or meal periods or taking breaks and/or meal periods that are too long, too short, or untimely."

Q: Now, why was this particular piece of information important to you, Dr. Baggett?

A: Because that piece of information tells me that voluntary waivers of breaks and meals were not allowed. . . .

Q: Is there anything else, Dr. Baggett, that was of significance to you in this document?

A: Yes. Down below, in this real long paragraph here, states that meal periods should be a minimum of 30 minutes in accordance with company policy and may be provided for up to 60 minutes which I understand is the standard in Pennsylvania depending upon business needs. . . .

Q: Dr. Baggett, you have . . . Plaintiffs' Exhibit 47. That's an April 20, 2000, memo from Bob Montfill to regional; subject, Department of Labor Investigation. What about this document, sir, was important to you in formulating your opinions?

A: Well, this was a directive from Bob Montfill to the regional directors, and it states—it describes that Wal–Mart directs their regional directors to the time clock punch exception report to determine violations in the time clock. . . .

Q: And if I could direct your attention, sir, to the next exhibit in the book, Plaintiffs' Exhibit 48? . . . This is a memo dated April 21, 2000, to Don Harris. And what about this document was of importance to you in formulating your opinions?

A: It again describes Wal–Mart's reliance on the time clock punch exception report. . . .

Q: And the additional lines that appear under the highlighted section on Plaintiffs' Exhibit 51, were those important to you as well?

A: Yes. It just—it signifies additional importance to the record that Wal–Mart places on the accuracy of the time clock record. "Research all errors listed on the time clock punch errors report. Research the time clock activity log report and retain and then finalized [sic] daily payroll."

N.T., 9/19/06 (morning), at 21, 27–32, 35–36, 38–44, 51–56, 58–68; R.R. at 1653a–59a, 1662a–63a, 1165a–68a.

At the start of the afternoon session, Dr. Baggett was asked about a chart he prepared entitled, "Summary Analysis of Missed Rest Breaks." He was asked to explain the chart:

A: For each of the 52 million shifts—or actually, 46 million that Wal–Mart provided, I compared the shift with what the rule stated in PD–07 as far as how many rest breaks and meals they got, and this chart is just—this is the total or indicates the totals after I added all those shifts up of the missed rest breaks. So this first column is just the rest breaks promised by Wal–Mart in PD–07. Then the next column is the number of rest breaks owed, which I tallied up from all the 46 million shifts, plus the additional ones that Wal–Mart didn't provide. And then the third column is just based upon each associates' hourly rate at that time. And so the totals of the three columns are indicated below, and the total damages to the Wal–Mart Associates for missed rest breaks is $68,412,107.

N.T., 9/19/06 (afternoon), at 9.

During the statutory period, Wal–Mart saved $48,258,111 by prohibiting rest breaks. Trial Ct. Op., 10/3/07, at 2. The jury was shown a chart which showed Wal–Mart's Timeclock Archive Report Data based upon the forty-six million shifts and Statistically Determined Timeclock Archive Report Data. N.T., 9/19/06 (afternoon), at 10; R.R. at 1670a. Dr. Baggett explained the latter data:

Q: And when you use the term "statistically-determined timeclock archive report data," what does that refer to?

A: It means that all that I basically did was take the average number of missed rest breaks and apply it over to the data that was missing.

Q: Okay. Dr. Baggett, in the column Statistically [D]etermined [T]imeclock [A]rchive [D]ata have you also included the shifts for which Wal–Mart did not provide you with data?

A: Yes. And all those shifts include shifts that were recorded after February 10 of 2001 . . . .

Q: And how many shifts were missing from the data that Wal–Mart provided to you?

A: There was about 10 percent of them missing.

Q: So how many was that total in absence [sic] number?

A: Well, it went—the number of shifts that Wal–Mart provided me was about 46 million, and then it ended up being 52 million with the shifts that Wal–Mart didn't provide. So a total of a little over 52 million shifts.

Q: And did you use statistically-accepted methods, common statistical methods to derive the missing shifts where Wal–Mart did not provide data as to the shifts?

A: Yes, I did.

Q: And do you hold your opinion about the missing shifts, about your deduction as to the missing shifts to a reasonable degree of statistical certainty?

A: Yes, I do.

Q: Did you do any testing in your work to ensure that your calculation of the missing shifts was correct?

A: Yes.

Q: Can you describe that work generally?

A: Yes. I did have the payroll data, but the payroll data just has information on pay period by pay period, which is a two-week time span. I don't have daily payroll data, it's just a total after two weeks. So I calculated the number of shifts that should be in the payroll data and compared that with the number of shifts that I estimated or that I determined statistically and compared those. And actually, the number that I determined statistically is about 5 percent less than what's indicated in the payroll.

Q: So your number of statistically-determined shifts is a conservative number based upon your testing of the data; is that correct?

A: Yes. It's conservative in Wal–Mart's favor....

Q: And for that period after Wal–Mart eliminated rest break punching [February 10, 2001 to 2006], can you explain to the jury how you statistically determined the number of rest breaks promised by Wal–Mart pursuant to PD–07?

A: Yes. From all of the timeclock archive data that's prior to February 10, 2001 that I had, I used the average information on missed rest breaks to then fill all of this information where Wal–Mart had no longer recorded rest breaks....

Q: Dr. Baggett, the methodology that you used to statistically determine the missing data, was that a statistically-accepted method in the community of people who study statistics?

A: It's probably the most commonly used technique in statistics. It's just a simple average is all [sic] I used.

Q: Do you hold the opinions reflected on this chart to a reasonable degree of statistical certainty?

A: Yes.

Q: If we could turn to the next chart that would be Summary analysis of Short Rest Breaks.... And that's expressed again in hours rather than in number of breaks?

A: Yes, and then Rest Break Hours Owed to Class Members due to Short Rest Breaks. So I tallied up for all of the 52 million shifts the number of hours that were owed to the Class members....

Q: Okay, and the Rest Break Hours Owed to Class Members Due to Short Breaks, that was a total of 902,460 hours?

A: That's correct.... For each shift I took that Associate's hourly pay and then determined what they were owed based upon the amount of time out of the short rest breaks. And that total comes out to $7,561,968....

Q: And, Dr. Baggett, the explanation that you provided to the jury in connection with the first chart that we looked at, the Summary analysis of Missed Rest Breaks with regard to how the statistically-determined timeclock archive data was derived, is that the same for this chart?

A: Yes.

N.T., 9/19/06 (afternoon), at 11–16, 18–19; R.R. at 1670a–76a.

Dr. Baggett was asked to explain the one-minute docking of employees for long rest breaks:

Wal–Mart doesn't care about this period or interval. Actually they do. If that rest break is 1 minute too long, if it's 16 minutes long, they dock the associate for that 1 minute.

And we saw an example here yesterday of where Dolores Hummel received a 16–minute rest break and an 11–minute rest break. And even though she was promised 34 minutes for that rest break, she only received—she was docked 1 minute. She was paid for 15 minutes of the 16–minute rest break and 11th [sic] minutes of the other rest break.

So it's like they disregard short rest breaks until they're 11 minutes or shorter on the one side. But on the other side, if it's as much as 1 minute too long, the associate gets docked.

N.T., 9/20/06 (morning), at 28.

Dr. Martin Shapiro, an expert in statistics, computer programming, and psychology, testified. N.T., 9/21/06 (morning), at 13, 20; R.R. 1745a, 1748a. He compared the time-clock data to the cash-register data. *Id.* at 20; R.R. at 1749a. Each cashier had a unique cashier identification number. *Id.* at 21; R.R. at 1750a.

Q: Is this a computer file that is linked to the cash register database?

A: Yes, the cash register database is in fact the daily compilations of this file. Every day, there's a file created for every cash register transaction that happened in the store that day.

Q: And did you then compare those records that the cash registers generated electronically with the time-keeper record that is generated when an employee swipes a badge in and out for shifts or meals or rest bricks (sic)?

A: Exactly. That is, what I did was merge or, if you wish, marry the two files, so that I could see, or the computer would see. Obviously I didn't look at each one of them individually. But the computer could track whether the individual had clocked in for the day or whether they had clocked out for the day before they got on the cash register.

Q: And can you tell by looking at the data whether the person clocked in at the beginning of the shift, clocked out at the end of the shift, clocked in for a rest break, clocked out after a rest break, clocked in for a meal, clocked out after a meal?

A: What happens in the Wal–Mart computer system, is every time you punch the clock, well, you swipe your badge, but, old fashioned, we call it punch the clock, every time you punch the clock, it creates a record in the timekeeper database. And the time-keeper database categorizes, names, that record, either as a punch in for the day or a punch out for a rest or a punch back in for a rest or the same with a meal, a punch out or in, and then finally they punch at the end of the day. And they literally are what is called a punch code. And a one is that you just clocked in for the day. A two is the end of your shift. A three is the beginning of a rest. And a four is the end of a rest, and a five is the beginning of a meal, and a six is the end of a meal. And a nine is that you didn't really clock out, but the manager clocked you out.

*Id.* at 21–23; R.R. at 1750a–52a.

Q: Was that lock-out program put in by Wal–Mart before or after you told them you could do this analysis?

A: It was done after I said that I was going to do the analysis of comparing the two databases, and then they initiated the lock-out.

Q: How long after you told Wal–Mart you could do this analysis did they start implementing this time clock lock-out program?

A: I think it would be about six months.

Q: Now, what is the significance to you that Wal–Mart instituted a lock-out program to prevent cashiers from operating cash registers when they weren't on the time clock?

A: Well, it signifies several things: One is, you know, apparently there was something that had to be changed. There was a problem that had to be cured, and so that's one clear thing. The third is that of course they in essence were agreeing with me that the analysis, the comparison, could be done, because the lock-out system is really the same thing; that is, every time somebody tries to get on the register, you're comparing—you're looking at the time clock and asking whether they're clocked this in or not, so it essentially is the same analysis that I was doing. So they're verifying that the analysis can reliably be done, because they're doing it.

Q: Okay. And the problem that you mentioned, is this the problem of associates operating cash registers while they're not on the time clock?

A: Yes.

Q: Is this lock-out program something Wal–Mart could have done prior to the beginning of this class period back in 1998?

A: Yeah, of course. I mean, it was no different—the computer system is no different then than it is now.

*Id.* at 29–30; R.R. at 1756a–58a.

Q: You have the cash register activity logs that show who's operating that register and whether it's actually being operated, correct?

A: Correct.

Q: And on the other hand, you have the payroll data automatically generated by Wal–Mart's computers from the employee swiping in and out?

A: That's correct.

Q: Or the managers editing?

A: Correct.

Q: Tell me what you do in one sentence, please, at that point in time so I can have follow this (sic).

A: One sentence.... Well, you add the two files together so that they're now in one file. But of course, they're in the wrong order because when you just put 'em together, all of one kind's at the top, and all of the other kind's at the bottom. So you have to sort them. And, you know, just like you would do on e-mail or Excel or, you know, any other computer program, you tell the computer to sort, put all the data from the first store together. Then with—and do the same for the second store and so forth. Then once you have it sorted by store, sort it by person—that is, associate ID number—so that all the data for a particular person are together. Then finally sort it by date and time so that now the records are in chronological sequence.

Q: Okay. What I kind of envision—tell me if I'm wrong—is, I have a letter I've got over here and a letter I'm writing to somebody else over there. And I want to put it all into one letter and send it to both of them, so I drag the information off this letter and pull it over. Is that what you did with these two databases?

A: That's the first step, yes.

Q: All right. And then you sort it?

A: Then you sort it by store, individual employee, and chronological order. So what you end up with is in a sense a time record of—one record for all the time clock work and all the cash register work inter-leafed together; that is, in one long column for each person.

Q: And do you do that so that you can match up what the person's doing on the cash register to what their time clock shows?

A: That's right. For each cash register action. I want to know were they on the

clock or off-the-clock; that is, what's the last time record that, time clock record, that you have. . . . And once you have these two databases merged so that you can line these times and persons in stores up, is that when you run your sort function and ask for it to identify these type of shifts?

A: Well, the sorting is done first so that they're inter-leafed. And then you run a select; that is, let me see those that are off the clock. Now, when I say let me see, the computer isn't really pulling them out. It's just flagging them; that is, it's just, you know, putting a one next to all—each one that's off the clock, so that now when you go to count them or something like that, it knows what to count versus what to ignore because it's not off the clock. . . .

Q: Now, you mentioned 16 stores that you looked at the data; and as I understand it, that's data from 2001 to 2006, because Wal–Mart had purged certain data before 2000; is that correct?

A: That's correct.

Q: For those six—you mentioned something earlier about putting a one up there to identify off-the-clock work. Can you explain that?

A: Well, what I mean is, the final analyses are done by counting time only in the cash register actions that are off the clock. So what you have to do first is identify those cash register operations that are off the clock. And what the computer does simply is, you tell it the rule to use, and next to each off-the-clock record, it puts a one, and next to all the other records, it puts a zero. So now when you do your counting and so forth, you're just counting off the clock.

Q: And you're counting the ones?

A: Well, you may be counting instances—that's counting how many ones there are—but more likely you're count-

ing the time difference between successive ones, because you want to know the total time off the clock, so the time record is what you're looking at usually.

Q: So you're looking at the length of time between the successive ones for that particular associate?

A: That's right, and then you're going to add them up, yes.

Q: And the difference in the ones, the time interim of the ones, is where the employee is actively operating the cash register but not punched in on the time clock?

A: That's correct. . . .

Q: For the period of 2001 through part of 2006 of this class period, did you tabulate those instances of time where the associate was operating a cash register but not on the time clock?

A: Yes. . . .

Q: And this chart, can you explain what you did, why you included this chart in your report?

A: Yes. For each year, I looked at two, two sets of times. The first set of times are in the next two columns labeled off clock. Those are the number of hours off the clock and the number of actual cash register operations off the clock and—yes, those two columns.

Q: So the off-the-clock total time—strike that. The off-the-clock number, that's the instances that you saw where this happened?

A: Yes.

Q: And by this happening, you're talking about the lengths of time where the employee was operating the operator accountable cash register but not on Wal–Mart's time clock?

A: That's correct.

Q: And the second column, off-clock total time, is that the hours that you get

when you add up all these instances of that period of time?

A: Yes.

Q: That period of time again being the time where the employee is operating a Wal–Mart operator-accountable cash register but not on the time clock?

A: Yes. We can be a little more specific: The time after the cashier logs on to the register; that is, actually puts in his password again, and then stays on the register.

Q: So the operator that is responsible for that cash register would input his or her own unique PIN number and start operating the cash register but not be on the time clock?

A: That's right....

Q: So for the years 2001 through the number of months we've included in 2006, you identified 22,875.6 hours of associates in Wal–Mart and Sam's Clubs operating operator-accountable cash registers but not on the time clock?

A: That's correct....

Q: Did you see an increased correlation in the amount of time the cashiers were on the clock ringing up items during their shift after Wal–Mart eliminated rest break punching?

A: Yes, that time increases.

Q: Have you seen that in Pennsylvania as well as the other states that you have analyzed?

A: Yes, I believe that pattern holds.

Q: And you hold that opinion to a reasonable degree of certainty in your areas of expertise?

A: Yes.

*Id.* at 43–47, 49–50, 52–54, 57, 62–63; R.R. at 1766a–70a, 1773a.

Dr. Shapiro explained how he extrapolated data from the 16 stores:

Q: Now you talked about the 16 stores earlier. How did you apply it to the 102 stores in Pennsylvania that existed in 2001?

A: Okay. What I did was, I divided that number by 16, so I now had the number of hours per store. I then multiplied the number of hours per store by 102 to increase it to account for all 102 stores.

Q: Is that acceptable in your areas of expertise?

A: Yes. I mean, that's how you would extrapolate 20 from a sample to a population.

Q: And do you hold that opinion within a reasonable degree of certainty in your areas of expertise?

A: Yes.

Q: All right. When you calculated the 1,309.4 hours we saw on the last chart for the 16 stores, what did you come up with this number as 3 applied to the 102 stores?

A: It's 8,347.4.

Q: And is that hours?

A: Yes, those are hours.

Q: So you were able to identify through this method statistically that there were 8,347.4 hours between the time a Wal–Mart associate had clocked out and the time they began running the cash register off the clock?

A: Yes.

Q: All right. And if you remember the chart a minute ago, you had 7,520.3 hours for off the clock, and that is the time that the associate was actually working on an operator-accountable cash register, actively working up items or ringing up items while they were off the clock?

A: Yes.

Q: That sum was 7,520.3 hours. When you divide that by 16 and then multiply

it by the 102 stores that exist, what do you come up with?

A: 47,941.9.

Q: And again is that hours, Dr. Shapiro, that Wal–Mart associates are operating accountable cash registers but not on the clock in Wal–Mart and Sam's Club stores?

A: Yes....

Q: Now, the next column is average hourly rate. What did you use for the average hourly rate?

A: Actually I got the average hourly rate from Dr. Baggett's report because he had done it already. I mean, it's simple enough to do. You just take the payroll file and calculate the average for each year. But he had calculated already, and I simply used his numbers, and his number was $8.20.

Q: Do you dispute the figure that Dr. Baggett had gotten?

A: No, not at all.... I added—and another extrapolation for the missing operator ID; that is, because they were purged, erased by Wal–Mart until 2003, there are people in 2001 and 2002 that can't be identified either. In fact, there are 9 percent of the people who can't be identified....

Q: All right. Let's go to 2002. Did you do the same methodology for 2002?

A: Yes....

Q: I noticed that between 2002 and 2003, the number went from $738,472.30 to 242,765.47.

A: Yes, it's a big drop.

Q: What do you account for that large drop?

A: In 2003, Wal–Mart changed their policy and introduced the lock-out; that is, they literally were doing the analysis we're looking at now in the sense that if you were off the clock, the system would not allow you to log on to a cash register....

Q: Is the manager override and the ability for a manager to come in after the employee has left and clock 'em out earlier, is that what accounts for the fact that you continued to see some off-the-clock work for cash register operations after they instituted the lock-out program?

A: That's right. You can't tell in 2003, because the lockout was introduced partway through the year. But you can see it in 2004 and—

Q: Why don't we go to 2004. What did your analysis in 2004 show for off-the-clock work?

A: Well, there are 130 stores, and you see the amount of off-the-clock work total drops to $93,000....

Q: All right. Did you do the same for 2005?

A: Yes.

Q: And did you do the same for 2006?

A: Yes.

Q: All right. Now, what we have blank on our demonstrative is 1998, 1999 and 2000. Can you tell the jury what you did to account for the off-the-clock work in the stores for which you do not have the data because Wal–Mart had purged it?

A: Yeah. I simply took the average of 2001, 2002, in terms of per store, because you then have to account for the fact that there are fewer stores in those years. I took the average per store and simply applied it to the earlier years, corrected by how many stores there were.

Q: So you took 2001 and 2002, because that was the lowest number of stores; is that correct?

A: Well, I took it because those are the data from before the lock-out. So if you

want to look backwards, you really have to look at 2000 and 2001 where the rules at Wal–Mart were the same as they were in '98, '99, and 2000.

You really can't use the time after 2003, because they changed the rules.

Q: So the change in the rule was the implementation of the lock-out program?

A: Yes.

Q: What did you come up with for 1998, Dr. Shapiro?

A: Well, in 1998 for the 68 stores, it's $262,208. And actually the date begins August 21st, 1998, so it's just a partial year.

Q: All right. What did you do for '99?

A: For the 92 stores, it's $467,086.92. Again, all of these are corrected for the 9 percent because they're using 2001 and 2002 data.

Q: And what did you find out for the year 2000?

A: And in 2000, 95 stores are $511,928.27.

Q: I noticed in 1998 through 2002, the numbers are relatively increasing, with the exception of maybe $4,000 between 2000, 2001. Do you see that?

A: I'm sorry, say that again.

Q: Sure. You have $262,280 in off-the-clock work in 1998 . . . . What was the total of the amount of off-the-clock work that you calculated during the class period for Wal–Mart associates who were operating operator-accountable cash registers while off Wal–Mart's time clock?

A: $2,993,063.32.

Q: What is your opinion as to the value of the time of the Wal–Mart associates who were working off the clock and operating operator accountable cash registers in the State of Pennsylvania?

A: $2,993,063.32.

Q: And do you hold that opinion and all opinions that you have given us here today within a reasonable certainty within your areas of expertise?

A: Yes.

*Id.* at 64–66, 68, 70, 72–76; R.R. at 1774a–75a.

In the afternoon session, Dr. Shapiro's testimony continued and his report of September 18, 2006, was discussed. The calculation of damages in that report differed from numbers given earlier in his testimony:

Q: The new report changes virtually every single calculated number, doesn't it?

A: Yes, but the—a large number of the changes are very, very small. I think quite easily it's described to you what the change is. It's a very specific point that I realized that the data analysis did not exactly reflect what I intended my analysis to be, and so I re-ran the analysis to reflect the description of the analysis . . . .

Q: The new report that I got last night says that there were 10,086.5 hours less pre-off-clock work than you had calculated with scientific certainty on August 30th. Correct?

A: Correct. That is the one area that I changed . . . .

Q: Now let me ask you about edits to employee's time records. We heard a little bit about that from other witnesses and you talked a little bit about edits to the timeclock archive reports as well?

A: That's not quite—edits to the timekeeping data. The Timeclock Archive Report would show the final set of times . . . .

Q: Let me rephrase it again. You are here to testify on behalf of the Class in support of its claim for damages for off-the-clock work, correct?

A: A specific kind of off-the-clock work, yes.

Q: And the specific kind of off-the-clock work that you have studied is limited to operator-accountable registers, correct?

A: And operators, which represent about 30 percent of the Class probably.

Q: Yes, right. And to your knowledge, there is no other study or analysis of any kind in this case of any kind of other off-the-clock work, is there?

A: There are no data for the ones you specify because they are not tracked through a data base....

Q: Does the work that the Wal–Mart cashiers on a Wal–Mart–accountable cash register in Wal–Mart stores who were not punched in on time clocks appear on the Timeclock Archive Report used to pay the Wal–Mart employees?

A: No, those times are not in the data, the timekeeping data used to derive payroll.

Q: So do you just have to look at the Timeclock Archive Reports to pay the employees for every minute they work as required by Wal–Mart's own written policy PD–43?

A: No.

Q: What else do you have to look at, Dr. Shapiro?

A: Well, you've got to look at the other evidence for work that is not on the Timeclock Archive Report.

Q: Do you have to look at the analysis that you have done and to find out that the Class has been underpaid by $2,993,063 and 32 cents?

A: Yes.

Q: Has Wal–Mart always, since 1998, been able to look at its own records and do this analysis?

A: Yes....

Q: Has Wal–Mart locked the employees off that unless they are on the timeclock since you told Wal–Mart you could do this analysis?

A: Yes....

THE COURT: All right. What is your opinion as to whether the final Archive Time Report accurately reflects all the work that Wal–Mart workers did in Pennsylvania?

THE WITNESS: The Timeclock Archive Reports reflect the paid time and the recorded breaks. They do not reflect off-the-clock work of the other varieties that I have been asked about.

N.T., 9/21/06 (afternoon), at 9–11, 21, 48–49, 60–62, 69–70; R.R. at 1780a–82a, 1792a, 1801a–02a.

Wal–Mart's expert testified and attempted to discredit Drs. Baggett and Shapiro:

Q: I understand what you are hired to do, but your team came up with the same number of shifts, correct?

A: Yes. We were able to understand what Dr. Baggett did and to replicate his counting of the time swipes in the data system, yes.

Q: So Dr. Baggett correctly counted the time swipes and the shifts, correct?

A: Yes. We were able to replicate his analysis fairly closely.

Q: I think last year when you testified, that you came up within .003 percent of the same number that Dr. Shapiro came up with?

A: Yes, that's right. Again, we were able to replicate his counts, not at all that we agree with his conclusions.

N.T., 10/5/06, at 33. She testified further:

Q: Is your criticism of Dr. Baggett based on some inability of his to simply count?

A: No. No. Again, and we talked about this a little bit earlier, but we can replicate what he did. We can understand

what he did. And he has counted properly. Our criticism goes to the conclusions that he draws from that counting.

*Id.* at 37. The following occurred at side bar outside of the jury's presence.

The Court: What do you assume is wrong?

The Witness: The two major things are that a missed swipe is not equal to a missed break.

\* \* \*

The Court: What else?

The Witness: He is assuming—he is doing the big extrapolation for missing data. And so he is taking data that we know is bad and he is using it to fill in data that's missing. So he is filling in— necessarily, by definition, he is filling in data that's bad. And that's a statistically improper thing to do.

The Court: Okay. Is there anything improper if the data was good?

The Witness: No. Extrapolation is a technique that statisticians can use.

*Id.* at 46–48. When asked if she was "critical of Wal–Mart for eliminating rest break swiping," she replied, "No. That's not part of my opinion here at all." *Id.* at 90. Dr. Martin's criticism was based on her opinion that the data was "bad," rather than that the methodology of extrapolation was flawed.

Q: Now, are you as confident in your testimony that a punch exception report in the year 2000 would not identify a 12– minute rest break as you are of any other opinion you have offered in this case?

A: Yes. My understanding is that rest breaks between 12 and 14 minutes did not show up on the exception reports.

Q: So, if I show you an exception report that this jury has seen from May 30, 2000 that identify [sic] 12–minute rest breaks, 13–minute rest breaks, and 14–

minute rest breaks, will you agree your opinions in this case are wrong?

A: No. I would have to look at that data.

Q: Well, let's look at it then. Let's look at Plaintiff's Exhibit 2b. You have seen Plaintiff's Exhibit 2b, haven't you?

A: I don't know that I have seen exactly this exhibit. I have certainly seen a lot of timeclock punch exception reports . . . .

Q: Isn't it true, Dr. Martin, that the only request you made was for Mr. Manne to give you what he thought was important for you to look at?

A: No. That's absolutely not true.

Q: Did he show you this document, Exhibit 2b?

A: I don't know if I have seen this. They all look very familiar. I am not sure I have seen this exact document. I have certainly seen many documents that are timeclock punch exception reports.

Q: Do you understand that this document identifies 12–minute rest breaks?

THE COURT: Do you want to read the whole document, or do you want to read a portion of it, or just wait until she reads it off the screen?

Q: Let's look at the fourth shift down. I believe it's of a Christopher Boas. Do you see the last break there? On the right?

\* \* \*

A: Okay. I see that that says Too Few Meals and Too Many Breaks.

Q: It says he got a 13–minute rest break, doesn't it? Right there on the right. It says ":13"?

A: Yes. But that's not the reason that the entry is showing up on this report.

Q: It's on the report, is it not, for any manager in that store to look at, right?

A: Sure, it's on the report.

Q: So you are wrong that 13–minute rest breaks did not show up on this report, correct?

A: No, that's incorrect.

Q: All right. Let's look at the shift for Mary Brossman. She has a 14–minute rest break there. Do you see that?

A: Yes, I see that.

Q: You also know, because you have read the Payroll/Scheduling Guide, that she was docked a minute for her 16–minute rest break that's shown there, but she didn't get it back although she got a shortened rest break at 14 minutes, right?

A: Yes.

*Id.* at 91–94.

Q: Now, in reaching your conclusions, you didn't rely on any of the testimony of Wal–Mart's key executives, did you?

A: No, that's not right.

Q: Did you rely on Cannetta Ivy Reid's testimony?

A: Yes.

Q: You know that she is the voice of Wal–Mart with regard to compliance?

A: I know that she is head of compliance, yes.

Q: And you know that she was put on this witness stand by Wal–Mart, the same witness seat that you are sitting in, as the designated representative for compliance?

A: Yes, I understand that.

Q: If you read her deposition you would agree with me, would you not, that she says the exception reporting is done?

A: Exception reporting is done?

Q: Yes, where they go in and—the manager goes in and looks at the punch exception report and investigates and resolves what's on that report before the timeclock records are finalized. Do you not know that?

A: No. That's not what she testified to.

Q: All right. Let's play her testimony so we can all see it.

(At this time the following video clip of Cannetta Ivy Reid is played for the jury:)

"Q: Okay, fair enough. There can be a limited number of exceptions to that general statement that the timeclock punch exception report investigation needs to be done before the timeclock archive report is finalized?

"A: Yeah.

"Q: But those should be limited exceptions?

"A: That is our goal.

"Q: It should not be the preponderance of the time?

"A: Our goal would be that all exceptions to the best of that manager's ability need to be investigated and, you know, if in fact the person did get a meal period, that that be reflected accurately in the records. That is our goal.

"Q: Similarly, it is your goal to make sure that if the employee did not get a meal period that is also reflected in the timeclock archive report?

"A: Yes, that would be.

"Q: And the timeclock archive report is the finalized payroll document that's used to pay Wal–Mart hourly Associates?

"A: Again, I am not going to say it's used to pay them, but it does show the Associate, Here are the hours that we've recorded for you for this week for this pay period.

"Q: Fair enough. And if an employee's timeclock archive report shows 39.85 hours, they're going to be paid for 39.85 hours in that payroll period?

"A: They should be, yes."

[Appellees' Counsel:] Do you remember that testimony?

A: I didn't see it live before, but yes, I remember that.

Q: Ms. Reid, the designated spokesman for Wal–Mart, confirms that the punch clock exception reporting is investigated and resolved before the payroll records are finalized, correct?

A: No. She didn't say that. She said it was the goal, the policy.

Q: Is it your testimony that when Mr. Holley signs the Wal–Mart tax returns under oath, under the penalty of perjury, that those tax returns are inaccurate?

A: No.

Q: You know who Mr. Holley is, don't you?

A: No, actually, I don't recognize his name.

Q: Mr. Manne didn't give you Mr. Holley's sworn testimony?

A: I don't believe I read Mr. Holley's sworn testimony, no.

Q: Would you agree with me that the top executives in this company like Mr. Tom Coughlin, Mr. Don Swann, Mr. Mike Huffaker, know more about what goes on at Wal–Mart than you?

A: Yes.

Q: You would defer to their testimony under oath what really happens at Wal-Mart rather than the opinions you have been hired to give this jury, correct?

A: No, I wouldn't agree with that.

Q: Did you read Mr. Coughlin's deposition?

A: No, I did not.

Q: Did you read Mr. Harris' deposition?

A: No.

Q: Did you read Mr. Swann's deposition?

A: No.

Q: Did you read Mr. Castural Thompson's deposition?

A: No.

Q: Do you know who Mr. Castural Thompson is?

A: No.

Q: Did you view the video clip of Tom Coughlin saying, They are to get their breaks. This just drives me crazy. They are to get their breaks. It's not an optional issue. Did Mr. Manne show you that video clip?

A: I have seen a video clip, I believe in trial, of Tom Coughlin. I wouldn't agree with your representation of it.

Q: Did you see the video clip of Don Swann addressing the personnel—strike that—yeah, the personnel managers at the shareholders meeting, where he says the allegations are true, and it's because of payroll pressure?

A: Again, I have seen that video clip in trial. I wouldn't—I am not sure if those exact words were used.

*Id.* at 100–05 (colons added). Dr. Martin was questioned regarding the use of extrapolation in the field of statistics:

Q: All right. Now, extrapolation. You criticize both Dr. Baggett and Dr. Shapiro for extrapolation, correct?

A: Yes, for the—for their extrapolation in these situations, absolutely.

Q: And both Dr. Baggett and Dr. Shapiro extrapolated to fill in gaps for data Wal–Mart had destroyed, correct?

A: I don't know whether Wal–Mart—no, no, I wouldn't agree with that.

Q: Dr. Baggett extrapolated to fill in the gaps in the data he was given, correct?

A: Yes, it's correct that one reason he extrapolated was to fill in data that was illegible. He couldn't read it on the printed TCAR reports.

Q: It was illegible, and in fact, some were missing, correct?

A: Yes, I believe some of the reports were not available, that's right.

Q: And Dr. Shapiro had to extrapolate for information that Wal–Mart had erased. Correct?

A: No, I don't recall that.

Q: You don't recall from reading his report and reading his testimony that Wal–Mart had destroyed 9 percent of the operator I.D. information?

A: Now that you say that, I do remember that he had—that for 9 percent of the data in that particular instance he extrapolated. So you are right, I am sorry.

Q: And another extrapolation Dr. Baggett did was to fill in the gap because Wal–Mart was no longer allowing its employees to clock in and out for rest breaks after February 9, 2001, correct?

A: I disagree with your characterization of not allowing their employees. They made a decision in February of 2001 not to have employees swipe for rest breaks anymore. So there is no sort of, by definition, there is no rest break data after that point.

Q: You know why they did it, don't you?

A: No, I don't—I wasn't part of that decision.

Q: You know why they did the timeclock lockout to prevent Dr. Shapiro from doing this analysis was because of litigation, don't you?

A: No, I don't know that.

Q: Put up Exhibit 522 please. Did Mr. Manne show you this E-mail?

A: Yes, I have seen this E-mail.

Q: And you read it carefully, didn't you?

A: Yes, I read this E-mail.

Q: You know that Greg Campbell in the ISD Department was asking for these lockout programs, and he said, "Please help us, as you are aware of this hot topic with all the current litigation we are involved in." Did you not notice that when you read it?

A: Yes, I noticed that.

Q: So it's a true statement, is it not, that the timeclock lockout program was done because of litigation?

A: This document—yes, I believe this document says that one of the reasons for the timeclock lockout decision is litigation. I am sure there are other reasons.

Q: You are reading that into this on behalf of Wal–Mart, aren't you?

THE COURT: Reading what into what?

Q: That there are other reasons. It says the current litigation. It doesn't say anything else, does it?

A: This document doesn't say anything else, no.

Q: Thank you. And you know that Wal–Mart eliminated the rest break punching because of litigation, don't you?

A: No, I don't know that.

Q: All right. Dr. Baggett had to extrapolate the rest break punching after Wal–Mart—strike that. Dr. Baggett had to extrapolate the missed rest breaks after Wal–Mart eliminated the rest break punching because Wal–Mart did away with the proof of that; correct?

A: Yeah, I wouldn't agree with the way you are characterizing it. He had to extrapolate because there was no rest break swiping after February of 2001. So there was, by definition, no rest break swiping data.

Q: Let's see if we can agree on this. You would agree if Wal–Mart was still punching out for rest breaks, Dr. Baggett wouldn't have to extrapolate to find

out when the timeclock archive reports showed a missed break, right?

A: Yes, that's right. If there was still swiping, he would have data rather than extrapolation.

*Id.* at 107–11; R.R. at 2079a–83a. Dr. Martin testified that she used extrapolation when she testified in a case against Wal–Mart in California.

Q: Wal–Mart hired you last year in the matter in which you testified in November to extrapolate for them, didn't they?

A: No, they didn't hire me to extrapolate for them. . . .

Q: Did you extrapolate last November on your own?

A: Yes. That was one of the pieces of analysis that I did.

Q: Right. You extrapolated for meal break waivers, correct, prior to March of 2003, right?

A: Yes, that's right.

*Id.* at 111; R.R. at 2083a.

Q: Now, I believe when we broke you were talking about the opinions that you had given on behalf of Wal–Mart a year ago when you extrapolated that. Do you remember that?

A: Yes.

Q: In fact, what you did is, Wal–Mart began taking written waivers from its employees regarding meal breaks in California, correct?

A: Yes, that's right.

Q: You took the evidence of written waivers beginning in March 2003 and applied them to the period before March 2003. You remember that?

A: Yes. I used extrapolation to draw a conclusion about waivers orally that had occurred before 2003, that's right. . . .

Q: Do you remember admitting on cross-examination that there were 207

written waivers in Wal–Mart's system prior to March 2003?

A: Oh, I am sorry, 207. I thought you said 207,000. I didn't know what you were talking about.

Q: I misspoke. Let me make sure we understand each other, okay? You extrapolated that there should be 600,000 waivers prior to March 2003, correct?

A: Yes. That was approximately the number of oral waivers that I estimated occurred during that time period.

Q: Right. And you extrapolated that estimate of oral waivers based upon the number of written waivers Wal–Mart got from their Associates after March 2003, right?

A: Yes, that's right. . . .

Q: Dr. Baggett, where there was missing data prior to 2001, filled in the gaps by extrapolating, correct?

A: Yes.

Q: You understand, do you not, that Dr. Baggett verified those extrapolations by comparing the shifts that he estimated by the total hours on the TCARs. Did you know that?

A: I read his report, yes.

Q: He did not disregard any data to do that, did he?

A: No, I am not aware that he disregarded any data. . . .

Q: You know for a matter of fact, do you not, from reading [Dr. Shapiro's] testimony that Wal–Mart had purged 9 percent of the operator information, correct?

A: Yes. I understand that 9 percent of the operator information was missing, according to Dr. Shapiro's report.

Q: And Dr. Shapiro then extrapolated from the data he did have to fill in for that 9 percent, correct?

A: Yes.

Q: In addition to that, Dr. Shapiro extrapolated from his example of 16 stores to the 139 stores in general, correct?

A: Yes, that's right.

Q: You have access to the same data, don't you?

A: Yes.

Q: And you have never done the analysis for those other hundred-some-odd stores either, have you?

A: No, I have not. . . .

Q: Now let's talk about your criticism of Dr. Baggett for the six-hour shifts. You have read PD–07, correct?

A: Yes.

Q: If an employee goes over six hours working for Wal–Mart, even if it's six hours and one minute, they are entitled under PD–07 to a meal break, right?

A: Yes.

Q: And they are entitled to a rest break, right?

A: Yes.

Q: A second rest break, correct?

A: Yes. . . .

Q: They are entitled to it because Wal–Mart has promised them as a benefit of their employment, correct?

A: Yes.

N.T., 10/5/06 (afternoon), at 122–28; R.R. at 2085a–86a.

Dr. Frank Landy, an expert in human resources, industrial organizational psychology, and statistics, testified for Appellees that a reasonable employee would understand Wal–Mart to have offered and promised the benefits.

Q: Dr. Landy, could you tell the jury what Defendant's Exhibit 146 is?

A: This is a description of various benefits that associates get when they come to work for Wal–Mart.

Q: It's called the associate benefits book?

A: The Associate Benefits Guide, The Associate Benefits Book, yeah.

Q: And what about this document did you consider important?

A: Well, what I particularly found important were pages 110 and 111 of this document.

\* \* \*

A: . . . Section is called My Money, right. And if you highlight Paid Programs, just the first two lines, right. That's good. In addition to the pay you receive for regular day's work, there are other programs and benefits that can supplement your income. And then they're going to list a number of these benefits.

So if you go to the next page, the very first item on the top says one of those benefits they were just talking about, paid break periods: Take a break and get paid for it. Paid breaks differ by facility. See your personnel representative for details about paid break time in your division and your facility. Yesterday we saw a comparison of Sam's Club and Wal–Mart. And what it showed was that in all facilities, the break policy is the same. If you work three hours, you get one break. If you work six hours, you get two breaks.

So in this benefit guide they hand to associates, this says this is a benefit; this is what you get, this is part of your money. . . . Because they're all communications to the associates. They all represent the same promise, the same agreement. They say it on posters. They say it on the website. They say it on benefit guides. They say it every place they can, that this is a benefit.

So the associates say, they've said it often enough and in as many different places and in as many different ways, so

this is their promise. And Tom Coughlin said this is a non-negotiable.

Q: Dr. Landy, I'm going to ask you to refer to Plaintiffs' Exhibit 460, which I think was right around, yeah. I think you have it there, 460. It's the associate handbook?

A: Yes.

Q: Can you tell the jury what this is and when associates get it?

A: My understanding is that when the associate is—it's one of the early steps in them becoming a 1 worker for Wal–Mart. They're given an associate handbook. They're asked to read it and to sign it and acknowledge that they have seen what's included in it.

Q: And can you refer us to the page where they have to acknowledge it?

\* \* \*

A: I see, right. This is in the left-hand section, give the signed—read and sign the acknowledgment, separate the acknowledgment at the perforation; give the acknowledgment to your manager.

Q: Is there anything that you reviewed in the text below that you considered in developing your opinions in this case?

A: There is a sentence about halfway down that paragraph that begins, from time to time, if you can highlight that right. From time to time, Wal–Mart may determine that it needs to change some of the policies or programs in this handbook in order to better meet the requirements of our associates and the company.

Then the next sentence: If any policies or programs are changed, modified, deleted, or supplemented, Wal–Mart will notify associates as soon as possible. . . . [T]hey have told them in every way they can that paid breaks are a benefit. They've told them on the website. They've told them on the paper guide-line, the booklet. They've told them on posters. Tom Coughlin has said it in messages. I mean, they've said it every way they can that this is our promise to you.

N.T., 9/13/06 (morning), at 42–44, 46–47, 52; R.R. at 1553a–55a, 1557a–58a, 1562a.

Dr. Landy testified that the manager bonus program impacted negatively on the rest breaks and off-the-clock benefits:

And as we had seen a number of times yesterday and the day before, the single biggest expense for a manager was payroll. It was payroll. So if a manager could reduce payroll and stay within the hours they gave him or her, in all likelihood, as long as the sales stayed where they were supposed to be, the manager would make a bonus. And the lower the expenses, the bigger the bonus. So I was already concerned about preferred hours. Everybody was concerned about that. There were managers concerned about it. There were associates concerned about it. We don't have enough people. That translated directly into bonuses for managers; that is, running a store with fewer people meant lower expenses and a bigger bonus . . . .

Q: Did you make any association between a store manager's ability to capture missed breaks, missed meals, off-the-clock work, and his bonus?

A: I did.

Q: Can you tell the jury what your association was?

A: I did some calculations, and there's really big numbers. But I can give you the bottom line to this: If we have a manager who takes—who's able to capture one minute a week, just one minute a week, so if I have two minutes in a year, is able to or her store, so let's just assume that there were 300 associates in the store, which is not an outrageous

number. That's kind of average, maybe a little low. All he had to do is get one minute of their time every week for 52 weeks and he would add to his bonus something around $1300 for one minute. So if he could capture one minute a week from 300 people, that would increase his bonus by $1300. Now, if—

Q: $1300 a week?

A: No. $1300 at the end of the year, but that's for one minute.

Q: Oh, I see.

A: If he was able to capture one hour, this is over just one hour, a week, his bonus would be enhanced by $82,000.

Q: So if an associate missed two breaks and one lunch?

A: $82,000. If 300 associates missed two breaks and one lunch a week, or you could have two hours of off-the-clock, it really doesn't matter how you put it together, it's rest break, meal break—he would see $82,000 more in his bonus at the end of the year.

*Id.* at 77–79; R.R. at 1585a–88a. Dr. Landy testified that Wal–Mart was aware of the violations of company policy:

A: Exhibit 98 is a memo from Kendall Schwindt. We've talked about him before. He was one of the generals. And he says that in this memo, which goes to store managers, so this is one of the generals talking to the troops. A major issue from grass roots was that our associates are not receiving scheduled breaks and lunches. Now grass roots was an employee survey they do every year to find out whether the employees are happy. And the employees were saying they're not getting their scheduled breaks and lunches. He says not only is this against company policy, it is also a violation of federal law. Violation of this policy will result in disciplinary action. He's saying it is our responsibility to keep track of records and to give people their appropriate breaks. It's not only law, it's also company policy.

Q: All right. Now, who was this memo sent to?

A: Well, the memo was sent to all store managers. But on the right-hand side, you can see it went to all the Division 1–A district managers and all the regionals and then to Tom Coughlin. And Tom Coughlin is the CEO. So the date of this memo was also kind of important. It's 1998.

N.T., 9/12/06 (morning), at 51–52. Dr. Landy was asked whether there was a problem with cashiers:

Q: Had there been any indications other than the grass roots survey, had there been other surveys that top management had seen at Wal–Mart indicating they may have a problem with staffing or cashiers or something like that?

A: Well, yeah. I mean, there are cashiers, what's called a cashiers' survey, where they were concerned about the turnover with cashiers. The turnover for cashiers might run 120 percent, 140 percent, which means the average cashier stays with Wal–Mart in a store that has 140 percent turnover six months, seven months, then we're go. We're spending time to train them. We're getting them into the schedule, and then they're leaving. What's going on? So they would survey cashiers to see how come they're leaving. And one of the things that cashiers would frequently say is, we're not getting our breaks. We're on our feet too long. We're not getting relieved. It's just a grueling kind of job. . . .

Q: Exhibit 48 what you're referring to?

A: Yes.

Q: Was there something significant about where this went to, and can you tell the jury about this?

A: Well, the issue is that this was something that Tom Coughlin said at a Dallas meeting, and that is that the top five reasons cashiers quit are, they can't get breaks and they're understaffed. Understaffed means not enough people. Same thing as [sic] since there's not enough people, they can't get breaks.

Q: Is there a correlation between understaffing and the ability to get breaks and meals?

A: Yeah. I mean, it's logical. If you don't have enough people to relieve somebody, they can't get a break. So if I have staffed a store of some kind with just enough people to run every part of the store but I don't have one extra person who can wander around and give people relief, what are you going to do? I mean, you can't just say sporting goods is closed for an hour or, you know, we're not going to unload a truck.

*Id.* at 55–57. Dr. Landy described the purpose of the internal audits that were performed.

Q: Now I think you indicated that there were a number of audits then done?

A: Correct.

Q: Tell the jury approximately how many? I think we have a stack of them?

A: Yeah. There are about ten. And they begin in September of '99, which is about the same time as that memo we saw about Tom Coughlin and the Dallas meeting. It was in '99, around that time period. They start doing individual audits, sometimes just a single store like a store in Alabama or Iowa.

Q: Like 104?

A: Correct, that's a good example.

Q: And these run through—and rather than throwing them all up, just so we can save the jury some time, how many are we talking about, what?

A: I think there are ten.

Q: So like 104 through 113?

A: Yeah.

Q: But this is an example, a good example, of all the rest we would look at?

A: Yeah, the only difference being if you want to highlight audit scope, yeah. This one was conducted in 12 stores across the United States. Some of them were done with just one store. Some of them were done with collections of stores, so some of them are big, and some of them are small. But yeah, they're all—the structure of them is pretty much the same.

Q: And what did you find significant about using this as an example of the 12 others—10 others?

A: Well, a couple things. First, if you go to the upper right-hand CC, yeah, just highlight the whole thing, we say first this is going to Tom Coughlin. I'll just pick out some of the names of the four-star generals. It was going to Rob Hay, who was Tom Coughlin's deputy assistant. It's going to go Mike Huffaker. It's going to Dale Jackson, going to Coleman Peterson who is here in the courtroom. It's going to Kendall Schwindt. It's going to Larry Williams. It's going to regional VPS. So it's going to a (sic) lots of folks, generals. So that was the first important thing. The second important thing is if you go down to breaks and lunches because that's obviously what one of the things that interested me was breaks and lunches, there were in these 12 stores during this week, there were 738, 15–minute breaks scheduled, and there were 208 exceptions. An exception could be a break that wasn't taken or a break that was too short. So that's an exception. So 28 percent of the scheduled breaks were not taken or at least were too short. And then if you look at the lunch breaks, 344 were scheduled in these 12 stores

during this week, and 28 of them were exceptions, meaning that either they got too short a break or the break came too—or the lunch or break or the lunch came too late or they didn't get a lunch at all. So that's 8 percent of 'em. So what they're saying essentially is, the relative thing, is that the violation of the company policy about the 15–minutes breaks proportionately is much, much greater than the violation of lunches, but missing eight percent lunches and missing 28 percent breaks? That's a big deal.

Q: And now there are audits that were done for at least nine other places or groups of places, correct?

A: Yeah. Just let me make one more point about that, the first line of that. Says a review of the time clock archive report was conducted so the time clock archive report—that's the gold standard. That's what you look at. That's what with (sic) the auditors looked at. Anyway, there were nine more of these that were done either for an individual store, for a group of stores, during a period roughly from September of '99 through March, April, May, of 2000. So a period of about a six, seven months, there's ten of these audits that concentrate on meal and rest breaks.

Q: And you relied on all of those exhibits 104 through 113 in developing your opinions in this case, correct?

A: I did.

*Id.* at 62–65.

Dr. Landy testified about the Shipley Audit, a nationwide audit of 128 stores, 5 of which were in Pennsylvania. *Id.* at 65–67. The audit indicated that 76,472 exceptions were noted in 127 stores for a one-

week period. *Id.* at 67. The audit indicated that the number of too-few breaks was 60,767, the balance missed meals. *Id.* at 68. He stated: "There aren't enough people in the store because of preferred scheduling, which is leading to missed breaks and missed meals. So now this is all starting to make some sense. And the audit says, we've got a problem." *Id.* at 74. There was a policy for correcting mistakes:

> The average store runs between 30 and 50 time adjustment slips daily. This is 300 to 600 exceptions, but only 30 to 50 adjustments. Adjustment means that the associate actually comes and says, no, no, I actually did get my break; I just forgot to swipe in or out for. So it says the magnitude of this problem even after they correct it for honest mistakes is big.

*Id.* at 81–82. The parties stipulated that the jury would be told how many lawsuits against Wal–Mart had been filed. *Id.* at 86. As a result of the Shipley Audit, the following actions were taken:

> They—well, two things: First is that they didn't do any more audits. We saw those admissions for rest breaks or off-the-clock work. And the second was that they eliminated the process whereby associates would punch in or swipe in and out for rest breaks, so they just eliminated punching in and out for rest breaks.

*Id.* at 88.

The commonality of proof of the loss of rest breaks and work off the clock was demonstrated by Appellees relying upon Wal–Mart's own business records.[18] Dr. Landy testified:

---

**18.** *Cf. In re Wal Mart Employee Litig.,* 290 Wis.2d 225, 711 N.W.2d 694, 695 (2006) (denying class certification based upon unmanageability of class; because "much of the

pertinent Wal–Mart payroll records were generated in the first instance by members of the proposed class," Wal–Mart would have right to examine those individuals).

Q: [W]hy did you consider the time clock archive reports important in performing your analysis?

A: Well, there's the—the important part of the time clock archive reports is that this is the official record of—of how, for example, when we talked yesterday about you'd lose a minute if you're a minute too long on break, you don't get it back, and you said that it's the time clock archive report that shows. And we looked at it yesterday, a version of it. It shows you how the computer adds and subtracts time, which means adds and subtracts money. So the time archive report is the official record. That's how Wal–Mart pays its people and presumably pays taxes on them and does other kinds of things. So that's—that's—that's the official record. . . .

Q: Other than getting the little documents again, we created a sheet. What did you consider important about this, and can you tell the jury what it is?

A: Well, this is—this is a report that comes off of the report we just saw. So the time clock archive report says you should have had a 15–minute break, you had a 14–minute break. It would appear here on the next report—this is a more refined report—as a long break, for example. . . . So a long shift means, watch out, this person could be headed for overtime, and you may want to take some hours back later in the week so you don't get into overtime, because overtime is not good. So we have all sorts of these things that are indicated here: Short break, short shift, meal too early, too many meals, long break. So this is the report, which comes off of the time archive report, now identifies for the store manager all sorts of key little things. Now, it does a couple of things. It tells the manager what's going on here so a long shift, the manager says, "Ooh, you know, Mike Donovan worked ten hours. I got to keep an eye on his hours for the rest of the week because we can't get into overtime. The second thing that's—that it indicates what that computer down in Bentonville is going to do. A short break is going to take some time off—I mean a long break will take your time away. If you're on a break two minutes too long, that's coming out of your paycheck. . . . But what it does say, when you have too few breaks, you now—you're now notified in an official sense this could be a problem. There could be a violation of some kind, company policy, the promise, a wage and hour law if it's a lunch or meal. So, this report tells you a lot of things.

*Id.* at 30–34.

Ms. Hummel was a named class representative. She testified that she started to work at a Sam's Club store in 1992. N.T., 9/18/06 (afternoon), at 11, 24; R.R. at 1632a, 1635a.

Q: Do you remember that there was an orientation at the start of your working at Sam's Club in 1992?

A: Yes.

Q: And during that orientation did you receive a Handbook?

A: Yes, I did.

Q: Did you also sign an Acknowledgment form?

A: Yes.

Q: And did you understand when you did that that you could quit Sam's Club at any time?

A: Yes.

Q: Did you also understand that Sam's Club could terminate you at any time?

A: Yes.

Q: Did you understand, in other words, that you were an employee at will?

A: Yes.

Q: Now during this orientation at Sam's Club, did you learn that you were entitled to get paid rest breaks?

A: Yes, that's what I was told.

Q: And did you understand you were entitled to paid rest breaks depending upon the length of the shift that you worked, the number of hours?

A: Correct....

Q: Did you ever miss meal or rest breaks during the time you worked at Sam's Club?

A: Yes.

Q: And did you—were you told by any manager at Sam's to work through your rest breaks or meal breaks to get your productivity up? ...

THE WITNESS: Yes.

Q: Ms. Hummel, did you work off the clock while you were an employee at Sam's Club?

A: Yes, I did, many times.

Q: And why did you do that?

A: Because my managers told me to.

*Id.* at 13–14, 20–21; R.R. at 1634a. She was terminated after ten years and told that there was not enough work for her in the bakery. *Id.* at 23.

Ms. Braun was an employee at Wal–Mart from November 17, 1998, until she was fired in late January of 1999. N.T., 9/15/06 (afternoon), at 9; R.R. at 1626a.

Q: Do you remember that first day you went to Wal–Mart?

A: Orientation, going through the Handbook, them explaining what was to be done and how it's to be done. Yeah.

Q: About how long did that last?

A: About four—four hours everything lasted.

Q: Did you read the Handbook?

A: Did I read it in its entirety? No, but I did skim through it, and I can remember a lot of things.

Q: What do you remember about the Handbook or your first day there at orientation about the rest and meal breaks?

A: Fifteen minute meal—I am sorry, one-hour meal breaks, fifteen-minute breaks, regular breaks, to clock in and out, to—well, it was basically what we were entitled to.

Q: And as a result of that—well, let me back up first. Did they show you where the timeclock was?

A: Yes.

Q: Was there any posters around the timeclock?

A: Yes. There was posters all over the place.

Q: What did the posters say?

A: Punch in and out, make sure you get your meal breaks, make sure you get your breaks, be accordingly(sic) when you are on your breaks.

Q: You were hired as a cashier, correct?

A: Yes.

*Id.* at 7–8; R.R. at 1624a–25a. Ms. Braun was asked to describe the time between the day after Thanksgiving, which was referred to as Blitz, and through Christmas:

Q: Was that a busy day?

A: Busiest. It was as if they were standing there pounding on the door to walk in that morning. I am looking at them before they walked in the door.

Q: Now between Blitz, the day after Thanksgiving, and right before Christmas when you stopped being a cashier, can you tell the jury what it was like there as a cashier?

A: It was horrible. Some days you got your breaks, all of them. But there was a lot more times where, especially being a cashier, you would be on your lunch for 23 minutes, you would get called

right back in. They would come outside and get you.

If you were sitting outside enjoying your meal break, they are out the door getting you. They would bring you back in, but I got to clock back in. You can't, you don't got time for that, you got to get back on the register, look at the all lines we got there (sic)....

Q: Now you mentioned having to zone. Did you ever have to zone off the clock?

A: All the time.

Q: How would that come about?

A: When I was on the cash register we would go up count out our money, throw our bags in the cash room, come down, do our registers, go to the door, getting ready to leave, ready to leave. No, you got to go help soft lines, or, you got to go help the electronics department, or, you got to go help the hunting department. I thought my job was done, and I was told—I had said my schedule is until 11 o'clock. I am to leave at 11.

Q: Did you work at the Franklin Mills store?

A: Yes.

Q: Did that store close at 11 p.m.?

A: Yes.

Q: Were you told to go zone after the store was closed?

A: Yes.

Q: When you went and tried the front doors, what did you find?

A: It was locked.

Q: Who told you to go back and zone?

A: A lot of occasions it would be a customer service manager. On two occasions it was Travis Bailey, the Store Manager....

A: I was told if I had a complaint, problem, personal problem, door is always open.

Q: And what happened when you used it to complain about being locked in the store?

A: I got fired.

Q: When you were the cashier, how would you signal the Cashier Service Manager that you desperately needed a break?

A: You flick your light up and it blinks.

Q: Were there store meetings concerning that?

A: Yeah.

Q: What were you told in the store meetings by Wal–Mart managers?

A: Exactly the way they said it?

Q: Yes.

A: "Starting to look like Christmas out there, stop blinking them lights."

Q: Was that out on the floor?

A: That meeting was on the floor....

Q: Did you miss rest breaks at Wal–Mart?

A: Yes.

Q: Did you receive short breaks at Wal–Mart?

A: Yes....

Q: Were you forced to work off the clock?

A: Yes.

*Id.* at 10–11, 18–19, 26–28.

Patricia Holley testified that she worked at the Franklin Mills Wal–Mart:

Q: You were told by a member of salaried management at the Franklin Mills store that despite the policy that said you got two rest breaks, your second one was a privilege?

A: Yes.

Q: Were you working more than six hours so that you earned it under PD–07?

A: I was actually in the Wal–Mart store for nine hours. My schedule scheduled me for nine hours.

Q: How did it come up that you were asking about the second break that you weren't receiving?

A: Because I never got them and I wanted to know, I asked, well, I thought I was supposed to get two breaks. And he said that's it, the second one was the privilege.

Q: How did you know you were supposed to get two 15–minute rest breaks?

A: I did read it.

Q: Did read what?

A: I read it in the Handbook.

Q: You were fired from Wal–Mart, correct?

A: Yes.

N.T., 9/22/06 (afternoon), at 6–7.

Delores Killingsworth Barber was a Wal–Mart employee from 2003–2005. N.T. 9/25/06 (afternoon), at 16; R.R. at 1897a.

Q: Do you recall anything from your orientation at Wal–Mart?

A: We just—different people were there for different positions, they had addressed us by positions, what our responsibilities would be according to our positions. They let us know about their policies, that we get breaks—we get two breaks and we get a lunch. So I thought that was a great benefit. They let us know about their insurance, the 401(k), their stock plan, different things like that. . . .

THE WITNESS: We didn't get our breaks because there wasn't enough people to cover us, to relieve us to get our breaks, to take our first fifteen minutes. Sometimes our lunch we wasn't able to take until the end of the shift, or we would have to take a half a lunch, things of that nature.

Q: Was anything said to you by anyone about your second break that stands out in your mind?

A: They—we would request our breaks and they would just let us know that we couldn't take it, they didn't have anyone to relieve us, as soon as they could that they would. And this was said to us by the Customer Service Managers, the CSMs and sometimes the assistant managers, the salaried managers.

Q: How frequently would this happen?

A: That we didn't get our breaks? Probably about three times a week we didn't get our breaks.

*Id.* at 16–17, 20; R.R. at 1897a–98a, 1901a.

Instantly, the trial court opined:

In support of their claim, [Appellees] present expert analysis of [Wal–Mart's] own computer records of employee time and activity. [Appellee] relies upon the expert opinion of Dr. L. Scott Baggett[,] a highly qualified consulting statistician, the opinion of Martin M. Shapiro[,] a highly qualified psychologist and researcher at Emory University with significant experience in the application of the statistical quantification of measurement operations, each of whose reports are of record and the "Shipley Audit[,]" an analysis performed for management purposes by [Wal–Mart]. All expert analyses relied upon [Wal–Mart's] own computer records maintained in the regular course of their business for business purposes, namely to determine the pay earned by hourly employees. These computer records are mandated by law including the Pennsylvania Minimum Wage Act of 1968 which states: "Every employer of employees shall keep a true and accurate record of the hours worked by each employee and the wages paid to each. . . . "

[Wal–Mart's] business record, the "Time Clock Archive Report" records the "total hour's (sic) worked" and "total breaks" for every employee for every shift worked. [Wal–Mart's] own records, the Time Clock Punch Exception Report lists missed or inadequate breaks. These reports have been utilized and relied upon by [Wal–Mart's] management for payroll and evaluation purposes. The same reports were relied upon and analyzed by [Appellees'] experts.[5]

[Wal–Mart] claims to have an unalterable written policy of providing all employees and there all putative class members with all mandated rest and meal breaks. This policy, applicable to all employees, incorporated in "PD–07" requires that all "work associates" receive one paid rest break of 15 minutes during any three hour work period and two paid 15 minute rest breaks and one unpaid meal break of 30 minutes over a six hour work period. [Wal–Mart] further claims to have an unalterable written policy incorporated into "PD–43" that no associate "should perform work for the company without compensation" and that no supervisor may request or require any associate to work without compensation. [Wal–Mart] is mandated by law in Pennsylvania to advise every employee of the wage payments and "fringe benefits" to which they are entitled.[6]

Dr. Baggett examined management reports from March 1998 to December 2000 for twelve stores in Pennsylvania. Based upon an analysis of 23,919 individual shifts covering 2,250 individual associates Dr. Baggett concluded that 17,556 or 64.4% of the shifts contained deficiencies in duration of rest and meal breaks and 10,889 or 40% of workers did not receive the appropriate number of breaks. As to [Appellee] Hummel herself, Dr. Baggett found 35.8% of her breaks were deficient in duration and 28.3% deficient in number.

These findings for Pennsylvania stores by [Appellee's] retained expert are consistent with [Wal–Mart's] internal audit performed in June 2000. After studying the computer "exception reports" in 127 stores nationally including five stores in Pennsylvania, [Wal–Mart's] Internal Audit division found "Stores were not in compliance with company and state regulations concerning the allotment of breaks and meals as 76,472 exceptions were notes in 127 stores reviewed for a one week period." 75% of these missed breaks concerned rest breaks 25% concerned missed meal breaks. [Wal–Mart's] own internal management analysis revealed that an average of 2 breaks per associate per week were either missed or shorted at every store. The internal audits findings concerning the Pennsylvania stores actually revealed greater deficiencies than Dr. Baggett's conclusions.

Other computer records were also analyzed by [Appellees'] experts. [Wal–Mart's] database records time associates spent on other electronic devices such as cash register and computer based learning terminals. [Appellees'] expert Dr. Shapiro compared this database with time records and determined that while associates were recorded as taking breaks they were also recorded as being engaged in employment related activities.

---

[5] Even though [Wal–Mart] relied upon these records which are mandated by law, to determine associate's pay, [Wal–Mart] claims that their employment records are inaccurate and may not be relied upon. While this defense may be persuasive at trial, for purposes of this preliminary procedural certifica-

tion decision the [c]ourt accepts these business records as *prima facie* accurate.

[6] 43 P.S. 260.4, actual notification is not required since posting is sufficient for compliance.

Trial Ct.1925(a) Op., 9/3/08, at 5–6 (quoting Trial Ct. Cert. Op., 12/27/05, at 8–10).

Wal–Mart avers that Dr. Baggett's testimony could not demonstrate on a class-wide basis whether employee swipe records adequately reflected missed breaks. Individual employees would have to be questioned, Wal–Mart claims, to determine whether Wal–Mart managers forced class members to work through or cut short their breaks. Similarly, Dr. Shapiro's methodology could not show off-the-clock work. His analysis of data from cash registers at sixteen Wal–Mart stores could not show whether or why employees worked off the clock. Simply because an employee was not logged onto Wal–Mart's time-keeping system, Wal–Mart argues, did not prove that the employee was forced to work off the clock. In support of its contentions regarding Appellees' experts, Wal–Mart cites *Basco v. Wal–Mart Stores, Inc.*, 216 F.Supp.2d 592 (E.D.La.2002), *Cutler v. Wal–Mart Stores, Inc.*, 175 Md. App. 177, 927 A.2d 1 (2007), *Petty v. Wal–Mart Stores, Inc.*, 148 Ohio App.3d 348, 773 N.E.2d 576 (2002), *Harrison v. Wal–Mart Stores, Inc.*, 170 N.C.App. 545, 613 S.E.2d 322 (2005), and *Wal–Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 557 (Tex.App. 2002).[19] These cases are distinguishable from the instant case because those courts do not liberally construe class action rules. *See Cutler*, 927 A.2d at 14. Furthermore, the *Petty* Court did not discuss the Baggett–Shapiro testimony. In *Basco* and *Lopez*, the courts do not discuss the Baggett–

Shapiro testimony, and they are further distinguishable from the instant case since they involve claims for breach of oral contracts. *See Basco*, 216 F.Supp.2d at 602–03; *Lopez*, 93 S.W.3d at 556–57.

It is undisputed that corporate, written directives existed governing rest breaks and off-the-clock work, *viz.*, corporate policies PD–07 and PD–43. Prior to February, 2001, all hourly employees were required to clock out for breaks. The parties stipulated that after January 4, 2001, this policy changed and that there was pending litigation:

> Stipulation on litigation pending as of January 4, 2001: Wal–Mart stipulates and agrees that by January 4, 2001, at the latest, it had decided that it would no longer require employees to swipe in and out for rest breaks. "That policy change became effective on February 9, 2001. As of January 4, 2001, 2 lawsuits alleging violations of Wal–Mart's rest break policy had been filed against Wal–Mart on behalf of employees in seven states: Colorado, Indiana, Louisiana, New Mexico, North Carolina, Ohio, and Texas.

N.T., 9/26/06 (morning), at 5; R.R. at 1905a.

Furthermore, in response to a request for admissions, Wal–Mart stated:

> [Appellees' counsel]: For the record, Your Honor, the Request For Admission Number 47 asked:

> "During the relevant period, Wal–Mart Corporate Policy PD–07 was dictated to associates at Wal–Mart stores and Sam's

---

**19.** Wal–Mart acknowledges that other jurisdictions certified class actions, *viz.*, *Salvas v. Wal–Mart Stores, Inc.*, 452 Mass. 337, 893 N.E.2d 1187 (2008), *Hale v. Wal–Mart Stores, Inc.*, 231 S.W.3d 215 (Mo.Ct.App.2007), *Iliadis v. Wal–Mart Stores, Inc.*, 191 N.J. 88, 922 A.2d 710 (2007), and *Armijo v. Wal–Mart Stores, Inc.*, 142 N.M. 557, 168 P.3d 129, 142 (2007). Wal–Mart's Brief at 35. Wal–Mart also notes that it has reached settlement agreements in *Hale*, *Iliadis*, and *Armijo*. *Id.* at 35 n. 22.

clubs by corporate headquarters in Bentonville."

"Response: Defendants admit only that PD–07 was communicated to hourly associates in Pennsylvania stores during the relevant period in a variety of ways, including, among other things, during the training of new hourly associates, signs posted in stores, computer-based learning, the pipeline/wire, and Wal–Mart's closed-circuit television system, and that many of communications concerning PD–07 originated from defendant's corporate headquarters in Bentonville, Arkansas. In all other respects, this request is denied." And in addition, Your Honor, plaintiffs will publish to the jury the request for admission relating to the grass roots survey and rest breaks. This was similar to the ones that were already published on meal breaks and off-the-clock work. It's Request for Admission 324. For the record, this reads: "In the year ended January 31, 1999, the grass roots survey inquired about whether associates received their rest breaks.

"Response: Defendants admit that the grass roots survey for the year ended January 31, 1999, did not include any direct question concerning whether or not hourly associates who worked in Pennsylvania stores received rest breaks. 'However, the grass roots survey did measure overall hourly associates' job satisfaction concerning, among other subjects, associate treatment and the application of defendant's policies. In all other respects, this request is denied."

Your Honor, this same request, this identical request, without me reading it into the record, was also admitted in the same language for each of the years 2000 through 2006.

N.T., 9/26/06 (morning), at 6–8, R.R. at 1906a–08a.

Wal–Mart's own policies and its directives for enforcement of the policies are undisputed. The individual most qualified to speak of Wal–Mart's policies, Mrs. Reid, testified that managers and associates would be disciplined if they violated the rest break policy. The policies were strictly enforced by Wal–Mart. If a manager reported that a fellow manager forced an employee to work off the clock, then that manager would be subject to discipline. In fact, that manager would not be promoted and may be fired.

Undisputed testimony from Wal–Mart's own personnel verified that the associates were not receiving rest breaks. The executive vice president of human resources worldwide, Mr. Peterson, who reported to the president and chief executive officer, Mr. Coughlin, acknowledged a memo sent as early as 1998 that associates were not receiving rest breaks. Every associate had access to the twice-yearly meetings attended by all store managers and Wal–Mart's top management via an internal internet system. It is undisputed that Wal–Mart's policies were disseminated to associates.

Mrs. Reid testified that associates received employee handbooks at orientation which contained the promise of certain benefits.[20] "Unilateral contracts . . . involve only one promise and are

---

**20.** Wal–Mart noted: "Wal–Mart's rest break policy was not mentioned at all in some versions of the employee handbook." Wal–Mart's Brief at 24 n. 14. Both of those employee handbooks contain the following statement: "Note: All associates please refer to your Benefits Summary Plan Description (SPD) Booklet for eligibility requirements and details of your benefits." R.R. at 6719a, 6779a. The SPD references rest breaks. R.R. at 6789a.

formed when one party makes a promise in exchange for the other party's act or performance." *First Home Sav. Bank, FSB v. Nernberg,* 436 Pa.Super. 377, 648 A.2d 9, 14 (1994). In *Bauer v. Pottsville Area Emergency Med. Servs., Inc.,* 758 A.2d 1265 (Pa.Super.2000), this Court stated:

> Provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her duties. A unilateral contract is a contract wherein one party makes a promissory offer which calls for the other party to accept by rendering a performance. In the employment context, the communication to employees of certain rights, policies and procedures may constitute an offer of an employment contract with those terms. The employee signifies acceptance of the terms and conditions by continuing to perform the duties of his or her job; no additional or special consideration is required.

> *Darlington v. General Electric,* 350 Pa.Super. 183, 210–12, 504 A.2d 306, 320 (1986) (Beck, J., concurring).

*Id.* at 1269.

Instantly, Appellees do not argue that the handbook supplanted their employee at-will status. On the contrary, they contend that at-will employees may be parties to a unilateral contract. In *Bauer,* as in the case *sub judice,* the employee handbook provided a disclaimer that the employer was an employer-at-will. The *Bauer* Court found that an employee handbook could create a contractual relationship while not supplanting the at-will employer-employee relationship:

> [T]he employee handbook stated, in relevant part:

> EMPLOYMENT

Pottsville Area E.M.S., (herein referred to as PAEMS), is an "at will" employer. This means that employment may be offered or denied at any time for any reason. Both PAEMS management and the employee reserve the right to terminate employment at any time for any reason.

\* \* \*

**STATUS CLASSIFICATIONS**

Full Time–Any employee scheduled for at least 36 hours per week for a period of 90 consecutive days will be treated as a full time employee.

(Employee Handbook, effective May 1, 1998, at 1.) In addition, the handbook set forth appellee's policy regarding attendance, vacation, paid sick time and other benefits. Specifically, full-time employees are given forty (40) hours of sick time per year, eight (8) hours of compensated time off for holidays, up to twenty-four (24) hours of bereavement leave, health coverage, and compensation for military service and jury duty. The handbook does not provide for part time and per diem employee benefits. In its Opinion, the trial court found there was no contract upon which to base a cause of action because appellee evidenced its intent to maintain the at-will employment relationship. We [*i.e.,* the *Bauer* Court] disagree. In this case, a reasonable person in appellant's position would understand that his continued performance would bear the fruits of his employer's policies. Appellant worked the requisite 36 hours per week for in excess of 90 days and received none of the benefits provided for in the handbook.

*Id.* "A handbook distributed to employees as inducement for employment may be an offer and its acceptance a contract." *Morosetti v. Louisiana Land & Exploration Co.,* 522 Pa. 492, 495, 564 A.2d 151, 152

(1989). In *Morosetti,* however, "[t]he employees in their evidence were able only to show that they believed there was a policy of severance pay." *Id.* at 495, 564 A.2d at 153.

 We are persuaded by the reasoning in a decision by the United States District Court for the Eastern District of Pennsylvania, *Caucci v. Prison Health Servs., Inc.,* 153 F.Supp.2d 605 (E.D.Pa. 2001), where the court stated:

An employment handbook is enforceable against an employer if a reasonable person in the employee's position would interpret its provisions as evidencing the employer's intent to supplant the at-will rule and be bound legally by its representations in the handbook. The handbook must contain a clear indication that the employer intended to overcome the at-will presumption. The court may not presume that the employer intended to be bound legally by distributing the handbook nor that the employee believed that the handbook was a legally binding instrument. Generally, explicit disclaimers of contract formation in an employee handbook preclude a breach of contract claim.

Notwithstanding this, provisions in a handbook or manual can constitute a unilateral offer of employment which the employee accepts by the continuing performance of his or her duties. A unilateral contract is a contract wherein one party makes a promissory offer which calls for the other party to accept by rendering a performance. In the employment context, the communication to employees of certain rights, policies and procedures may constitute an offer of an employment contract with those terms. The employee signifies acceptance of the terms and conditions by continuing to perform the duties of his or her job; no additional or special consideration is re-

quired. Thus, the provisions comprising the unilateral contract may be viewed as a contract incidental or collateral to at-will employment. An employer who offers various rewards to employees who achieve a particular result or work a certain amount of overtime, for example, may be obligated to provide those awards to qualifying employees, although retaining the right to terminate them for any or no reason.

*Id.* at 611 (citations and quotation marks omitted); *see also Golkow v. Esquire Deposition Servs., LLC,* No. 07–3355, 2009 WL 3030218, at *3, 2009 U.S. Dist. LEXIS 87226, at *7 (E.D.Pa. Sept. 23, 2009) (stating, "A unilateral contract is proven if the plaintiff can show that 'one party made a promissory offer, which calls for the other party to accept by rendering performance.'" (quoting *Bauer,* 758 A.2d at 1269)); *Pilkington v. CGU Ins. Co.,* No. 00–2495, 2000 WL 33159253, at *6–7, 2001 U.S. Dist. LEXIS 3668, at *22–*23 (E.D.Pa. Feb. 9, 2001) (employer can create a unilateral contract with employee-at-will by offering additional terms of employment conditioned upon the employee's continued performance of his job).

 In *McGough v. Broadwing Commc'ns, Inc.,* 177 F.Supp.2d 289 (D.N.J. 2001), applying Pennsylvania law, the court stated:

Defendants are correct in maintaining that this Compensation Plan, which is attached to the Complaint as an exhibit, does not in and of itself alter the Plaintiffs' status as at-will employees. *See Herbst v. General Accident Insurance Company,* 1999 WL 820194 (E.D.Pa. 1999); *Anderson v. Haverford College,* 851 F.Supp. 179, 181 (E.D.Pa.1994); *Raines v. Haverford College,* 849 F.Supp. 1009 (E.D.Pa.1994).[5] Plaintiffs' status as at-will employees, which appears to be undisputed, does not, howev-

er, excuse Defendant Broadwing from providing compensation for services rendered prior to their termination. The presumption of at-will employment confers a legal status upon employees hired for an undefined term of employment which addresses a particular aspect of the employment relationship—the ability of both employer and employee to terminate their employment relationship at any time without explanation or cause. *See Herbst,* 1999 WL 820194 at *8; *Ruzicki v. Catholic Cemeteries,* 416 Pa.Super. 37, 610 A.2d 495, 497 (1992). The doctrine does not, however, address other aspects of the employment arrangement, such as issues regarding the promised form and amount of compensation for work completed prior to an employee's termination. *See Kotlinski v. Mortgage America, Inc.*[,] 40 F.Supp.2d 298, 307 (W.D.Pa.1998); *see also Martin v. Safeguard Scientifics, Inc.,* 17 F.Supp.2d 357, 368 (E.D.Pa. 1998). While an employer may permissibly discharge an at-will employee at any time with or without cause, the doctrine does not relieve an employer of its contractual obligation to provide the compensation promised in return for an employee's services. Moreover, while the language of the Plan's disclaimer may reserve Broadwing's right to alter the nature and extent of Plaintiffs' compensation for future services, it cannot and does not permit Broadwing to retroactively modify the terms of Plaintiffs' compensation for work performed prior to such modifications.

An express contract is formed when the terms of an agreement are declared by the parties either verbally or in writing. However, even where no such clear declaration exists, a contract may nevertheless be implied-in-fact. A contract implied-in-fact is an actual contract which arises when parties agree on the obligation to be incurred, but their intention, instead of being expressed in words, is inferred from the relationship between the parties and their conduct in light of the surrounding circumstances. *See Halstead v. Motorcycle Safety Foundation, Inc.,* 71 F.Supp.2d 455 (E.D.Pa.1999).[6] An offer and acceptance need not be identifiable and the moment of formation need not be precisely pinpointed. *See Ingrassia Construction Co., Inc. v. Walsh,* 337 Pa.Super. 58, 67, 486 A.2d 478 (1984). In general, there is "an implication of a promise to pay for valuable services rendered with the knowledge and approval of the recipient, in the absence of a showing to the contrary." *Martin v. Little, Brown and Company,* 304 Pa.Super. 424, 429, 450 A.2d 984 (1981). As one Pennsylvania court has explained, "a promise to pay the reasonable value of the service is implied where one performs for another, with the other's knowledge, a useful service of a character that is usually charged for, and the latter expresses no dissent or avails himself of the service." *Id.* at 430, 450 A.2d 984 (citing *Home Protection Building & Loan Association,* 143 Pa.Super. 96, 98, 17 A.2d 755 (1941) and 12 Amer. Jur. Contracts, § 5). However, a promise to pay for services can only be implied, however, in circumstances under which the party rendering the services would be justified in entertaining a reasonable expectation of being compensated by the party receiving the benefit of those services. *Id.*

---

[5] Under Pennsylvania law, in order to rebut the presumption of at-will employment, a plaintiff must establish the existence of additional consideration other than the services he was engaged to perform, an agreement for a definite duration, or an agreement specifying he will be discharged only for just cause. *See Herbst v. General Accident Insurance*

*Company*, 1999 WL 820194 at *8 (E.D.Pa. 1999). A document such as the Compensation Plan promulgated by Broadwing is only enforceable as a contract modifying an employee's "at-will" status "if a reasonable person in the same position as the employee would interpret its provisions as evidencing an intent by the employer to overcome the at-will presumption." *Anderson*, 851 F.Supp. at 181. Courts have consistently held that, under Pennsylvania law, the existence of a disclaimer expressly disavowing any intent to contract are sufficient to retain the at-will presumption. *See id.* at 182.

[6] Defendants do not suggest that averment of an express contract is necessary to state a valid cause of action under the WPCL. As case law suggests, the statute merely requires the existence of a binding legal duty upon the employer to provide the compensation sought by the complainant. Under Pennsylvania law, a contract implied-in-fact "has the same legal effect as any other contract" and "differs from an express contract only in the manner of its formation." *Ingrassia Construction Co., Inc. v. Walsh*, 337 Pa.Super. 58, 67 n. 7, 486 A.2d 478 (1984).

*Id.* at 295–97. "[I]t is the intention of the parties which is the ultimate guide, and, in order to ascertain the intention, the court may take into consideration the surrounding circumstances...." *Martin v. Capital Cities Media, Inc.*, 354 Pa.Super. 199, 511 A.2d 830, 839 (1986) (citation omitted).

Appellees claimed that Wal–Mart deprived the class of unpaid, thirty-minute meal-periods and paid, fifteen-minute rest-breaks pursuant to Wal–Mart's PD–07 policy and required its employees to work off the clock without compensation, in violation of PD–43. Appellees claim they continued to work in reliance on the promise that these corporate policies would be enforced.

In *Iliadis v. Wal–Mart Stores, Inc.*, 191 N.J. 88, 922 A.2d 710 (2007), the Supreme Court of New Jersey reversed the trial court's refusal to certify a class of "all current and former hourly employees of Wal–Mart (including Wal–Mart Stores, Supercenters and Sam's Clubs) in the State of New Jersey during the period May 30, 1996 to the present." *Id.* at 714.[21] The Court held "that common questions of law and fact predominate over individualized questions and that the class-action device is superior to other available methods of adjudicating this dispute." *Id.* On virtually identical facts, the Court opined:

> First, plaintiffs allege breach of implied-in-fact contracts concerning rest and meal breaks and off-the-clock work. Such contracts arise from promises implied by words and conduct in light of the surrounding circumstances. *Wanaque Borough Sewerage Auth. v. Twp. of W. Milford*, 144 N.J. 564, 574, 677 A.2d 747 (1996). Implied-in-fact contracts are formed by conditions manifested by words and inferred from circumstances, thus entailing consideration of factors such as oral representations, employee manuals, and party conduct. *See Troy v. Rutgers*, 168 N.J. 354, 365, 774 A.2d 476 (2001).
>
> Second, the proposed class seeks recovery for breach of unilateral contracts, allegedly embodied in the Associate Handbook. In a unilateral contract, one party's promise becomes enforceable only on the performance of the other party's obligation. *Woolley v. Hoffmann–La Roche, Inc.*, 99 N.J. 284, 302, 491 A.2d 1257 (1985). To recover, plaintiffs must establish that they acted in accordance with the Associate Handbook—if a trier of fact deems it contractual—and that Wal–Mart did not honor its promises.

21. The *Iliadis* Court observed, "New Jersey courts, as well as federal courts construing the federal class action rule after which our rule is modelled [sic], have consistently held that the class action rule should be liberally construed." *Id.* at 718. Further, New Jersey requires, unlike Pennsylvania, "that a class action is **superior** to other available methods for the fair and efficient adjudication of the controversy." *Id.* at 720.

*Id.* at 722. In *Iliadis*, as with the instant case,

> The core of the present dispute is whether Wal–Mart engaged in a systematic and widespread practice of disregarding its contractual, statutory, and regulatory obligations to hourly employees in this State by refusing to provide earned rest and meal breaks and by encouraging off-the-clock work. Essential to that issue are other salient and common questions, most notably the meaning and significance of Wal–Mart's corporate policies concerning breaks and off-the-clock work. The impact of the Associate Handbook's disclaimer and the uniformity of new employee orientation also are prominent common questions.

*Id.* at 723.

Canetta Ivy Reid, the designated representative of Wal–Mart who was most knowledgeable about the policies known as PD–07 and PD–43, testified that Wal–Mart associates were told from day one in orientation that they were supposed to get rest breaks. Associates received employee handbooks and were told of Wal–Mart policies. She stated that it was against Wal–Mart's policy to work without getting paid.[22] She also conceded that the employee handbook promised these benefits to employees. Drs. Shapiro and Baggett

reviewed Wal–Mart's own records, which were used to generate payroll. Payroll hours were transmitted to corporate headquarters in Bentonville. Wal–Mart's own internal audits revealed violations of company policies regarding missed breaks and work off-the-clock.

In *Salvas v. Wal–Mart Stores, Inc.*, 452 Mass. 337, 893 N.E.2d 1187 (2008), again on virtually identical facts, the court held that the trial court erred in granting Wal–Mart's motion to decertify the class:

> The plaintiffs present the additional materials, including policy directives, employee handbooks, and the like, as evidence of an implied-in-fact contract or enforceable promise concerning work breaks and off-the-clock work. *See Li-Donni, Inc. v. Hart*, 355 Mass. 580, 583, 246 N.E.2d 446 (1969) ("In the absence of an express agreement, a contract implied in fact may be found to exist from the conduct and relations of the parties"). The judge found these general corporate materials (among other things) sufficiently specific to the contract issue to survive a challenge on summary judgment. They are no less persuasive on the issue of class certification, where all members of the class

---

22. In a Nevada case, one court found:

> The Court finds Plaintiffs have established commonality. Plaintiffs allege common policies emanating from the Home Office caused payroll manipulation over a widespread period of time over many stores in each state. Plaintiffs have presented evidence in the form of Wal–Mart's own internal memos, audits, reports, and communications regarding a company-wide policy of centralized wage cost control enforced through detailed computer records and daily and weekly communications from the Home Office. Plaintiffs also have presented statistical evidence of missed rest breaks, unauthorized management edits to employee time, and a uniform timekeeping system

> that did not credit employees for missed break time. Plaintiffs also have presented anecdotal evidence of missed breaks, one minute edits, and off the clock work. Wal–Mart's efforts at showing lack of commonality generally go to the weight of Plaintiffs' evidence, such as challenges to Shapiro's statistical analysis, rather than its admissibility. Further, Wal–Mart's arguments on the topic are stronger with respect to whether common issues will predominate rather than whether there are any common issues at all.

*In re Wal–Mart Wage & Hour Employment Practices Litig.*, No. 2:06–CV–00225–PMP–PAL, 2008 WL 3179315, at *13 (D.Nev. June 20, 2008).

were unarguably the beneficiaries of identical terms of employment.

*Id.* at 1211; *see also Armijo v. Wal–Mart Stores, Inc.,* 142 N.M. 557, 168 P.3d 129, 140 (2007) (holding "that the question of whether a missed break constitutes a breach of contract is also an issue common to the class").[23]

■ Instantly, the employee handbook contained Wal–Mart's policies regarding rest breaks, off-the-clock work and meal breaks, policies which were reinforced by Wal–Mart's corporate-wide policies and orientation sessions in which the handbook was disseminated and signed for by the hourly associates, resulting in a unilateral contract between Wal–Mart and the members of the class. *See Bauer,* 758 A.2d at 1269.

The video of the Cheryl Lippert deposition was read to the jury at the time of trial:

Q: Was it fair to say that the time clock adjustment forms, white slips, were one of the primary means that Wal–Mart used to ensure that the archive report was accurate at the end of the payroll period?

A: It was the primary tool but not only. Even with the direction given, which was, we want to see a white slip for every change in the payroll, do I know that, you know, there are changes made to payroll when a PTC called the employee at home because it's a payroll clause, they can call them at home and say I am missing a punch; what time did you leave. Do I know that happened? Yes....

Q: They would get a time clock exception report on a daily basis and look to see whether in fact there were punch exceptions that day, correct?

A: The direction was given that they review it on a daily basis.

Q: That was the expectation, correct?

A: The expectation was, yes.

Q: Okay. Then under Wal–Mart's expectation, they would investigate the exceptions and attempt to obtain a white slip to correct the exceptions that were reflected on that report; am I right?

A: That is correct, that is correct....

Q: And then assuming that they were able to get satisfactory explanations for exceptions or—and documented with the time clock adjustment forms, they would then finalize the time clock archive report for payroll purposes, right?

A: Yes, generally that was the standard process.

Q: Okay. So then at that point, the time clock archive report with, you know, maybe a few last minute changes every now and then would become the final data upon which the company would rely in generating bi-weekly payroll, right?

A: Yes. The archive report contained the data that contained a payroll report and generated a payroll run, that is correct.

N.T., 9/15/06, at 36–39; Supp. R.R. at 8125a–28a.

The trial court opined:

It is unusual in the extreme for [Wal–Mart], who relies on their records for business purposes to contend that although required by law to be created and maintained, their records are so unreliable that they cannot constitute prima facie proof of their contents. Since 1939 the Business Records Act, 42 Pa. C.S. [§ ] 6108, allowed business records

---

**23.** *Cf. Basco,* 216 F.Supp.2d at 602 (denying class certification because individualized issues predominated in claim of breach of oral contract); *Harrison,* 613 S.E.2d at 328 (same); *Lopez,* 93 S.W.3d at 557 (same).

into evidence without any actual proof of their accuracy because the law presumed the regularity and accuracy of records maintained in the regular course of business. The purpose of the legislatively enacted statute is the same as that of the Supreme Court [when it] adopted Rule 803(6) of the Pennsylvania Rules of Evidence. Records created and maintained for independent business purposes are not self-serving or created for litigation. As stated by the Supreme Court in *Williams v. McClain*, 513 Pa. 300, 520 A.2d 1374 (1987): "... the basic justification for the business records exception to the hearsay rule is that the purpose of keeping business records builds in a reliability which obviates the need for cross-examination." Because important business decisions routinely depend upon the accuracy of regularly kept records, they are admissible and constitute prima facie proof of their contents whether offered by their creator or an antagonist. Without question, a party opponent's business records may be offered against their creator, are prima facie proof of their contents, and may even constitute opposing party admissions against pecuniary interest. The presumption of reliability of business records which are created and maintained by affirmative requirement of law are utilized for payroll purposes is beyond question.

\* \* \*

█ The computer records demonstrate the existence of common questions of law and fact, and that common issue predominate.

Trial Ct. Op., 12/27/05, at 11–12. We agree.

Instantly, "there are questions of law or fact common to the class." Pa.R.C.P. 1702(2). The evidence presented at the time of trial by Wal–Mart and Appellees shows that Wal–Mart violated its own corporate policies promising benefits to associates. After considering all of the factors enunciated in Rule 1702, the court found that common questions of fact predominated based upon, *inter alia*, Wal–Mart's own internal memos, audits, payroll records, and policies. *See Clark*, 990 A.2d at 24–25; *Bauer*, 758 A.2d at 1269; *Janicik*, 451 A.2d at 457.

Wal–Mart claims the trial court's definition of the class was vague and overbroad. The trial court certified the class as follows: "[A]ll current and former hourly employees of Wal–Mart in the Commonwealth of Pennsylvania from March 19, 1998, to the present." The class was certified from March 19, 1998, to May 1, 2006, the opt out date. The class period was set using the notice opt-out deadline of May 1, 2006, as the end date. Wal–Mart cites *Bailey* and *Harrison* for the proposition that the definition of the class was overly broad because it included employees who never missed breaks or worked off-the-clock. As previously discussed, those cases are distinguishable. Further, to reiterate: "[C]lass members can assert a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are **subject** to the same harm will suffice." *Baldassari*, 808 A.2d at 191 n. 6 (emphasis added).

Next, Wal–Mart avers the court prevented it from raising the affirmative defense of voluntary waiver of rest breaks. However, a review of the record reveals Wal–Mart withdrew this defense at the close of Appellees' case:

[Appellees' counsel]: Your Honor, plaintiff has 2 motions.

THE COURT: That's it. Okay.

[Appellees' counsel]: Plaintiff moves for a directed verdict on defendant's affirmative defense of waiver. There has

been no evidence whatever that, one, waiver is a defense in this case, since it's precluded by statute. And two—

THE COURT: Wait a minute. Is there a defense of waiver, [Wal–Mart's counsel]?

[Wal–Mart's counsel]: There is no defense of waiver per se. We don't seek a jury question on the waiver issue. So it's clear and notwithstanding the Court's ruling, we certainly believe that the issue of employee voluntariness is relevant to the jury's consideration of other issues in the case, but we are not asking for and we are not submitting a waiver question or making a waiver defense.

THE COURT: Did you raise any waiver defense as an affirmative defense?

[Wal–Mart's counsel]: We are not making a waiver defense.

N.T., 10/6/06, at 87–88; R.R. at 2100a–01a.

Wal–Mart also contends the trial court deprived it of due process by eliminating its right to try inherently individualized issues on liability. The court did not preclude Wal–Mart from presenting employees to testify as to their individual experiences. The trial court stated:

Although [Wal–Mart] also claims to argue that they should have been permitted to call each of the 126,005 employee class members to explain why their time records showed miss[ed] breaks or off-the-clock work, no prohibition on calling 1[8]6,000 witnesses was ever imposed beyond the [c]ourt commenting on the absurdity of the "threat." [Wal–Mart] did however, identify hundreds of new witnesses never listed on their pre-trial memorandum the weekend before trial. However, even the request to call these witnesses was withdrawn.

Trial Ct. Op., 9/3/08, at 4 n. 4.

Wal–Mart, in fact, called several witnesses. Denise Pettigrew, a cake decorator at a Sam's Club store in Reading, Pennsylvania, testified that during her seven years of employment, she never had a manager ask her to miss a rest break or interrupt her during a break or ask her to work off-the-clock. N.T., 9/26/06 (afternoon), at 11–12, 15. She opted out of the class. *Id.* at 26. Tyrone Johnson, an employee of a Wal–Mart in Bechtelsville, Pennsylvania, also testified. *Id.* at 33. He testified that in six years of working for Wal–Mart, he was never asked by a manager to take a short rest break, skip a rest break, or interrupt a rest break. *Id.* at 36; R.R. at 1912a. He stated that since the termination of the swipe cards, he observed employees taking more and longer breaks. *Id.* at 38. He noted that when he works off the clock, he fills out a time-adjustment sheet. *Id.* He also opted out of the class. *Id.* at 47. Janet Ulmer, who worked for a Wal–Mart in Harleysville, Pennsylvania, and opted out of the class, testified:

Q: Were you paid for the time when you came in the morning and there were too many folks there?

A: Absolutely. I was always paid for my time.

Q: When you started working at Wal–Mart, were you told anything about Wal–Mart's policy on working off-the-clock?

A: I was told it was expressly forbidden. You did not work off-the-clock.

Q: And when and how did you learn about this policy?

A: I learned about that policy at orientation, my initial interviews. It was constantly reminded to me by different managers. Even the associates I worked with. It was just a constant rule.

Q: Now, were there ever occasions when you were working and doing some-

thing related to your Wal–Mart work, but you were not literally swiped out of the clock?

A: There were three specific occasions.

Q: Okay. Could you describe those for the jury?

A: The first occasion, I was new at Wal–Mart and we had a customer call in and she was looking for a specific item and I could not locate it. I had to contact my department manager who worked a different shift than I did. So when I was on break for my job during the day, I called the department manager to find out about the merchandise, and I had left a note with the customer's name and telephone number at the desk. And I had contacted her also to let her know whether the product was available or was not available. And when I came in that evening, I got kind of dressed down for it, said we're filling out a time adjustment record. You absolutely have to get paid for your time; you're not allowed to do that. That was the first time. The second time, I had come in, and I meant to talk with a manager. The store was between my home and my day job. So I stopped in on my way home to talk with a manager. And we have to punch in; you have to be paid for your time to work. And I wasn't working; I was talking with her, but I had to get paid for the time, so I was. And the third time was when I stopped in to let them know that I would not be able to continue working with them, and I was told again I had to be paid for my time.

Q: Just to be clear, because I don't think we covered this, were you a full-time employee, a part-time employee? How many hours did you work roughly?

A: No, sir, I was a part-time employee. I worked about 20 or so hours a week.

Q: And during the day, what was the day job that you had during that time?

A: I worked as a secretary.

Q: Now, did you ever work off-the-clock at Wal–Mart and you didn't get paid for it?

A: No, absolutely not.

Q: Let's switch gears now and talk about meal breaks and rest breaks. Did you ever come to learn about Wal–Mart's policies on meal breaks and rest breaks?

A: Yes, sir. That was also discussed with me at the initial orientation.

Q: And was there any discussion of it after the initial orientation?

A: Sure. I mean, everybody would ask you, it's like did you get a break, do you need a break, do you want a break, do you want to stop, do you need a rest? It was constant.

Q: Let's talk first specifically about the paid rest breaks that you got. Were you able to take a paid rest break whenever you wanted to?

A: Any time I needed one, you can take a break. They were very good.

Q: Now, I believe you said you worked as a cashier from time to time; is that right?

A: Yes, I did.

Q: When you worked as a cashier, were you still able to take your paid rest breaks when you wanted?

A: Sure. . . .

Q: Now, were there times when you took paid rest breaks that were longer than 15 minutes?

A: Absolutely.

Q: Did you take 20–minute paid rest breaks?

A: I'd take 20–minute rest breaks. Sometimes they were 30 minutes, 35 minutes.

Q: When you took a 20–minute paid rest break, were you paid for that entire 20 minutes of time?

A: Absolutely. It was a paid rest break.

Q: How about for 30 and 35 minutes, were you paid not just for the 15 minutes, but for the whole 30 or 35 minutes?

A: I was paid for the full time.

Q: Were there any times that you didn't take all 15 minutes of your paid rest breaks?

A: Absolutely.

Q: Why wouldn't you do that?

A: Well, it's similar to like when I was on the register. You get going; you're having a good time; you're working with some terrific people. The customers are nice. And I don't smoke; I don't need a smoke break. I wasn't hungry necessarily and I didn't need to use the bathroom, so I can't imagine just sitting around doing nothing for 15 minutes or whatever.

Q: Do you believe Wal–Mart owes you money for the times when you didn't take your full 15–minute paid rest breaks?

A: No, sir. They paid me for all the time I worked.

Q: Did anyone at Wal–Mart ever force you to skip or cut short your paid rest breaks?

A: No, absolutely not.

N.T., 9/27/06 (morning), at 32, 33–39; R.R. at 1917a–18a.[24] Bill Clinton, a full-time, hourly employee at the Wal–Mart in Quakertown, Pennsylvania, and who opted out of the class, also testified for Wal–Mart:

Q: Has any manager at Wal–Mart since you started working there in July 1998 ever kept you from taking a break?

A: No, they never have.

Q: Has any manager at Wal–Mart ever interrupted a rest break that you were on or forced you to come back from that break sooner than you would have?

A: No, that has never happened. . . .

Q: What sorts of things would cause you to swipe out a little late and go slightly over your scheduled six hours?

A: Well, finishing up putting a bicycle together or anything of that nature or— and I just wasn't being watchful going out for that six-hour time. . . .

Q: Well, let me ask you about off-the-clock work, Mr. Clinton. Do you know what Wal–Mart's off-the-clock policy is?

A: Yes, I do. You just don't work off the clock for any reason.

Q: What is your understanding of that policy based on? How do you know that?

A: It's brought to our attention regularly. Any meetings we have, this issue comes up at all these. They tell us there's no excuses for it in any way. Do not work off the clock.

N.T., 10/3/06 (morning), at 11, 13–14, 19; R.R. at 2057a–59a. Rosemary Aquilino worked at a Wal–Mart store in Franklin Mills, Pennsylvania, for nine years. N.T., 10/4/06 (afternoon), at 38. She was an hourly employee in the accounting office. *Id.* She testified:

Q: And let me ask you this about rest breaks, how do you in the cash office take rest breaks?

A: Okay, there is usually a few of us that work in the cash office, so we just take turns taking, you know, our breaks. If one person wants a break before the other, it's usually not a problem. It's

**24.** The reproduced record at 1917a only partially reproduces page 38 from the original record.

never been a problem. We always had our breaks.

Q: Do you always take two exact 15-minute breaks?

A: No....

Q: Do you feel like at any time you have been deprived of rest breaks at Wal-Mart?

A: No....

Q: What has been your experience with whether the people at the Franklin Mills store, Associates, are getting their rest breaks since rest break swiping ended?

A: They are probably taking longer breaks, a lot of them sometimes, because there is no way to calculate. People do get their breaks as far as what I can see.

Q: Has any manager ever suggested or asked you to work off the clock at the Franklin Mills store?

A: Absolutely not. Absolutely not.

*Id.* at 39–41. She also opted out of the class. *Id.* at 47. Susan Detwiler testified for Wal-Mart. She was a cashier at the Wal-Mart in Harleysville:

Q: Have you ever not been able to take a rest break when you wanted to?

A: No.

Q: Has anyone ever asked you, any manager at Wal-Mart, any co-worker, asked you to shorten a rest break?

A: No....

Q: What—do you have an understanding of what I mean by working off the clock?

A: Yes, sir.

Q: How do you understand that term?

A: Working off the clock is working before I punch in or working after I punch out for lunch or working after I punch out for the day.

Q: Have you ever in the entire time you have been at Wal-Mart ever worked off the clock, Ms. Detwiler?

A: No.

Q: Has anyone ever asked or suggested that you do so?

A: No.

Q: Do you know whether or not Wal-Mart has a policy on working off the clock and taking your rest breaks and your lunch breaks?

A: Yes.

Q: Tell me what that policy is, as you understand it?

A: It was explained to me when I was hired that, you are required to take your 15-minute breaks and your lunch break and under no circumstances would they take them away from you.

Q: Now that was when you were first hired you were told that?

A: Well, they told us, too, at the meetings.

Q: What meetings are you talking about?

A: We will have meetings with the certified nurse's assistant and the managers.

*Id.* at 49, 51–53.

Wal-Mart argues that it was denied its due process rights to have a jury determine liability as to each individual class member, rather than relying upon the analysis of Drs. Shapiro and Baggett, citing *Alix, Lopez,* and *Basco.* As discussed above, those cases are distinguishable from the instant case. Wal-Mart avers that it was denied its due process rights in defending against Drs. Baggett and Shapiro. Wal-Mart's argument is in derogation of class certification. Wal-Mart contends:

To defend itself adequately against [Appellee]s' experts' testimony, [Wal-Mart] would need to call each class member whose time records show missed or short swipes or database overlap, as well

as other witnesses with pertinent knowledge.... [Appellee]s tried this case not with testimony of what happened to individual Wal–Mart employees ..., but with the flawed notion Dr. Baggett's and Dr. Shapiro's analysis could create a composite picture of the experiences of the class as a whole.

Wal–Mart's Brief at 39–41. Appellees counter that Wal–Mart's "own policies and promises, its own business records, its own uniform scheduling plans, its own centralized staffing dictates, its own bonus practices and its own corporate admissions" applied to the members of the class. Appellees' Brief at 35. As the trial court opined:

It is unusual in the extreme for [Wal–Mart], who relies on their records for business purposes[,] to contend that although required by law to be created and maintained, their records are so unreliable that they cannot constitute *prima facie* proof of their contents.

Trial Ct. Op., 10/27/05, at 11.

█ The contention that Wal–Mart was denied due process in not being able to question each individual employee is in derogation of class certification, since common questions of law and fact predominate. *See Debbs,* 810 A.2d at 153; *see also Iliadis,* 922 A.2d at 726. The primary and predominant issue was whether Wal–Mart promised its employees breaks, and whether it encouraged, at times, a culture of denying those promised breaks. We discern no abuse of discretion by the trial court. The court considered all of the factors enumerated in Pa.R.C.P. 1702 and certified the class. *See Liss & Marion, P.C.,* 937 A.2d at 505.

With respect to Wal–Mart's third issue, we briefly restate the background. Appellees brought a WPCL claim against Wal–Mart for breach of an agreement to pay wages for rest breaks and off-the-clock work. As part of Wal–Mart's benefits for all employees, Wal–Mart had instituted a guaranteed, paid, single, fifteen-minute rest break if an employee worked more than three hours in a shift, or two such breaks if an employee worked more than six hours in a shift. Wal–Mart's employee handbook and PD–07 policy referenced these rest breaks as a benefit to Wal–Mart employees.

Wal–Mart counters that the employees were not denied any payment for missed rest breaks because they were paid regardless of whether they took a break or not. First, Wal–Mart argues that the WPCL's definitions of "fringe benefits" and "wage supplements" exclude rest breaks. Wal–Mart insists that the WPCL encompasses only payments to employees, such as cash, stock, or stock options. Conversely, Wal–Mart suggests, the WPCL does not cover rest breaks because rest breaks are not "payments." Wal–Mart's Brief at 50. Wal–Mart asserts that rest breaks are distinguishable from payments recognized under the WPCL because "the opportunity to rest cannot be exchanged for money." Wal–Mart's Reply Brief at 27–28.

Second, Wal–Mart contends that rest breaks do not constitute "fringe benefits" or "wage supplements" because the deprivation of the rest breaks does not give rise to a contractual right to payment. Wal–Mart reasons it pays employees regardless of whether they took rest breaks, missed rest breaks, or had shortened rest breaks. Thus, because employees are paid regardless, Wal–Mart concludes employees have no statutory right under the WPCL to payments for missed or shortened rest breaks. In other words, Wal–Mart insists its own corporate policies do not grant employees "extra" pay if they missed a rest break. Because employees do not receive "extra" pay if they missed a rest

break, Wal–Mart suggests employees are not entitled to payments under the WPCL. Wal–Mart's Brief at 49–50 (citing *Harding v. Duquesne Light Co.*, 882 F.Supp. 422 (W.D.Pa.1995)).

Should this Court conclude, however, that Appellees are entitled to payments for missed rest breaks under the WPCL, Wal–Mart advances four alternative arguments. First, Appellees failed to present evidence that "shortages in the wage payments made exceed five percent (5%) of the gross wages payable on any two regularly scheduled paydays in the same calendar quarter...." 43 P.S. § 260.10. If an employer underpays by less than 5%, Wal–Mart suggests that Appellees have alternative methods of recovering damages. Absent record evidence of such shortages, Wal–Mart claims the court erred in calculating damages. Second, Wal–Mart introduced evidence of its good faith in disputing Appellees' claims for payments under the WPCL. Third, the court erred in charging the jury regarding the requirements for liquidated damages under the WPCL. Fourth, Appellees failed to identify the specific plaintiffs entitled to liquidated damages. Simply, Wal–Mart's arguments pertain to reducing or eliminating the amount of $62,253,000 in statutory liquidated damages.

In sum, Wal–Mart's argument is threefold. First, the WPCL excludes rest breaks. Even if the WPCL encompasses rest breaks, Wal–Mart's own employment agreement does not grant employees a right to "extra" pay for missed rest breaks. Finally, even if this Court finds otherwise, Appellees failed to meet their burden of proof, the court erred in calculating damages and charging the jury, and Wal–Mart acted in good faith.

Appellees counter that they established Wal–Mart's agreement to pay for rest breaks and all time worked. They dispute Wal–Mart's interpretation of the liquidated damages provision. Specifically, Appellees argue the court awarded liquidated damages based on wages unpaid "for thirty days beyond the regularly scheduled payday...." 43 P.S. § 260.10. Appellees contend Wal–Mart waived its 5%-shortage argument and, regardless, they introduced evidence supporting the court's calculation of damages. Further, Appellees suggest Wal–Mart failed to establish good faith by clear and convincing evidence by, *e.g.*, offering evidence that it was unaware of the alleged failures to pay for rest breaks, investigated the alleged failures, or undertook remedial measures upon learning of the alleged failures. Appellees contend the jury evaluated conflicting testimony regarding Wal–Mart's good-faith efforts and the jury's determination should not be disturbed.

In addition to disagreeing with Wal–Mart's interpretation of the WPCL, Appellees claim Wal–Mart waived the issue. Appellees note that the court granted Appellees' motion *in limine* to preclude Wal–Mart from introducing evidence regarding statutory liquidated damages. Appellees therefore reason that Wal–Mart cannot challenge the court's alleged error of failing to charge the jury on shortages. Appellees also contend they were not required to identify the specific class members entitled to statutory liquidated damages because Wal–Mart waived the issue. Appellees suggest that because they were precluded from making any jury arguments regarding liquidated damages, Wal–Mart cannot now contend Appellees were required to identify class members entitled to liquidated damages. Regardless, Appellees conclude, the WPCL does not require identification of class members.

In reply, Wal–Mart disputes Appellees' statutory construction of the WPCL. Wal–Mart also relies on *Hartman v. Baker*, 766

A.2d 347 (Pa.Super.), *appeal denied,* 564 Pa. 712, 764 A.2d 1070 (2000), in insisting it acted in good faith in disputing Appellees' wage claim. Specifically, Wal–Mart contends that because it has consistently argued it had no contract with Appellees for paid rest breaks, it has demonstrated good faith. Finally, Wal–Mart reiterates its challenge to the court's allegedly improper jury charge on the WPCL.

The trial court reasoned that Appellees' claim is for payment of wages that were earned but unpaid because they were required to miss rest breaks and to work without time-clock records, which constituted "wages," "fringe benefits," and "wage supplements" as defined by the Act. Trial Ct. Op., 11/14/07, at 3. Because equity interests that highly-paid executives may have qualify as "protected fringe benefits and wage supplements," the court similarly concluded that "the monetary equivalents of 'paid [rest] break[s]' ... are protected fringe benefits and wage supplements." *Id.* at 6. The court found that mandatory liquidated damages apply to wages withheld from employees who worked off-the-clock. Trial Ct. Op., 11/14/07, at 6.

We initially examine whether the WPCL's definition of "fringe benefits" encompasses paid rest breaks. "Because statutory interpretation is a question of law, our standard of review is *de novo,* and our scope of review is plenary." *Snead v. Soc'y for Prevention of Cruelty to Animals of Pennsylvania,* 604 Pa. 166, 171, 985 A.2d 909, 912 (2009).

The object of interpretation and construction of all statutes is to ascertain and effectuate the intention of the General Assembly. *See* 1 Pa.C.S. § 1921(a). When the words of a statute are clear and free from all ambiguity, their plain language is generally the best indication of legislative intent. A reviewing court should resort to other considerations to determine legislative intent only when the words of the statute are not explicit. 1 Pa. C.S. § 1921(b). In ascertaining legislative intent, this Court is guided by, among other things, the primary purpose of the statute, *see* 1 Pa.C.S. § 1921(c)(4), and the consequences of a particular interpretation. *Id.* § 1921(c)(6).

*In re Carroll,* 586 Pa. 624, 636, 896 A.2d 566, 573 (2006) (case citations omitted). Moreover, "[i]t is axiomatic that in determining legislative intent, all sections of a statute must be read together and in conjunction with each other, and construed with reference to the entire statute."

*Penn Jersey Advance, Inc. v. Grim,* 599 Pa. 534, 540, 962 A.2d 632, 634 (2009). "[T]he Pennsylvania rules of statutory construction require the civil provisions of the WPCL to be liberally construed." *Hartman,* 766 A.2d at 353 (citing 1 Pa.C.S. § 1928(c)).

By way of background, the WPCL "provides employees a statutory remedy to recover wages and other benefits that are contractually due to them." *Oberneder v. Link Computer Corp.,* 548 Pa. 201, 204, 696 A.2d 148, 150 (1997) ("*Oberneder II* "); *Lugo,* 967 A.2d at 968.[25] The WPCL defines "wages" as including "any other

25. We agree with the following observation: "This court has also attempted to review the legislative history of the Wage Payment Collection Law to further determine the purposes underlying the law. Unfortunately, there are no substantive remarks included in the history of this law which would instruct this court." *Barnhart v. Compugraphic Corp.,* 936 F.2d 131, 134 n. 5 (3d Cir.1991); *see McGoldrick v. TruePosition, Inc.,* 623 F.Supp.2d 619, 630 (E.D.Pa.2009).

amount" pursuant to an employment contract. *See* 43 P.S. § 260.2a. For example, bonuses, commissions, and stock options are "wages." *See id.* Thus, if an employee demonstrates that any "amount to be paid pursuant to an agreement" "remain[s] unpaid," then that employee may be entitled to liquidated damages. *See* 43 P.S. §§ 260.2a, 260.10.

▮▮▮▮ "To present a wage-payment claim," the employee must aver a contractual entitlement "to compensation from wages" and a failure to pay that compensation. *Sullivan v. Chartwell Inv. Partners, LP,* 873 A.2d 710, 716 (Pa.Super.2005); *Hartman,* 766 A.2d at 352 (stating WPCL "establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement."); *see also Weldon v. Kraft, Inc.,* 896 F.2d 793, 801 (3d Cir.1990) (stating, "The contract between the parties governs in determining whether specific wages are earned."). We agree with the United States Court of Appeals for the Third Circuit's observation that, absent a formal employment contract or collective bargaining agreement, an employee raising a WPCL claim would have to establish, at a minimum, an implied oral contract between the employee and employer. *See De Asencio v. Tyson Foods, Inc.,* 342 F.3d 301, 309 (3d Cir.2003).

As the *Hartman* Court noted, "the courts of Pennsylvania have had little opportunity" to interpret the WPCL. *Hartman,* 766 A.2d at 353. In *Hartman,* an employee, in exchange for a reduction in pay, agreed to an equity stake in the company. *Id.* at 350. That employee wanted to exercise his equity stake, but the employer refused. *Id.* at 350–51. The Court addressed whether the employee's equity interest in the company constituted "wages" under the WPCL. *Id.* at 353.

▮▮▮ In resolving this issue, the *Hartman* Court relied on *Bowers v. NETI Techs., Inc.,* 690 F.Supp. 349 (E.D.Pa. 1988).[26] In *Bowers,* the employees had an agreement providing for severance pay and an option by the employees to sell their equity interest—the employer's stock—back to the employer. *Bowers,* 690 F.Supp. at 352. The employer was required to repurchase any such stock. *Id.* The employees sued the employer under the WPCL. *Id.*

The employer filed a motion for judgment on the pleadings, arguing that severance pay and the employer's payment to repurchase the employees' stock did not qualify as "wages" under the WPCL. *Id.* at 353. The *Bowers* court denied the employer's motion, reasoning that severance pay was both "guaranteed pay" and an amount to be paid pursuant to an agreement under the statute. *Id.* (citing 43 P.S. § 260.2a). Similarly, the court concluded that the stock-repurchase payment was also a "wage" because it was a payment pursuant to an agreement, and "offered to plaintiffs as employees, and not for some reason entirely unrelated to their employment." *Id.*

Because the stock repurchase payment in *Bowers* qualified as "wages," the *Hartman* Court similarly concluded that the equity interest at issue also qualified as "wages." *Hartman,* 766 A.2d at 353. The *Hartman* Court reasoned that the equity interest was a payment offered to the employee in exchange for a reduction in pay. *Id.* Further, the employer did not offer the

---

**26.** "While we recognize federal district court cases are not binding on this court, Pennsylvania appellate courts may utilize the analysis in those cases to the extent we find them persuasive." *Stephens v. Paris Cleaners, Inc.,* 885 A.2d 59, 68 (Pa.Super.2005) (citations omitted).

equity interest for reasons unrelated to the employee's employment. *Id.*

In *Kafando v. Erie Ceramic Arts Co.,* 764 A.2d 59 (Pa.Super.2000), this Court examined whether a gainsharing plan constituted earnings of an employee or a fringe benefit.[27] Initially, the *Kafando* Court declined to define a gainsharing plan as earnings of an employee "because the funds in the plan" were "not determined based upon an employee's time or task, piece or commission. Rather, the program is entirely dependent upon the ratio of the total cost of goods manufactured by" the employer. *Id.* at 62.

The Court then considered whether the gainsharing plan was a "fringe benefit" or "wage supplement":

> [W]e first note that the gainsharing plan does not involve any employee benefit plan as defined by ERISA, nor is the gainsharing plan a reimbursement for expenses or related to the payment of union dues. The money paid through the gainsharing plan likewise cannot be considered separation, vacation, or holiday pay for the same reason that the money in the plan is not earnings-because the fund is calculated in a manner that is entirely unrelated to any employment activities of the individual employees but rather is solely dependent upon [the employer's] earnings during the time period. There are, therefore, two possibilities left which would include the gainsharing plan in the WPCL definition of fringe benefits or wage supplements, "guaranteed" pay and "any other amount to be paid pursuant to an agreement."

By the terms of the gainsharing plan set forth in the employee handbook, the plan can only be considered "guaranteed pay" if the conditions set forth in the handbook are met. The plan sets forth responsibilities of [the employer's] employees and management; these can be described as goals designed to enhance the profitability and productivity of the company. Further conditions are set forth in paragraph ten of the program as quoted above; specifically, the employee must be on the payroll both on the last day of the calculation period and on the date that the gainsharing checks are distributed. It is only if these conditions are met that the gainsharing payments are guaranteed. The conditions were not met in this case.

*Id.* at 62–63 (footnote omitted). Because the employee was not on the payroll as of the last day of the calculation period and the date of distribution, the employee did not comply with the terms of the agreement. *Id.* at 63. Thus, the *Kafando* Court concluded that because the employee did not comply with the agreement, the gainsharing plan could not be considered "guaranteed pay" or a payment "pursuant to an agreement." *Id.*

The *Kafando* Court also distinguished the cases relied upon by the employee:

> Moreover, the cases Kafando cites in support of his claim do not require a different result. In *Hartman v. Baker,* 2000 PA Super 140 [766 A.2d 347], this Court determined that an employment contract entered into between the employer and employee had created an equity interest in the business which constituted wages under the WPCL. The

---

**27.** The *Kafando* Court defined "gainsharing plan" as follows:

> Through this plan, employees could receive bonuses in addition to their regular wages. The gainsharing program is based upon the

profitability of the company and generates a pool of funds, which are then periodically distributed to eligible employees, in proportionate shares.

*Id.* at 61.

equity interest was offered to the appellee as an employee, and for no other reason unrelated to his status as an employee. Importantly, the equity interest in *Hartman* was offered pursuant to a binding contractual agreement between the parties. The employee had taken a reduction to his salary in consideration for obtaining an equity interest in the company. The terms of the contract in *Hartman* clearly distinguish that case from the instant one.

*Kafando* also cites *Bowers v. NETI Technologies, Inc.*, 690 F.Supp. 349 (E.D.Pa.1988). This reliance is likewise misplaced. In *Bowers*, the District Court found that a stock repurchase agreement constituted a wage or other fringe benefit in accordance with the provisions of the WPCL. The court stated that the repurchase payments "were certainly 'wages' within the broad definition of the WPCL in that they were payments pursuant to agreement, and they were offered to plaintiffs as employees, and not for some reason entirely unrelated to their employment by Phoenix." 690 F.Supp. at 353. Like in *Hartman*, however, the payments arose out of an employment contract and the parties agreed that the contractual terms had been complied with by the employees. In the present case, Kafando does not dispute that he has not fulfilled the clear contractual terms of the gainsharing agreement because he did not remain in [the employer's] employ at the time of distribution. This fact is dispositive of the issue. *Id.* at 63.

■ An employer that has contractually agreed to "pay or provide" fringe benefits and wage supplements must "pay or provide" them within a certain timeframe. 43 P.S. § 260.3; *Regier v. Rhone–Poulenc Rorer, Inc.*, No. 93–4821, 1995 WL 395948, at *6, 1995 U.S. Dist. LEXIS 9384, at *16 (E.D.Pa. June 30, 1995) (stating "pay or provide" phrase "suggests that fringe benefits and wage supplements are not limited to cash compensation and that the phrase 'amount to be paid' contained in § 260.2a should be construed to include the value of non-monetary obligations owed to an employee." (footnote omitted)). "It is the contract between the parties that governs the determination of whether specific 'wages' or benefits were 'earned.' *See, e.g., DeAsencio v. Tyson Foods, Inc.*, 342 F.3d 301, 309 (3d Cir.2003); *Oberneder v. Link Computer Corp.*, 548 Pa. 201, 696 A.2d 148, 150 ( [ ] 1997); *Kafando v. Erie Ceramic Arts Co.*, 764 A.2d 59, 61 (Pa.Super. [ ] 2000)." *Integrated Serv. Solutions, Inc. v. Rodman*, No. 07–3591, 2009 WL 1152162, at *7 (E.D.Pa. Apr.29, 2009).

Employing a broad interpretation of the WPCL, courts have defined various monetary forms of compensation as "wages" under the WPCL. The statute specifically covers monetary compensation such as separation, vacation and holiday pay, and bonuses. *See* 43 P.S. § 260.2a; *Bowers*, 690 F.Supp. at 353; *Dep't of Transp. v. Pennsylvania Indus. for the Blind & Handicapped*, 886 A.2d 706, 714 (Pa. Cmwlth.2005). Other forms of compensation defined as "wages" include equity interests, put options, and call options. *See Bowers*, 690 F.Supp. at 353; *Hartman*, 766 A.2d at 353; *Regier*, 1995 WL 395948, at *6. This Court has recognized those forms of compensation as "wages" under the WPCL when "they were offered to plaintiffs as employees, and not for some reason entirely unrelated to their employment." *Hartman*, 766 A.2d at 353 (quoting *Bowers*, 690 F.Supp. at 353).

■ Consistent with the foregoing, we hold that monetary payments for rest breaks pursuant to an agreement between an employer and employee are "fringe

benefits," and thus "wages" under the WPCL. Similar to the severance pay in *Bowers,* the payment associated with a paid, agreed-upon rest break is both "guaranteed" and pursuant to an agreement. *Bowers,* 690 F.Supp. at 353. Analogous to the equity interest in *Hartman* and *Bowers,* the payment associated with a paid rest break is offered pursuant to an agreement with an employee. *Id.; Hartman,* 766 A.2d at 353. Unlike the gainsharing plan in *Kafando,* the payment is not dependent upon an employer's earnings and is dependent on an employee's compliance with an agreement. *Kafando,* 764 A.2d at 62–63. Thus, an employer's failure to timely pay the amount associated with a paid, agreed-upon rest break could constitute a violation of the WPCL. 43 P.S. § 260.3; *Sullivan,* 873 A.2d at 716; *Hartman,* 766 A.2d at 352; *see Doe v. Kohn, Nast & Graf, P.C.,* 862 F.Supp. 1310, 1325 (E.D.Pa.1994) (stating WPCL provides remedy when employer breaches contractual right to wages). Conversely, if an agreement provides for unpaid rest breaks, we suggest a violation of the WPCL could not occur because no monetary payments are involved. 43 P.S. § 260.2a; *see Doe,* 862 F.Supp. at 1325.

We reiterate that a violation of the WPCL occurs when an employer fails to timely pay the monetary amount associated with a paid, agreed-upon rest break. 43 P.S. § 260.3. An employer's failure to provide the rest break itself does not establish a violation of the WPCL. An employee retains the burden of, *inter alia,* establishing that the wages associated with a paid rest break were guaranteed or pursuant to an agreement. 43 P.S. § 260.2a. An employee, of course, still has the burden of establishing an employer's untimely payment of or failure to pay those wages. Thus, the evidence establishing a breach of an agreement to provide a paid rest break

and a violation of the WPCL overlap, but are not identical.

Having established that monetary payments associated with paid rest breaks could be "wages" under the WPCL, we examine Wal–Mart's second argument. Briefly, as summarized above, Wal–Mart argues that Appellees cannot recover under the WPCL because there is no contractual right to payment for missed or shortened rest breaks. We disagree.

▬▬▬▬ "[T]he interpretation of the terms of a contract is a question of law for which our standard of review is *de novo,* and our scope of review is plenary." *McMullen v. Kutz,* 603 Pa. 602, 609, 985 A.2d 769, 773 (2009) (citation omitted). Furthermore:

> Contract interpretation ... requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement. Courts assume that a contract's language is chosen carefully and that the parties are mindful of the meaning of the language used. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

*Pennsylvania Indus. for the Blind & Handicapped,* 886 A.2d at 711 (citations and quotation marks omitted).

▬▬▬ "The WPCL does not create a statutory right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual right to earned wages. Whether specific wages are due is determined by the terms of the contract." *Doe,* 862 F.Supp. at 1325 (citations omitted); *accord Sullivan,* 873 A.2d at 716; *Hartman,* 766 A.2d at 352. Courts have refused to find a contractual right to payment when an employee offers no evidence in support of that right. *See Weldon,* 896 F.2d at 801 (holding that, under WPCL, a suspended employee who was

then terminated had no right to wages during suspension because there was no contractual or implied contractual obligation to pay wages during suspension unless employee was reinstated); *Doe,* 862 F.Supp. at 1325–26 (holding that because discharged employee had no contractual right to payment for accrued but unused vacation days, summary judgment in favor of employer was proper for WPCL claim). For example, in *Harding,* Duquesne Light Company fired the employee for failing a drug test. *Harding,* 882 F.Supp. at 424. The employee sued under the WPCL to recover a claimed contractual right to payment for unused vacation time and for a stock-appreciation right. *Id.* at 425.[28] The court explained that the employer's written policies governing payment for unused vacation and stock-appreciation rights expressly identified certain situations where an employee could receive payment for accrued-but-unused vacation time and could continue to exercise a stock-appreciation right. *Id.* at 428. Those policies did not provide such a right to fired employees. *Id.* Thus, because the employee failed to identify material issues of fact with respect to his contractual right, the court granted summary judgment in favor of the employer. *Id.* Similarly, if an employee does not comply with the agreement, that employee usually does not have a right to payment under the WPCL. *See Kafando,* 764 A.2d at 63 (holding that because employee did not comply with terms of agreement, employee was not entitled to payment under WPCL).

In this case, Wal–Mart's policy states that employees "are to take full, timely, uninterrupted breaks" and shall "receive compensation for break time at the applicable rate of pay." PD–07, Revised May 2004; R.R. at 6987a–88a. This language is unambiguous and incapable of alternative interpretations. *Pennsylvania Indus. for the Blind & Handicapped,* 886 A.2d at 711. Indeed, Wal–Mart reinforced the mandatory nature of the paid rest breaks by warning employees they could be disciplined for missing or taking shortened rest breaks. PD–07, Revised May 2004; R.R. at 6987a–88a. Management would also be disciplined for failing to provide paid rest breaks pursuant to PD–07. *Id.* In conjunction with PD–07, Wal–Mart also guaranteed payment for all hours worked. PD–43; R.R. at 7020a. Essentially, Wal–Mart promised to pay a full-time hourly employee for a forty-hour workweek in exchange for thirty-seven-and-a-half hours of labor (including meal periods) and two-and-a-half hours of rest. Given such unequivocal language, we disagree with Wal–Mart's argument that its refusal to provide or curtailing of a contractual, paid rest break negates its WPCL liability because "[e]mployees are paid regardless of whether or not they take their rest breaks." Wal–Mart's Brief at 50.

■ The WPCL requires Wal–Mart to make any payments pursuant to an agreement. 43 P.S. § 260.2a. Appellees introduced evidence that Wal–Mart had the contractual obligation to provide paid rest breaks. PD–07, Revised May 2004; R.R. at 6987a–88a; *Weldon,* 896 F.2d at 801; *Harding,* 882 F.Supp. at 428; *Doe,* 862 F.Supp. at 1325–26. Appellees also introduced evidence that they could not take rest breaks. *See, e.g.,* N.T., 9/15/06 (afternoon), at 16; *Kafando,* 764 A.2d at 63. Wal–Mart's failure to provide those paid rest breaks triggered both a breach of contract claim and a WPCL claim. *See Sullivan,* 873 A.2d at 716; *Hartman,* 766

---

**28.** "A stock appreciation right ("SAR") is the right to receive any increase in market value of Duquesne Light Company common stock between the date the SAR was granted and the date the SAR is exercised." *Id.* at 425 n. 2.

A.2d at 352; *accord Doe,* 862 F.Supp. at 1325.

After viewing the evidence in the light most favorable to Appellees, the instant case is distinguishable from *Weldon* and *Doe.* In *Weldon,* the Court affirmed summary judgment against the employee on the WPCL claim because the evidence failed to establish material issues of fact regarding the employer's express or implied contractual obligation to pay the wages at issue. *Weldon,* 896 F.2d at 801. The *Doe* court similarly affirmed summary judgment in favor of the employer on the employee's WPCL claim because the employee could not establish a contractual right to payment for accrued-but-unused vacation time. *Doe,* 862 F.Supp. at 1325–26.

In contrast to *Weldon* and *Doe,* Appellees established their contractual right to payment for taking a mandatory rest break. *See* PD–07, Revised May 2004; R.R. at 6987a–88a. Indeed, if Appellees did not take their rest breaks, then Wal–Mart could discipline them. *Id.* Thus, unlike in *Kafando,* where the employee did not satisfy the agreement's terms for payment, Appellees complied with the terms of the instant contract by working shifts of the requisite length necessary for a rest break. *See, e.g.,* N.T., 9/15/06 (afternoon), at 16; *cf. Kafando,* 764 A.2d at 63.

Similarly, Wal–Mart's reliance on *Harding* is inapt. Wal–Mart cites *Harding* for the proposition that an employee, to recover under the WPCL, must establish "a contractual right to *payment* if the benefit is not provided." Wal–Mart's Brief at 49. In *Harding,* the contract specified the circumstances under which an employee could receive payment for unused vacation and for a stock-appreciation right. *Harding,* 882 F.Supp. at 428. For example, a retired or disabled employee was entitled to payment. *Id.* An employee fired for failing a drug test, however, was not identified as one of those circumstances warranting payment. *Id.* at 428–29. Unlike *Harding,* Appellees established a contractual right to paid rest breaks after working a qualifying number of hours. PD–07, Revised May 2004; R.R. at 6987a–88a. The policy did not specify any additional conditions that would, like the employer in *Harding,* absolve Wal–Mart of any contractual obligation to pay Appellees. Once Appellees worked a shift of a qualifying length, they had a right to be paid for temporarily not working, pursuant to their agreement. *See* PD–07, Revised May 2004; R.R. at 6987a–89a. Nothing in the agreement indicates that Appellees forfeited their right to paid rest breaks when they failed to receive or had to work during those breaks. Having established Wal–Mart's breach of that agreement, Appellees demonstrated entitlement to the wages they should have received.

Barring or cutting short a paid, agreed-upon rest break provides a basis for a WPCL claim because the employer is no longer paying the employee to rest, but to work. Thus, refusing to provide or curtailing a paid, agreed-upon rest break results both in a violation of the agreement to provide a paid rest break and a violation of the WPCL when the employer fails to make the payment associated with taking, *e.g.,* a fifteen-minute rest break. That the employee is not entitled to extra pay for a missed or shortened rest break does not negate the employer's contractual obligation to provide a paid rest break and WPCL obligation to pay the employee for taking that agreed-upon rest break. Under these specific facts, the WPCL does not permit an employer to escape liability when it receives the benefit of, for example, an employee's eight hours of labor when that employee agreed to be paid to work seven-and-a-half hours and to rest

for one-half hour. Having discerned no error in concluding Appellees have established a contractual right to payment for missed or shortened rest breaks, we examine whether the court erred in awarding liquidated damages.

To reiterate briefly, Wal–Mart argues that the court misinterpreted 43 P.S. § 260.10, the liquidated damages provision of the WPCL. Wal–Mart interprets the first two sections of that provision as addressing a scenario of when the employer completely fails to pay wages, while the third section addresses when the employer fails to pay a portion of wages only. Because Appellees alleged underpayment of wages, as opposed to a complete nonpayment of wages, Wal–Mart argues that Appellees' WPCL claim falls under the third section only. Wal–Mart thus suggests Appellees had, but failed, to demonstrate a wage shortage exceeding five percent in order to obtain liquidated damages. Specifically, Wal–Mart claims Appellees did not establish they had wage shortages of over five percent of their gross wages on any two paydays within three months. If Appellees' WPCL claim is considered an allegation for partial unpaid wages, Wal–Mart suggests that the third section is mere surplusage. Absent Appellees' shortages calculation, Wal–Mart claims the court had no basis to award liquidated damages. In sum, Wal–Mart argues that because the first two sections do not apply, the only applicable section is the third, and Appellees failed to establish liability under the third section. Because Wal–Mart's liability is not limited to the third section only, we disagree.

 Wal–Mart's "claim requires us to consider the proper interpretation of § 260.10, making the issue a question of law for which our standard of review is *de novo* and our scope of review is plenary." *Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565, 574 (Pa.Super.2006) (citing *Krebs v. United Refining Co. of Pa.*, 893 A.2d 776, 787 (Pa.Super.2006)); *see generally Snead*, 604 Pa. at 171, 985 A.2d at 912 (discussing standard of review for statutory interpretation); *Penn Jersey Advance, Inc.*, 599 Pa. at 540, 962 A.2d at 634 (same). Punctuation may be used to construe the statute, but cannot override or otherwise affect the legislative intent. 1 Pa.C.S. § 1923(b). The word "or" is disjunctive and the word "and" is conjunctive. *In re Paulmier*, 594 Pa. 433, 448, 937 A.2d 364, 373 (2007); *Rivera v. Philadelphia Theological Seminary of St. Charles Borromeo, Inc.*, 510 Pa. 1, 15, 507 A.2d 1, 8 (1986). We acknowledge our mandate to construe the WPCL liberally. *Hartman*, 766 A.2d at 353 (citing 1 Pa.C.S. § 1928(c)).

The liquidated-damages provision states:

### § 260.10. Liquidated damages

Where wages remain unpaid for thirty days beyond the regularly scheduled payday, **or,** in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employe of a proper claim or for sixty days beyond the date of the agreement, award or other act making wages payable, **or** where shortages in the wage payments made exceed five percent (5%) of the gross wages payable on any two regularly scheduled paydays in the same calendar quarter, **and** no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment, the employe shall be entitled to claim, in addition, as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater.

43 P.S. § 260.10 (emphases added).[29] The legislative history for this provision is sparse.

■ Because the WPCL is analogous to the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, this Court has examined federal cases interpreting the FLSA. *Signora v. Liberty Travel, Inc.*, 886 A.2d 284, 296 (Pa.Super.2005) (relying on *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), and *Friedrich v. U.S. Computer Sys., Inc.*, No. 90–1615, 1995 WL 412385, 1995 U.S. Dist. LEXIS 9791 (E.D.Pa. July 10, 1995), in interpreting the WPCL).[30] In *Brooklyn Sav. Bank*, the United States Supreme Court interpreted the then-existing version of the FLSA and observed "the liquidated damage provision is not penal in its nature but constitutes compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages." *Brooklyn Sav. Bank*, 324 U.S. at 707, 65 S.Ct. at 902, 89 L.Ed. at 1309. Compensating the aggrieved employee with both lost wages and liquidated damages acknowledges the employee's injury from the delayed payment. *Id.*

■ Pennsylvania courts have similarly acknowledged the compensatory purpose of the WPCL's liquidated damages provision. The *Signora* Court, for example, adopted the rationale of *Friedrich*, which relied on *Brooklyn Sav. Bank*, and concluded that "both the liquidated damages and pre-judgment interest are intended to compensate for the loss of use of the proper amount of wages payable" and such damages are not "punitive in nature." *Signora*, 886 A.2d at 296;[31] *see also Oberneder v. Link Computer Corp.*, 449 Pa.Super. 528, 674 A.2d 720, 722 (1996) ("*Oberneder I*") (noting "the primary goal of the WPCL is to make whole again [ ] employees whose wages were wrongfully withheld by their employers"); *accord Ambrose v. Citizens Nat'l Bank of Evans City*, 5 A.3d 413, 420 (Pa.Super.2010), *appeal denied*, 19 A.3d 1049, 2011 WL 1134712 (Pa.2011). As the Superior Court observed, "[t]he WPCL is not only a vehicle for recovery of unpaid wages; it also provides for damages in the event an employer withholds compensation in the absence of good faith." *Wapner*, 903 A.2d at 574.

The WPCL defines "wages" as including "fringe benefits," which encompasses "any other amount to be paid pursuant to an agreement". *See* 43 P.S. § 260.2a. For example, bonuses, commissions, and stock

---

**29.** As originally enacted, the statute stated:
Where wages remained unpaid for thirty days beyond the regularly scheduled payday and no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such nonpayment, the employe shall be entitled to claim, in addition, as liquidated damages an amount equal to the amount of the claim still unpaid and not in contest or disputed: Provided, however, that the amount of such liquidated damages shall not exceed two hundred dollars ($200) or six percent (6%) of the claim, whichever is greater.
43 P.S. § 260.10 (1961) (current version at 43 P.S. § 260.10 (2009)).

**30.** Briefly, under the FLSA, "[a]n employee who brings suit … for unpaid minimum wages or unpaid overtime compensation, together with liquidated damages, has the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515, 1522 (1946).

**31.** In this case, Appellees did not request prejudgment interest for any WPCL award. Order, 11/14/07. The *Signora* Court cautioned against awarding both prejudgment interest and liquidated damages under the WPCL. *See Signora*, 886 A.2d at 296.

options are "wages". Thus, if an employee demonstrates that any "amount to be paid pursuant to an agreement" "remain[s] unpaid," then that employee may be entitled to liquidated damages. *See* 43 P.S. §§ 260.2a, 260.10.

The liquidated damages statute identifies three conditions separated by two disjunctive "or" clauses, followed by a comma and then a conjunctive "and" clause requiring "no good faith." *See* 43 P.S. § 260.10; *In re Paulmier*, 594 Pa. at 448, 937 A.2d at 373; *Rivera*, 510 Pa. at 15, 507 A.2d at 8. To succeed on a claim for liquidated damages, a claimant must establish one of the three conditions separated by the disjunctive "or". *Cf. In re Paulmier*, 594 Pa. at 448, 937 A.2d at 373; *Rivera*, 510 Pa. at 15, 507 A.2d at 8. Our conclusion is bolstered by the original language of the statute, which required only "no good faith" and a single condition that a claimant had to fulfill: unpaid wages beyond thirty days. *Cf.* 43 P.S. § 260.10 (1961) (current version at 43 P.S. § 260.10 (2009)). If a claimant establishes one of those three conditions, then the burden of proof shifts to the employer to establish good faith. *Wapner*, 903 A.2d at 575 (holding employer has burden of proof); *Hartman*, 766 A.2d at 353 (assuming, without deciding, employer bore burden of proof).

We discern no statutory language in the first condition limiting recovery of liquidated damages to factual scenarios where, as Wal–Mart suggests, there is a complete nonpayment of wages. *See Penn Jersey Advance, Inc.*, 599 Pa. at 540, 962 A.2d at 634 (noting, absent ambiguity, "plain language is generally the best indication of legislative intent"). The WPCL defines "fringe benefits" as including "any other amount to be paid pursuant to an agreement". *Id.* Thus, the liquidated damages statute provides: "Where 'any other

amount to be paid pursuant to an agreement' remains unpaid for thirty days", the employee may be entitled to liquidated damages. 43 P.S. § 260.10. This construction does not render the third condition mere surplusage. The third condition addresses the factual scenario of when an employer consistently pays an employee late, *i.e.*, not on the regularly scheduled payday, but within thirty days of the regularly scheduled payday. *See id.* The third condition closes a loophole in the first condition, under which a dilatory employer might avoid liquidated damages by paying the amount owed within thirty days. *See id.* The amount owed, however, must exceed 5%. *See id.*

Instantly, to establish a claim for liquidated damages, an employee must demonstrate that any monetary amount associated with a paid rest break remained unpaid for at least thirty days beyond a regularly scheduled payday. *See* 43 P.S. § 260.10. The monetary amount does not have to exceed 5% of gross wages payable. *See id.* Alternatively, an employee must prove that the employer underpaid the monetary amounts associated with paid rest breaks and the amount of underpayment exceeds "five percent (5%) of the gross wages payable on any two regularly scheduled paydays in the same calendar quarter". *Id.*[32] Under this proviso, the employee does not have to establish a thirty-day window of time and only has to establish, *inter alia*, the amount of underpayment. *See id.*

Under Wal–Mart's proposed interpretation, an employer, in bad faith, could underpay an employee by 4%. If the first condition was limited to a complete nonpayment of wages, then the employee would have no claim for liquidated damages. The employee, similarly, would have no claim for liquidated damages under the

---

**32.** The parties agree the remaining condition set forth in section 260.10 does not apply.

third condition because the shortage is less than 5%. Accordingly, because of the compensatory purpose of this section, we are reluctant to construe the first condition as limited to a complete nonpayment of wages, as that interpretation could potentially bar liquidated damages should an employer, for example shortchange an employee 4% in bad faith. *See Signora*, 886 A.2d at 296; *see also Oberneder I*, 674 A.2d at 722; *cf. Brooklyn Sav. Bank*, 324 U.S. at 707, 65 S.Ct. at 902, 89 L.Ed. at 1309; *Friedrich*, 1995 WL 412385, at *3, 1995 U.S. Dist. LEXIS 9791, at *10 (commenting, in reference to Pennsylvania's Minimum Wage Act, "violators would in effect enjoy an interest-free loan for as long as they could delay paying out the wages."). In that circumstance, an employee should have the ability to recover compensatory damages, *i.e.*, liquidated damages, under the WPCL, and not under some alternative legal theory. *See Oberneder I*, 674 A.2d at 722; *see also Oberneder II*, 548 Pa. at 204, 696 A.2d at 150; *Lugo*, 967 A.2d at 968. Otherwise, an employee is not necessarily guaranteed damages for the injury caused by the delay. *See Brooklyn Sav. Bank*, 324 U.S. at 707, 65 S.Ct. at 902, 89 L.Ed. at 1309. Contrary to Wal–Mart's contention, Appellees did not have to introduce evidence establishing shortages of at least 5% because Appellees' WPCL claim was cognizable under the first condition. Thus, we discern no error of law. *See Wapner*, 903 A.2d at 574.

Wal–Mart next claims it met its burden of establishing, via clear and convincing evidence, a "good faith contest or dispute" of Appellees' wage claims. 43 P.S. § 260.10. Wal–Mart, although conceding the statute identifies "non-exhaustive examples of 'good faith,'" contends that the court should focus on the employer's litigation conduct because section 260.10 identifies the "right of set-off or counter-claim"

and "litigation is the only possible forum for assertion of set-off or counterclaim rights." Wal–Mart's Brief at 53. Given this focus, Wal–Mart suggests it had a reasonable legal basis for withholding Appellees' wages even if a court concludes that basis was incorrect. *Id.* (citing *Hartman*, 766 A.2d at 354–55). Wal–Mart notes that no Pennsylvania court has resolved these WPCL issues. Further, Wal–Mart argues, Appellees abandoned, or the jury rejected, a number of claims, giving further credence to Wal–Mart's position that its litigation conduct was in good faith. Wal–Mart is not entitled to relief.

In reference to the phrase, "[N]o good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment," the WPCL does not define "good faith." 43 P.S. § 260.10. With respect to the term "include," "[t]he term 'include' is to be dealt with as a word of 'enlargement and not limitation.'" *Pa. Human Relations Comm'n v. Alto–Reste Park Cemetery Ass'n*, 453 Pa. 124, 130–31, 306 A.2d 881, 885 (1973) (alterations omitted); *accord Samantar v. Yousuf*, —— U.S. ——, —— n. 10, 130 S.Ct. 2278, 2287 n. 10, 176 L.Ed.2d 1047, 1062 n. 10 (2010). As one treatise notes:

> A term whose statutory definition declares what it "includes" is more susceptible to extension of meaning by construction than where the definition declares what a term "means." It has been said "the word 'includes' is usually a term of enlargement, and not of limitation.... It, therefore, conveys the conclusion that there are other items includable, though not specifically enumerated...."

2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes & Statutory

Construction § 47:7 (7th ed.2007) ("Sutherland") (footnote omitted).

The *Hartman* Court analogized lack of good faith with bad faith in insurance caselaw in holding that an employer must establish good faith by clear and convincing evidence:

"Good faith" is defined as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage. Black's Law Dictionary (7th ed.1999), at 701.

"Bad faith" in the insurance context is defined as "[a]n insurance company's unreasonable and unfounded (though not necessarily fraudulent) refusal to provide coverage **in violation of the duties of good faith** and fair dealing owed to an insured." Black's Law Dictionary (7th ed.1999), at 134 (emphasis added).

*Hartman,* 766 A.2d at 354 n. 3; *see also Oberneder II,* 548 Pa. at 206 n. 3, 696 A.2d at 151 n. 3 (noting, in *dicta,* "that employers that act in bad faith in contesting an employee's claim for wages must pay liquidated damages").

In *Hartman,* the employer misunderstood the binding nature of the agreement at issue and interpreted the WPCL as excluding payment for equity interests. *Hartman,* 766 A.2d at 354–55. The *Hartman* Court reversed an award of liquidated damages, reasoning:

We find that the record provided appellants with sufficient reason to dispute [the employee's] claim that the parties were bound by the terms of the revised memorandum and that [the employee] was entitled to payment of the equity interest in the form of wages under the WPCL. The following facts and averments demonstrate that [the employer's] misunderstanding was reasonable and not indicative of bad faith:

1. The parties never signed a document reflecting [the employee's] revised pay structure.

2. The accounting system to determine the percentage of the equity interest was not defined by the revised February memorandum.

3. Due to the absence of a defined accounting system, [the employer] believed that no value could be placed on [the employee's] equity interest and that, accordingly, this interest did not qualify as "wages" under the WPCL.

4. [The employee's] testimony that, prior to his decision to exercise his equity interest and resign, both parties had set forth opposing points of view regarding the binding nature of the revised February memorandum.

5. [The employer's] belief that the resignation of Sam Colletts may have cancelled any agreement reached by the parties concerning [the employee's] revised pay structure.

Similar to the insurers in [*Collins v. Allstate Indem. Co.,* 426 Pa.Super. 197, 626 A.2d 1162 (1993), the instant employer] made an incorrect legal conclusion in good faith that was based upon supportive authority and a thorough examination of the parties' course of conduct. As we found in the insurance context that mere bad judgment is not bad faith, so to do we find that mere bad judgment does not prevent an employer from acting in good faith under the WPCL. *Cf.* [*MGA Ins. Co. v. Bakos,* 699 A.2d 751 (Pa.Super.1997) ]. Thus, we find that the Chancellor erred by finding that [the employer] failed to prove that they acted in good faith by disputing [the employee's] claim for payment.[6]

[6] Although the Chancellor stated that [the employer was] denied the benefit of a good faith defense due to the fact that [the employer] failed to pay [the employee] $222.86 for work done on a particular project, we find this conclusion far overreaching. Even assuming [the employer] did not act in good faith when [it] refused to pay the $222.86, we fail to see any connection to the present dispute in which the parties possessed varying interpretations of a memorandum. Simply because an employer failed to prove that it acted in good faith in one particular episode of disputed wages, does not deny the employer the benefit of a good faith defense under the WPCL in a subsequent wage dispute involving a different set of circumstances with the same employee.

*Id.* at 355 (some citations omitted). Accordingly, the *Hartman* Court held that the employer established it acted in good faith because it had a reasonable, although incorrect, legal conclusion. *Id.*

■ In the case of *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901 (Pa.Super.1999), this Court interpreted a statute providing for damages if an insurer acted in bad faith. *Id.* at 906 (interpreting 42 Pa.C.S. § 8371). The *O'Donnell* Court held that "section 8371 was designed to remedy all instances of bad faith conduct by an insurer, whether occurring before, during or after litigation." *Id.* at 906; *accord Bombar v. West Am. Ins. Co.*, 932 A.2d 78, 92 (Pa.Super.2007); *Hollock v. Erie Ins. Exch.*, 842 A.2d 409, 415 (Pa.Super.2004) (*en banc*). The *O'Donnell* Court, however, refused to permit recovery under the statute for alleged discovery violations because "the Pennsylvania Rules of Civil Procedure provide an exclusive remedy[.]" *Id.* at 909.

More recently, in *Wapner*, a hospital defended a WPCL claim by arguing it withheld the physician's wages on the basis that it exercised its right of set-off in good faith. *Wapner*, 903 A.2d at 574. The *Wapner* Court disagreed, holding that the record suggested the hospital failed to pay the wages owed to the physician for sever-

al months before learning the physician was not complying with his employment agreement, which could have justified the nonpayment. *Id.* at 575. Thus, the *Wapner* Court affirmed the trial court's denial of the hospital's motion for judgment notwithstanding the verdict, reasoning, "[T]he issue of good faith was properly a question for the jury because it was neither established as a matter of law, nor a matter about which two reasonable minds could not disagree." *Id.* at 575.

■ We disagree with Wal–Mart's suggestion that courts should examine "good faith" in the context of claims and arguments raised in litigation only. As Wal–Mart acknowledges, the term "include" is non-exhaustive and it is long-settled that "include" is not a term of limitation, but a term of enlargement. *Alto–Reste Park Cemetery Ass'n*, 453 Pa. at 130–131, 306 A.2d at 885; 2A Sutherland, *supra*, § 47:7. The statute's use of the word "including" and listing, as examples, the "right of set-off or counter-claim," does not limit the examination of good faith to solely the claims raised in litigation. We observe that in *Wapner*, the employer's defense of set-off was based on facts predating the litigation itself. *Wapner*, 903 A.2d at 574. The jury in *Wapner* did not examine whether the employer raised the defense in good faith during the litigation, but whether the employer acted in good faith by raising a right to set-off at the time it refused to pay the employee's wages. *Id.* at 575. Similarly, the *Hartman* Court examined the events and the employer's conduct prior to the lawsuit in determining whether a fact-finder could conclude the employer acted in good faith. *Hartman*, 766 A.2d at 355 & n. 6 (assuming the employer "did not act in good faith when [it] refused to pay"). Further, the liquidated damages statute compensates the employee for lost wages and not, for exam-

ple, only an employer's lack of good faith with respect to claims raised during litigation. *Signora*, 886 A.2d at 296; *see also Brooklyn Sav. Bank*, 324 U.S. at 707, 65 S.Ct. at 902, 89 L.Ed. at 1309. Interpreting that statute as focusing exclusively on the employer's litigation conduct—occurring after the withholding of wages—undermines the compensatory purpose of the statute. *Cf. O'Donnell*, 734 A.2d at 906 (concluding the insurance bad-faith statute encompasses bad faith conduct "before, during or after litigation").

To the extent Wal–Mart relies on *Hartman*, that case is distinguishable because the jury could, and did, find instantly that Wal–Mart did not meet its burden of clear and convincing evidence. In *Hartman*, the employer satisfied the evidentiary standard because there was little indication from the parties' conduct that anything more than "mere bad judgment" regarding the employer's legal obligations caused the employer's failure to pay. *Hartman*, 766 A.2d at 355. The employer, the *Hartman* Court concluded, "made an incorrect legal conclusion in good faith that was based upon supportive authority **and a thorough examination of the parties' course of conduct.**" *Id.* (emphasis added).

■ In contrast to *Hartman*, the instant record provides ample evidence from which a juror could conclude Wal–Mart's failure to pay was not a result of a good-faith, but incorrect, legal conclusion. *Id.*[33]

The record reflects testimony and documentary evidence suggesting that because of pressure from the home office to reduce labor costs and the availability of significant bonuses for managers based on store profitability, Wal–Mart's scheduling program created chronic understaffing, leading to widespread rest-break violations. *See, e.g.*, Pls.' Ex. 429; R.R. at 7787a–88a; N.T., 9/13/06 (morning), at 106–08; R.R. at 1596a–98a. Wal–Mart's own audit reports identified many such violations. *See, e.g.*, N.T., 9/12/06 (morning), at 61–65; R.R. at 1501a–05a. This case is more akin to *Wapner*, in which the record established that the facts purportedly justifying the hospital's right of set-off occurred months after the hospital's refusal to pay. *Wapner*, 903 A.2d at 575. Appellees introduced evidence that Wal–Mart did not permit its employees to take breaks and that it recognized off-the-clock work violated the law. *See, e.g.*, N.T., 9/15/06 (morning), at 19; R.R. at 1617a; Pls.' Ex. 27a; R.R. at 7020a. After viewing the entire record in the light most favorable to Appellees, the record does not compel the conclusion that Wal–Mart established good faith. *Moure*, 529 Pa. at 402–03, 604 A.2d at 1007. Similarly, we cannot conclude the record does not support the court's reasoning for denying a new trial on this particular basis. *Harman*, 562 Pa. at 467–69, 756 A.2d at 1122–24. Analogously, post-hoc events such as abandoned or dismissed claims and an award of damages in an amount less than that sought by Appellees

---

**33.** The fact-finder, of course, does not determine the validity of the legal conclusion. Rather, the fact-finder examines whether the employer had a good-faith basis for contesting or disputing the wage claim at the time the employer challenged the wage claim. This approach, we conclude, naturally prevents an employer from invoking a justification, legal or otherwise, after the fact. That a court may later hold an after-the-fact legal justification legally sound does not, we suggest, negate the employer's burden to establish its good faith at the time it challenged the wage claim. *Cf. Hartman*, 766 A.2d at 354. We are, for example, unaware of evidence of record that Wal–Mart's proffered legal justification for nonpayment was the actual basis for nonpayment, *i.e.*, Wal–Mart "governed its behavior in accordance with an **incorrect** interpretation of state and federal statutes and regulations." *Id.*

do not, under these facts, tend to establish Wal–Mart's good faith under this provision. Accordingly, we cannot agree that, in examining whether an employee may receive liquidated damages, the statute limits examination to whether the employer acted in good faith "in the context of the claims made in the litigation." Wal–Mart's Brief at 53.

Wal–Mart's third argument challenging the liquidated damages award is that the trial court's jury instruction misstated the law regarding liquidated damages under the WPCL. The court instructed the jury as follows:

> The Wage Payment and Collection Law was enacted by our legislature to provide a vehicle for employees to enforce payment of their wages and compensation which the employers have not paid them. The underlying purpose is to remove some of the obstacles employees face in litigation by providing them with a statutory remedy when an employer breaches its contractual obligation to pay wages. The Act does not establish a new right to wages, it simply establishes an employee's right to enforce payment of wages.
>
> If the defendant had a good faith contest or dispute of any wage claim, then those provisions of the Act do not apply. That was all the argument about good faith and bad faith. You will have to judge whether Wal–Mart acted in good faith when they failed to pay and contested the claims made by the plaintiffs.
>
> Good faith is a state of mind which consists of honesty in belief or purpose. It can be a state of mind which consists of faithfulness to one's duty or obligation. It can be a state of mind which consists of the absence of intent to defraud or to seek unconscionable advantage.

That's what good faith constitutes. Simple negligence or bad judgment is not bad faith.

N.T., 10/11/06, at 48–49; R.R. at 2145a–46a.

After the jury began deliberating at 11:40 a.m., the jury returned with a question at 1:50 p.m.: "We need more clarification about good faith contest." *Id.* at 75. Wal–Mart's counsel opined that the court should not respond to the question, but if it opted to respond, to reread only the section defining good faith. *Id.* at 80. Wal–Mart's counsel reiterated, "I do not think that the Court should provide them elaboration about what good faith is beyond the charge that has already been given." *Id.* at 81. The court agreed and briefly repeated the relevant sections of the charge to the jury, including the section defining good faith. *Id.* at 83–85. After additional discussion with counsel, the court clarified the scope of good faith to the jury. *Id.* at 95.

Wal–Mart contends that the court erred in rejecting its request that the jury make a finding that the wage shortages exceeded five percent of the gross wages payable on any two regularly scheduled paydays in the same calendar quarter. Wal–Mart also claims that the court erroneously charged the jury on good faith. In support of that assertion, Wal–Mart refers to an alleged misstatement of law in the verdict form, which asked if Wal–Mart "[had] a good faith contest or dispute when [it] failed to pay class members for every hour worked," and if Wal–Mart "[had] a good-faith contest or dispute when [it] failed to provide rest breaks to class members." Jury Verdict Interrog., at 2–3; R.R. at 2182a–83a. Wal–Mart suggests that the court should have asked whether Wal–Mart acted in good faith in disputing the wage claims raised by Appellees in this lawsuit. Wal–Mart is not entitled to relief.

As a prefatory matter, we address Appellees' claim that because Wal–Mart filed a successful motion precluding Appellees from referring to or introducing evidence regarding liquidated damages, Wal–Mart waived its argument that the jury is required to find shortages. Appellees' claim of waiver lacks merit. We fail to discern how, under these facts, winning a pretrial motion precluding evidence is the equivalent to waiving a challenge that the court instruct the jury properly.

■■■■■ Having resolved Appellees' allegation of waiver, the standard of review for this issue is one of abuse of discretion. *Rettger v. UPMC Shadyside*, 991 A.2d 915, 931 (Pa.Super.2010). "[O]ur courts have made clear that an appellant must make a timely and specific objection to a jury instruction to preserve for review a claim that the jury charge was legally or factually flawed." *Stumpf v. Nye*, 950 A.2d 1032, 1041 (Pa.Super.2008) (citations and quotation marks omitted).

> In reviewing a claim regarding error with respect to a specific jury charge, we must view the charge in its entirety, taking into consideration all the evidence of record to determine whether or not error was committed. If we find that error was committed, we must then determine whether that error was prejudicial to the complaining party. Error will be found where the jury was probably misled by what the trial judge charged or where there was an omission in the charge which amounts to fundamental error.

*Price v. Guy*, 558 Pa. 42, 46, 735 A.2d 668, 670–71 (1999) (citations and footnote omitted). Similarly:

> Error in a charge is sufficient ground for a new trial, if the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. A charge will be found adequate unless the issues are not made clear to the jury or the jury was palpably misled by what the trial judge said or unless there is an omission in the charge which amounts to fundamental error. A reviewing court will not grant a new trial on the ground of inadequacy of the charge unless there is a prejudicial omission of something basic or fundamental.

*Stewart v. Motts*, 539 Pa. 596, 606, 654 A.2d 535, 540 (1995) (citations and quotation marks omitted). Finally,

> The court is vested with substantial discretion in fashioning the charge and may select its own language cognizant of the need to adequately apprise the jury of the law as it applies to the evidence adduced at trial. Unless the language the court chose incorrectly states the law or mischaracterizes the evidence in a way that prejudiced the jury's consideration and thereby undermined the accuracy of the verdict, we will not interfere with the court's exercise of discretion.

*Rettger*, 991 A.2d at 931 (citations, alterations, and punctuation marks omitted); *Ettinger v. Triangle–Pacific Corp.*, 799 A.2d 95, 106 (Pa.Super.2002).

Initially, Wal–Mart preserved its objection:

> [Wal–Mart's counsel]: The language we want, Your Honor, is, Did defendants act in good faith in disputing the rest break fringe benefit claims.
>
> The Court: In the lawsuit?
>
> [Wal–Mart's counsel]: Yes, Your Honor.
>
> The Court: Any other objection? That request is overruled. Any other objection?
>
> [Wal–Mart's counsel]: No, Your Honor. . . .

N.T., 10/10/06, at 30. Wal–Mart again preserved its challenge the next day:

The Court: What's the problem with, Did defendant have a good faith contest or dispute when they failed to provide rest breaks to class members?

[Wal–Mart's counsel]: We don't believe that's law under the Wage Payment and Collection Act or good faith in what the determination should be focused on.

The Court: Right.

[Wal–Mart's counsel]: We believe good faith in the statute is directed to whether we disputed the claims asserted in this case in good faith.

The Court: Right, in the case, right. You are saying that the Act doesn't kick in until such time as plaintiffs bring a lawsuit. I disagree. You put that on the record, you preserved that....

N.T., 10/11/06, at 5–6; R.R. at 2135a–36a. Wal–Mart preserved its challenge to the scope of good faith in the liquidated-damages statute. *See Stumpf,* 950 A.2d at 1041.

For the reasons discussed above, however, we discern no merit to Wal–Mart's claim that the court should have instructed the jury to find wage shortages in excess of five percent in order to impose liquidated damages. To recover liquidated damages, Appellees did not have to establish wage shortages under that section. *Cf. In re Paulmier,* 594 Pa. at 448, 937 A.2d at 373; *Rivera,* 510 Pa. at 15, 507 A.2d at 8. Similarly, Wal–Mart's argument that an examination of good faith was limited to its actions in this lawsuit lacks merit. The liquidated damages statute does not limit examination of the employer's good faith to the employer's litigation conduct. *Alto–Reste Park Cemetery Ass'n,* 453 Pa. at 130–31, 306 A.2d at 885; *Wapner,* 903 A.2d at 574–75; *Hartman,*

766 A.2d at 355 & n. 6. The court could not accept Wal–Mart's proposed instructions, as they did not reflect the law accurately. After considering only Wal–Mart's specific, preserved challenges, the court did not err by limiting the jury's examination of good faith to only Wal–Mart's conduct after litigation commenced. *See Price,* 558 Pa. at 46, 735 A.2d at 670–71; *Stewart,* 539 Pa. at 606, 654 A.2d at 540.[34] We perceive no abuse of discretion. *See Rettger,* 991 A.2d at 931.

Wal–Mart also argues that Appellees are not entitled to a liquidated damages award because Appellees did not identify specific individuals who are owed liquidated damages. Wal–Mart asserts that Appellees are required to identify those individuals because the WPCL's liquidated damages provision provides that liquidated damages are awarded to an "employee." Therefore, Wal–Mart reasons that the provision does not contemplate an award to unidentified employees that comprise a class. Wal–Mart further contends that the compensatory purpose behind the liquidated-damages provision confirms its view that Appellees need to identify specific class members. Wal–Mart notes that its elimination of its policy requiring employees to swipe for rest breaks after February 9, 2001, means there are no time records identifying which particular employees were denied rest breaks in whole or in part. To the extent liquidated damages are proper, Wal–Mart suggests that any award be calculated via a claims-administration process. Wal–Mart theorizes that a claims-administration process would create a wage claim under 43 P.S. § 260.10 that obviates an award of liquidated damages as long as it was paid within sixty days. Further, the process ensures that

---

**34.** We decline to find error on an argument not raised or preserved by Wal–Mart at trial.

*Stumpf,* 950 A.2d at 1041.

liquidated damages are awarded only to aggrieved individuals, as opposed to the class. Wal–Mart is not entitled to relief.[35]

Liquidated damages under the WPCL are compensatory, and not punitive, in nature. *Signora*, 886 A.2d at 296. The WPCL also states:

§ 260.9a. **Civil remedies and penalties**

\* \* \*

(b) Actions by an employe, labor organization, or party to whom any type of wages is payable to recover unpaid wages and liquidated damages may be maintained in any court of competent jurisdiction, by such labor organization, party to whom any type of wages is payable or any one or more employes for and in behalf of himself or themselves and other employes similarly situated, or such employe or employes may designate an agent or representative to maintain such action or on behalf of all employes similarly situated. Any such employe, labor organization, party, or his representative shall have the power to settle or adjust his claim for unpaid wages.

43 P.S. § 260.9a(b). The statute does not specify that individual members of a class action must be identified in order to receive liquidated damages.

 Instantly, Wal–Mart correctly notes the liquidated-damages statute is compensatory in nature. *Signora*, 886 A.2d at 296. We discern nothing in the WPCL, however, that requires Appellees to identify individual employees entitled to liquidated damages. Additionally, narrowly construing section 260.10 in that fashion would result in a seeming conflict with

section 260.9a, which permits a representative to maintain an action to recover liquidated damages on behalf of all similarly situated employees—not just an individual employee. 43 P.S. § 260.9a. We decline to read these two sections together in a manner that could potentially render them at odds, particularly given our mandate to construe the WPCL liberally. *Penn Jersey Advance, Inc.*, 599 Pa. at 540, 962 A.2d at 634; *Hartman*, 766 A.2d at 353. Thus, absent explicit legislative language to the contrary, we decline to impute into section 260.10 a requirement that, in order to recover liquidated damages, the plaintiff must identify every individual employee entitled to such damages. On that basis, we also reject Wal–Mart's arguments regarding usage of a claims-administration process. Adopting Wal–Mart's reasoning would permit Wal–Mart to evade an award of liquidated damages by requiring individual employees to come forward or pay wages long-since overdue. As Wal–Mart acknowledged, liquidated damages is compensatory in nature and designed to compensate the employee for the loss of spending power of wages that an employee should have had. *See Signora*, 886 A.2d at 296; *see also Oberneder I*, 674 A.2d at 722; *Friedrich*, 1995 WL 412385, at \*2, 1995 U.S. Dist. LEXIS 9791, at \*5.

With respect to Wal–Mart's fourth issue, we affirm based on reasons similar to those set forth in our resolution of Wal–Mart's first issue. As with Wal–Mart's challenge to class certification, Wal–Mart suggests that because the policies and handbook did not establish a contract, the evidence was insufficient to establish a breach of contract. Wal–Mart contends that the testimony of Drs. Baggett and

---

**35.** Appellees again counter that Wal–Mart waived this argument because it filed a successful motion to preclude evidence and references to liquidated damages. As previously

noted, under these circumstances, Wal–Mart's successful pretrial motion did not result in Wal–Mart's waiving this argument.

Shapiro was the only testimony establishing class-wide liability. Wal–Mart suggests that because their testimony was erroneous, it was insufficient to establish breach of contract, unjust enrichment, and violation of the WPCL and MWA. Notably, Wal–Mart rests its challenge to the sufficiency only on the policies, handbook, and testimony of Drs. Baggett and Shapiro. Because of the limited nature of Wal–Mart's challenge to the sufficiency of evidence, and because of our resolution of Wal–Mart's challenge to class certification, we similarly conclude that this evidence, viewed in the light most favorable to Appellees, tends to support Appellees' claims. Conversely, we cannot conclude, after giving every reasonable inference of fact in favor to Appellees, that "the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant." *Moure*, 529 Pa. at 402, 604 A.2d at 1007.

We also observe that Wal–Mart agreed to pay Appellees for taking rest breaks, and therefore had to comply with the WPCL statute providing for timely payments of fringe benefits. *See* 43 P.S.

§ 260.3. Because Wal–Mart failed to provide rest breaks and the associated payments for those rest breaks, Wal–Mart violated that section. *See id.* Appellees are thus entitled to compensation under the WPCL. *See id.*

We next examine Wal–Mart's fifth issue. We briefly restate the pertinent facts. On October 30, 2006, Appellees filed a petition for attorney fees and moved for prejudgment interest. Trial Ct. Op., 9/03/08, at 2. That same day, Wal–Mart filed a post-trial relief motion asking the Court either to enter judgment in Wal–Mart's favor notwithstanding the jury's verdict, or to grant a new trial. *Id.* at 2–3.

In support of their petition for attorney fees and expenses, Appellees provided detailed fee and expense reports identifying the hours spent over five years by each of the five firms involved, categorizing each firm's hourly rate, and summarizing the expenses incurred. Trial Ct. Op., 11/14/07, at 3. Appellees' petition also included affidavits from counsel averring their hourly rates for, among other personnel, twenty-six lawyers and seventeen paralegals. *Id.* at 3.[36] Appellees claimed total counsel fees

36. For example, for one firm, the partners' hourly rates ranged between $550 to $600, the associates' hourly rates at $175, and the paralegals' hourly rate at $145. Ex. A. to Aff. of Michael D. Donovan in Supp. of Pls.' Pet. for Att'ys' Fees and Reimbursement of Costs; R.R. at 2275a. Paragraph four of the affidavit states:

The hourly rates for the attorneys in my firm included in Exhibit A are the same as the regular current rates charged for their services in other contingent matters and in class action litigation.

¶ 4 of Aff. of Michael D. Donovan in Supp. of Pls.' Pet. for Att'ys' Fees and Reimbursement of Costs; R.R. at 2271a. Of the 5,900.40 hours billed, 3,764.40 hours were billed by the partner with the $600 hourly rate. Ex. A. to Aff. of Michael D. Donovan in Supp. of Pls.' Pet. for Att'ys' Fees and Reimbursement of Costs; R.R. at 2275a. The exhibit reflects counsel fees of $2,701,093.50 and expenses of

$1,214,326.80. *Id.;* Ex. B. to Aff. of Michael D. Donovan in Supp. of Pls.' Pet. for Att'ys' Fees and Reimbursement of Costs; R.R. at 2277a.

Similarly:

The hourly rates for the attorneys in my firm included in Exhibit A are the same as the regular current rates charged for their services in other contingent matters in class action litigation.

¶ 4 of Aff. of Judith L. Spanier in Supp. of Pls.' Pet. for Award of Att'ys' Fees and Reimbursement of Expenses; R.R. at 2287a. Exhibit A defines the partners' hourly rates as ranging between $650 to $850, the associates' hourly rates as ranging between $250 to $550, the paralegals' hourly rates at $235, and the interns' hourly rates as ranging between $185 to $200. Ex. A. to Aff. of Judith L. Spanier in Supp. of Pls.' Pet. for Award of Att'ys' Fees and Reimbursement of Expenses; R.R. at 2291a. Of the 12,806.90 hours billed,

of $12,336,547.15 and $3,583,782.62 in expenses. Ex. A and B to Pls.' Pet. for Award of Att'ys' Fees and Reimbursement of Expenses; R.R. at 2245a–48a. Wal–Mart filed an answer to Appellees' fee petition and Appellees filed a reply. Trial Ct. Op., 11/14/07, at 3. The trial court ordered Wal–Mart to reveal the aggregate fees expended in its defense, which amounted to $10,048,944 in fees and $7,006,982 in expenses. *Id.* at 4, 19.

On February 27, 2007, the trial court heard oral arguments on Wal–Mart's post-trial motions and Appellees' petition for attorney fees and costs. There was a two-day fee-petition hearing in February and April of 2007. Two Wal–Mart witnesses testified, challenging the reasonableness of Appellees' fee request. John Marquess, a fee auditor, testified as an expert in fee cutting, although he had no academic training in fee auditing or certification.[37] For multiple reasons, the court rejected his expert opinion. Although Mr. Marquess criticized Appellees' counsel fees, the court noted a lack of a factual basis for his methodology. He concluded, for example, that Appellees' counsel who appeared at trial, but did not actually participate at trial, should not bill their time at trial because, *inter alia,* he could not ascertain whether they participated at each stage of the litigation. N.T., 2/27/07, at 45–48. The trial court stated:

> Mr. Marquess declined to offer an opinion about what fees had been earned. However, when provided with a calculator in the courtroom he could easily calculate [a fee of $10,359,200 and] offered no criticism of [that figure]. His criticism such as it is, is limited to $277,200.00 claimed by the Dyer firm, $550,505.00 in what he calls "duplicate attorneys" at trial and $202,991.00 for intern and law clerk work.
>
> Mr. Marquess's opinion is totally and entirely rejected on the basis that he had no pretense to knowledge of what a plaintiff's firm needs to do to prepare and try a case action jury trial to verdict and has no factual basis to evaluate the work performed in this case. His testimony is rejected as grossly lacking in necessary and readily obtainable facts. His testimony lacks all credibility, repeatedly demonstrating an unwillingness to have his statements cross-examined, by providing misleading and transpar-

---

3,729.80 hours were billed by the partner with the $650 hourly rate. *Id.* The exhibit states counsel fees totaling $5,393,255.00 and expenses of $1,709,858.12. *Id.;* Ex. B. to Aff. of Judith L. Spanier in Supp. of Pls.' Pet. for Award of Att'ys' Fees and Reimbursement of Expenses; R.R. at 2293a. Total claimed counsel fees for the firms of Mr. Donovan and Ms. Spanier, were $8,094,348.50 and total expenses were $2,924,184.92, for a combined total of $11,018,533.42.

By way of comparison, the firm of Azar & Associates, P.C., stated its counsel fees "include[ ] the total lodestar amount for attorney, law clerk and paralegal time, calculated at the firm's current complex litigation hourly rates on this litigation." ¶ 9 of Aff. of Franklin D. Azar in Supp. of Pls.' Pet. for Award of Att'ys' Fees and Reimbursement of Expenses; R.R. at 2306a. The firm of Bader & Associ-

ates, LLC, used identical language. ¶ 24 of Aff. of Gerald L. Bader, Jr. in Supp. of Pls.' Pet. for Award of Att'ys' Fees and Reimbursement of Expenses; R.R. at 2331a. Dyer, Garofalo, Mann & Shultz, L.P., calculated its counsel fees based on the "firm's current complex litigation hourly rate". ¶ 18 of Aff. of John A. Smalley in Supp. of Pls.' Pet. for Award of Att'ys' Fees and Reimbursement of Expenses; R.R. at 2343a. Thus, these firms calculated their lodestar based on their hourly rates for complex litigation in contrast to the first two firms, which calculated their lodestar based on their hourly rates for contingent matters. In an apparent oversight, only Mr. Donovan did not aver that receipt of fees was contingent upon success.

**37.** We do not opine on whether certification exists.

ently disingenuous answers in a conscious effort to obfuscate.

Trial Ct. Op., 11/14/07, at 13.

Wal–Mart's second expert, Ralph Wellington, Esq., testified about reasonable attorney fees. He opined that he had no criticism of the number of attorneys involved, work performed, and hours spent by Appellees' litigation team. He disputed, however, some of the hourly rates identified by some of Appellees' counsel. *Id.* at 14. After considering the affidavit, evidence, and conflicting testimony of the parties' experts regarding the reasonableness and necessity of the legal services provided, the court held that the rates requested by Appellees' counsel and the work performed by all attorneys, associates, paralegals, and interns were reasonable. *Id.* at 14.

The trial court then examined the reasonableness of Appellees' lodestar. The court compared the value of the total recovery, $151,164,277.35, against the $12,336,547.15 in fees, or a contingency equivalent of 8%. *Id.* at 20. The court categorically opined:

No [p]laintiff's firm would have accepted this case on such a contingency. No plaintiff's firm would have accepted any contested liability claim on such a low contingency fee. No competent firm would have accepted this case on less than a one-third contingency had they recognized that over $3,000,000.00 [in expenses] would have to be advanced and litigation prior to appeal would extend over 5 years.

*Id.* at 20.[38]

■■■ Appellees' counsel requested a contingency multiplier[39] of 3.7, or 370% of their fees and expenses, for a total of $45,600,000, or approximately 31% of the value of the total monetary recovery. *Id.* at 21. The court summarily held:

Their request for total fee [of] $45.6 million in fees is reasonable taking into serious consideration all appropriate factors, including those specifically detailed in [Pa.R.C.P.] 1716.

This award is reasonable. The fees awarded herein represent 31% of the total value of recovery exclusive of fees. The contingency multiplier requested is appropriate because of the exceptionally high degree of difficulty in the case and the remarkable success achieved.

*Id.* at 21. The trial court did not discuss any other factors, including those set forth by Pa.R.C.P. 1716.

On appeal, Wal–Mart argues that the court erred in approving a contingency multiplier when the contingency risk was already factored into the hourly rate. Wal–Mart thus contends that the trial court contravened the holding of *Birth Ctr. v. St. Paul Cos.*, 727 A.2d 1144 (Pa.Super.1999). Wal–Mart alleges that no Pennsylvania court ever approved a 3.7 multiplier, particularly considering the prediction by the United States Court of Appeals for the Third Circuit that the Pennsylvania Supreme Court would accept a 1.5 multiplier as the outer limit. Wal–

---

**38.** We observe the trial court cited no authorities for these propositions. We acknowledge one treatise's observation that in so-called "mega-fund" cases, fee recovery can range from 1.73% to 28% of the total recovery. 4 Alba Conte & Herbert Newberg, Newberg on Class Actions, § 14:6 (4th ed.2002) ("Newberg").

**39.** "The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *In re AT & T Corp.*, 455 F.3d 160, 164 n. 4 (3d Cir.2006) (citation omitted).

Mart's Brief at 61 (citing *Polselli v. Nationwide Mut. Fire Ins. Co.*, 126 F.3d 524, 536 (3d Cir.1997)). Wal–Mart asserts that where damages exceed $100 million, using a multiplier that results in counsels' recovering 33% of that figure in fees contradicts the maxim that "percentage awards generally decrease as the amount of the recovery increases" because "in many instances the increase in recovery is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." Wal–Mart's Brief at 61 (quoting *Krell v. Prudential Ins. Co. of Am.*, 148 F.3d 283, 339 (3d Cir.1998)). For these reasons, Wal–Mart suggests the trial court abused its discretion.

Appellees counter that Wal–Mart waived the issue for three reasons. First, Wal–Mart conceded that Appellees' counsels' hourly rates were appropriate. Second, Wal–Mart's experts did not opine that those hourly rates accounted for the contingency risk. Third, the multiplier ensures that litigants with small claims have access to class action counsel. On the merits, Appellees insist that this Court cannot make a factual determination as to the reasonableness of counsels' fees. Further, because the federal courts have found no difference between non-contingent and contingent hourly rates, Wal–Mart has no basis to assert that Appellees' counsels' hourly rate mitigated the contingency risk.

Appellees suggest Pennsylvania's public policy justifies the 3.7 multiplier.[40] Wal–Mart is entitled to limited relief, at the moment.

■ "[A]ppellate review of an order of a tribunal awarding counsel fees to a litigant is limited solely to determining whether the tribunal palpably abused its discretion in making the fee award." *Lucchino v. Commonwealth*, 570 Pa. 277, 284, 809 A.2d 264, 268–69 (2002) (citation omitted); *First Pa. Bank, N.A. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 397 Pa.Super. 612, 580 A.2d 799, 803 (1990). "An abuse of discretion is not simply an error of judgment. It requires much more. If in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record, discretion is abused." *Bedford Downs Mgmt. Corp. v. State Harness Racing Comm'n*, 592 Pa. 475, 487, 926 A.2d 908, 916 (2007) (quotation marks, alterations, and citations omitted).

In *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (plurality), the dissent set forth the background of contingency fees:

> In the private market, lawyers charge a premium when their entire fee is contingent on winning. . . .

**40.** We acknowledge the parties' citations of common-fund cases. *See, e.g.*, Appellees' Brief at 69 n. 37. Appellees opted for a lodestar. Pls.' Pet. for Award of Att'ys' Fees and Reimbursement of Expenses, at ¶ 45; R.R. at 2238a; *see generally* 4 Newberg at §§ 14:5–14:6 ("The lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the results achieved. For these reasons, it is necessary that district courts be permitted to select the more appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them." (citation omitted)). "Although it is sensible for a court to use a second method of fee approval to cross check its conclusion under the first method, we believe that each method has distinct advantages for certain kinds of actions, which will make one of the methods more appropriate as a primary basis for determining the fee." *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820 (3d Cir.1995) ("*In re GM Truck*").

The premium added for contingency compensates for the risk of nonpayment if the suit does not succeed and for the delay in payment until the end of the litigation-factors not faced by a lawyer paid promptly as litigation progresses. In the private market, the premium for contingency usually is recouped by basing the fee on a percentage of the damages recovered. The premium also could be computed as part of an hourly rate that the lawyer bills after the litigation succeeds. **Under either approach, the market-based fee or hourly rate that is contingent on success is necessarily higher than the hourly rate charged when payment is current and certain.** This fee enhancement ensures that accepting cases on a contingent basis remains an economically attractive and feasible enterprise for lawyers.

*Id.* at 735–37, 107 S.Ct. at 3092–93, 97 L.Ed.2d at 604–05 (Blackmun, J., dissenting) (citations omitted and emphasis added).

■■■■ A "lodestar" is "the product of reasonable hours times a reasonable rate." *City of Burlington v. Dague*, 505 U.S. 557, 559, 112 S.Ct. 2638, 2640, 120 L.Ed.2d 449, 454–55 (1992) (citation omitted); [41] *Krebs v. United Ref. Co. of Pa.*, 893 A.2d 776, 790 (Pa.Super.2006). The court must consider the factors set forth in Pa.R.C.P. 1716 in calculating the lodestar. *Birth Ctr.*, 727 A.2d at 1160. The lodestar "should be reduced in proportion to time spent on distinct claims which do not produce finding of liability." *Logan v. Marks*, 704 A.2d 671, 674 (Pa.Super.1997); *accord Hensley v. Eckerhart*, 461 U.S. 424, 440, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40, 55 (1983). After finalizing the lodestar, the court may then apply a multiplier, *i.e.*, enhancement. *Logan*, 704 A.2d at 674.[42]

The *Dague* Court examined whether a court "may enhance the fee award above the 'lodestar' amount in order to reflect the fact that the party's attorneys were retained on a contingent-fee basis and thus assumed the risk of receiving no payment at all for their services." *Dague*, 505 U.S. at 559, 112 S.Ct. at 2639, 120 L.Ed.2d at 454. In reversing a 1.25 multiplier of the lodestar, the high Court noted:

The "lodestar" figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence. We have established a strong presumption that the lodestar represents the "reasonable" fee, and have placed upon the fee applicant who seeks more than that the burden of showing that such an adjustment is **necessary** to the determination of a reasonable fee. The Court of Appeals held, and [the respondent] argues here, that a "reasonable" fee for attorneys

---

**41.** In *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the high Court opined that a reasonable rate is the fee charged to a client who pays regardless of winning or losing. *Id.* at 895 n. 11, 104 S.Ct. at 1547 n. 11, 79 L.Ed.2d at 905 n. 11 (stating calculation of reasonable fee based on prevailing market rate that client pays "whether he wins or loses"); *accord Perdue v. Kenny A. ex rel. Winn*, —— U.S. ——, ——, 130 S.Ct. 1662, 1672, 176 L.Ed.2d 494, 505 (2010) (stating, "[T]he lodestar method produces an award that **roughly** approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable

case"); *see also Report of Third Circuit Task Force on Court Awarded Attorney Fees*, 108 F.R.D. 237, 243 (3d Cir.1986) (noting lodestar "could be increased or decreased based upon the contingent nature or risk in the particular case involved").

**42.** A contingent enhancement is "entirely unrelated to the 'contingent fee' arrangements that are typical in plaintiffs' tort representation." *Copeland v. Marshall*, 641 F.2d 880, 893 (D.C.Cir.1980) (*en banc*); *accord Blum*, 465 U.S. at 903 n. *, 104 S.Ct. at 1551 n. *, 79 L.Ed.2d at 905 n. * (Brennan, J., concurring).

who have been retained on a contingency-fee basis must go beyond the lodestar, to compensate for risk of loss and of consequent nonpayment. Fee-shifting statutes should be construed, he contends, to replicate the economic incentives that operate in the private legal market, **where attorneys working on a contingency-fee basis can be expected to charge some premium over their ordinary hourly rates.** Petitioner . . . argues, by contrast, that the lodestar fee may not be enhanced for contingency. We note at the outset that an enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar. The risk of loss in a particular case (and, therefore, the attorney's contingent risk) is the product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits. The second factor, however, is ordinarily reflected in the lodestar—either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so. **Taking account of it again through lodestar enhancement amounts to double counting.**

*Id.* at 562–63, 112 S.Ct. at 2641, 120 L.Ed.2d at 456–57 (citations and quotation marks omitted; second and third emphases added);[43] *accord Perdue,* —— U.S. at ——, 130 S.Ct. at 1673, 176 L.Ed.2d at 505 (reiterating holding "that an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation").

In *Polselli v. Nationwide Mut. Fire Ins. Co.,* 126 F.3d 524 (3d Cir.1997), the United States Court of Appeals for the Third Circuit addressed whether this Commonwealth would permit courts to evaluate contingent risk in awarding attorneys' fees. Initially, the district court addressed whether counsel was entitled to a contingency enhancement for a contract and a bad-faith claim. With respect to the con-

---

**43.** The *Dague* Court also observed:

[W]e see a number of reasons for concluding that no contingency enhancement whatever is compatible with the fee-shifting statutes at issue. First, just as the statutory language limiting fees to prevailing (or substantially prevailing) parties bars a prevailing plaintiff from recovering fees relating to claims on which he lost, so should it bar a prevailing plaintiff from recovering for the risk of loss. An attorney operating on a contingency-fee basis pools the risks presented by his various cases: cases that turn out to be successful pay for the time he gambled on those that did not. To award a contingency enhancement under a fee-shifting statute would in effect pay for the attorney's time (or anticipated time) in cases where his client does not prevail.

Second, . . . we have generally turned away from the contingent-fee model-which would make the fee award a percentage of the value of the relief awarded in the primary action-to the lodestar model. We have done so, it must be noted, even though the lodestar model often (perhaps, generally) results in a larger fee award than the contingent-fee model. *See, e.g.,* Report of the Federal Courts Study Committee 104 (Apr. 2, 1990) (lodestar method may "give lawyers incentives to run up hours unnecessarily, which can lead to overcompensation"). . . . Contingency enhancement is a feature inherent in the contingent-fee model (since attorneys factor in the particular risks of a case in negotiating their fee and in deciding whether to accept the case). To engraft this feature onto the lodestar model would be to concoct a hybrid scheme that resorts to the contingent-fee model to increase a fee award but not to reduce it. Contingency enhancement is therefore not consistent with our general rejection of the contingent-fee model for fee awards, nor is it necessary to the determination of a reasonable fee.

*Id.* at 565, 112 S.Ct. at 2643, 120 L.Ed.2d at 458 (quotation marks and some citations omitted). This Commonwealth, however, has not adopted the high Court's rejection of a contingency enhancement.

tract claim, the district court "first calculated the lodestar amount based on the stipulated hourly rate for [counsel's] work in **non-contingency matters** and stipulated number of hours allocated to the contract claim." *Id.* at 533 (emphasis added). The district court rejected any enhancement for the contract claim, concluding "the contract claim was not unique or complex, and that it did not entail a substantial risk of failure." *Id.* The *Polselli* Court agreed, finding the district court did not abuse its discretion. *Id.*

█ With respect to the bad-faith claim, the district court enhanced the lodestar by 60%, a 1.6 multiplier, but then eliminated the enhancement, finding that the law barred any such award. *Id.* at 533–34. The Third Circuit thus had to "predict whether the Pennsylvania Supreme Court would permit consideration of the contingent risk of a particular case in calculating a reasonable fee for that case." *Id.* at 535. In concluding the Pennsylvania Supreme Court would permit consideration of contingent risk in calculating attorneys' fees, the *Polselli* Court reasoned:

The federal fee-shifting statutes considered in *Dague* did not provide for consideration of contingent risk.... The *Dague* majority found no justification for recognizing a common law enhancement for contingent risk; a statutory provision requiring consideration of enhancement would have been quite another matter.

Unlike courts assessing fees under the federal fee-shifting statutes like those considered in *Dague,* courts assessing fees under section 8371 are guided by Pennsylvania Rule of Civil Procedure 1716.... Thus, even if the Pennsylvania Supreme Court was persuaded by *Dague,* it would be bound by Rule 1716. [W]e predict that the Pennsylvania Supreme Court would permit courts to

consider a case's contingent risk when calculating a reasonable fee [and] also predict that the court would conclude that a contingency enhancement would not apply in every case. As the Supreme Court reasoned in *Dague,* a contingency enhancement often will duplicate factors already subsumed in the lodestar amount. For example, a difficult case may require a high number of hours dedicated to research or discovery. Or, it might require the skills of someone who ordinarily bills at a high hourly rate. Both of these factors are considered in calculating the lodestar amount, and they should **not** be reconsidered in enhancing the lodestar.

We predict that the Pennsylvania Supreme Court would permit a trial court to enhance the lodestar amount to account for a particular case's contingent risk **only** to the extent that those factors creating the risk are not already taken into account when calculating the lodestar amount. Thus, when a trial court is faced with a request to enhance a fee based on contingent risk arising from the magnitude, complexity and uniqueness of the litigation, the court should exercise caution so as **not** to skew the calculation of a reasonable rate by **double counting.** For example, if the complexity of a case is reflected in the high number of hours researching the complex issues or in the relatively high regular hourly rate of the attorney, complexity does not justify a contingency enhancement.

The court should also consider whether the attorney was able to mitigate the risk of nonpayment. For example, an attorney who has entered into a contingency-fee contract in a suit seeking substantial damages has significantly mitigated the contingent risk; in exchange for accepting the risk of nonpayment,

the attorney obtains the prospect of compensation under the agreement substantially in excess of the lodestar amount. Likewise, "attorneys who are paid a portion of their reasonable hourly fee irrespective of result have partially mitigated the risk of nonpayment." *Rendine v. Pantzer*, 141 N.J. 292, 661 A.2d 1202, 1229 (1995).

We emphasize that the determination of a reasonable fee is an inherently case-specific endeavor. Just as every case is unique, so too are the particularized risks faced by attorneys accepting contingency-fee cases. We are therefore reluctant to provide courts with a specific list of factors to consider in determining whether and to what extent a contingency enhancement is appropriate in any given case. When applying Rule 1716, courts must consider whether the receipt of a fee was contingent on success. Courts must **not**, however, deviate from their ultimate responsibility—the calculation of a "reasonable" fee. To the extent that the factors creating a contingent risk in a particular case are mitigated or are already taken into account when calculating the lodestar amount, a contingency enhancement is **not** "reasonable" and should not be applied.

In *Rendine*, the New Jersey Supreme Court departed from *Dague* and established a rule favoring the award of contingency enhancements to prevailing parties under the New Jersey Law Against Discrimination. The court held that "a counsel fee awarded under a fee-shifting statute cannot be 'reasonable' unless the lodestar, calculated as if the attorney's compensation were guaran-

teed irrespective of result, is adjusted to reflect the actual risk that the attorney will not receive payment if the suit does not succeed." *Rendine*, 661 A.2d at 1228. The court focused on risk of attorney non-payment, and it recognized that such risk will vary with the circumstances of each unique case. The court concluded that "contingency enhancements in fee-shifting cases ordinarily should range between five and fifty-percent of the lodestar fee, with the enhancement in typical contingency cases ranging between twenty and thirty-five percent of the lodestar." *Id.* 661 A.2d at 1231. We believe that our prediction of Pennsylvania law is not significantly different from the statement of New Jersey law in *Rendine*. *See, e.g., id.* 661 A.2d at 1228 (acknowledging concern about overpayment and double counting).

*Id.* at 535–36 (emphases added).

As both parties acknowledge, *Birth Ctr.*[44] is one of the seminal Pennsylvania cases addressing a contingency enhancement. In *Birth Ctr.*, the Court remanded the issue of attorneys' fees to the trial court. *Id.* at 1160. Because the applicable statute did not identify the factors the court should consider in awarding attorneys' fees, the *Birth Ctr.* Court instructed the court to consider the factors in Pa. R.C.P. 1716. *Id.* at 1160 (citing *Polselli*, 126 F.3d at 532–39). The *Birth Ctr.* Court embraced the reasoning of the *Polselli* Court and reinforced:

The court may also consider the discretionary application of a fee enhancement to reflect the contingent risk of the particular ... claim at issue. A contingent risk enhancement, however, **shall be in-**

**44.** In *Mishoe v. Erie Ins. Co.*, 573 Pa. 267, 824 A.2d 1153 (2003), the Pennsylvania Supreme Court disapproved of *Birth Ctr.* to the extent that case stood for the proposition that 42 Pa.C.S. § 8371 permitted a jury trial. *Id.* at 274 n. 3, 824 A.2d at 1157 n. 3. That proposition is not at issue in this case.

**appropriate** where the factors creating the risk have been mitigated [12] or already taken into account in the calculation of number of hours times fee per hour [*i.e.*, the lodestar]. Additionally, fee recovery may include the reasonable fees incurred in the preparation and litigation of the fee petition if the client retains a material interest [13] in the fee litigation.

[12] *See Polselli, supra* at 535 (suggesting that the existence of a fee contract or an agreement for payment of a portion of the reasonable hourly rate regardless of result may significantly mitigate contingent risk).

[13] Whether a client maintains a "material interest" means whether a client has anything to lose if the counsel fees are denied. If counsel must prevail on the fee petition to get paid at all, then the client has nothing to lose if counsel fees are denied because the client is not liable for the fees. Under this scenario, the client does not maintain a material interest in the fee petition and attorneys' fees associated with the petition itself would be inappropriate.

*Id.* at 1161 (emphasis added).

▆▆▆▆ In considering whether to apply an enhancement to the lodestar, the court shall evaluate the degree of success, the deterrent effect of the verdict or decision, the potential public benefit, and the potential inadequacy of a private fee agreement. *Logan*, 704 A.2d at 674; *accord Krebs*, 893 A.2d at 790. "[T]he degree of success is the critical consideration...." *Logan*, 704 A.2d at 674. The court shall consider "whether an award of fees and costs would promote the purposes of the" statute(s) in question. *Krebs*, 893 A.2d at 789–90; *Logan*, 704 A.2d at 674. "The court may consider the relationship between the damages sought and those recovered." *Logan*, 704 A.2d at 674; *accord Krebs*, 893 A.2d at 789. If a contin-

gency-fee agreement exists, then the court may consider the agreement in determining the enhanced amount, but the agreement cannot create an "artificial ceiling based on the percentage agreed upon between attorney and client." *Krebs*, 893 A.2d at 791. The court, however, "may not lower the fee to achieve proportionality with the size of the verdict." *Logan*, 704 A.2d at 674; *accord Krebs*, 893 A.2d at 789. If an enhancement is applied, then the resulting sum should be "sufficient to attract competent counsel who might otherwise" refuse to represent the class. *Logan*, 704 A.2d at 674; *accord Krebs*, 893 A.2d at 790. The court should refrain from enhancing the lodestar based on factors incorporated into the reasonable fee. *See Birth Ctr.*, 727 A.2d at 1161; *see, e.g., Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 566, 106 S.Ct. 3088, 3099, 92 L.Ed.2d 439, 457 (1986) ("*Delaware Valley*") (stating, "Because considerations concerning the quality of a prevailing party's counsel's representation normally are reflected in the reasonable hourly rate, the overall quality of performance ordinarily should not be used to adjust the lodestar, thus removing any danger of 'double counting'").[45] Finally, the court is not limited to discussing only these factors in determining whether to apply an enhancement. *Krebs*, 893 A.2d at 791; *see Polselli*, 126 F.3d at 536 (noting, "We are therefore reluctant to provide courts with a specific list of factors to consider in determining whether and to what extent a contingency enhancement is appropriate in any given case").

▆▆▆ In sum, courts are permitted to award a reasonable fee pursuant to a lodestar, a percentage of the common fund, or, if necessary, a hybrid approach. With

**45.** The *Delaware Valley* Court agreed with this Commonwealth's argument that the lower court erred by increasing the fee amount to account for counsel's superior performance. *Delaware Valley*, 478 U.S. at 566, 106 S.Ct. at 3099, 92 L.Ed.2d. at 457.

respect to a lodestar, the court analyzes multiple factors in considering whether to apply a contingency enhancement, *i.e.*, multiplier. *See, e.g., Krebs*, 893 A.2d at 790–91; *Birth Ctr.*, 727 A.2d at 1161; *Logan*, 704 A.2d at 674. A contingency enhancement on top of the lodestar is appropriate only if the lodestar does not reflect counsel's contingent risk. *See Birth Ctr.*, 727 A.2d at 1161; *see also Perdue*, — U.S. at —, 130 S.Ct. at 1673, 176 L.Ed.2d at 505; *Dague*, 505 U.S. at 562–63, 112 S.Ct. at 2641, 120 L.Ed.2d at 456–57; *Polselli*, 126 F.3d at 536.

As a prefatory matter, we address Appellees' claim that Wal–Mart waived its argument. The record reflects that Wal–Mart challenged the imposition of a contingency multiplier when Appellees' counsel's hourly rates incorporated a contingency risk factor. Wal–Mart's Supplemental Mem. of Law in Opp'n to Pls.' Pet. for Award of Att'ys' Fees and Expenses, at 14; R.R. at 2651a (citing ¶ 4 of Aff. of Michael D. Donovan in Supp. of Pls.' Pet. for Att'ys' Fees and Reimbursement of Costs; R.R. at 2271a; and ¶ 4 of Aff. of Judith L. Spanier in Supp. of Pls.' Pet. for Award of Att'ys' Fees and Reimbursement of Expenses; R.R. at 2287a). Wal–Mart's concession to the appropriateness of counsel's hourly rates is not equivalent to waiving its double-counting argument. Further, Appellees refer us to no caselaw suggesting Wal–Mart's experts had to opine on Appellees' counsel's hourly rates. Regardless, Appellees submitted sworn declarations identifying the hourly rates for contingent matters. *See* ¶ 4 of Aff. of Michael D. Donovan in Supp. of Pls.' Pet. for Att'ys' Fees and Reimbursement of Costs; R.R. at 2271a; ¶ 4 of Aff. of Judith L. Spanier in Supp. of Pls.' Pet. for Award of Att'ys' Fees and Reimbursement of Expenses; R.R. at 2287a. To the extent Appellees contend that the multiplier ensures access to class action counsel, that

contention has no bearing on whether Wal–Mart waived the argument on appeal.

■ With respect to the merits, in applying an enhancement, the court inadvertently double-counted contingency factors incorporated into the counsel fees for the firms of Donovan Searles, LLC, and Abbey, Spanier, Rodd, Abrams & Paradis, LLP. The affidavits for those firms state, "The hourly rates for the attorneys in my firm included in Exhibit A are the **same** as the regular current rates charged for their services in **other contingent matters** in class action litigation." ¶ 4 of Aff. of Michael D. Donovan in Supp. of Pls.' Pet. for Att'ys' Fees and Reimbursement of Costs; R.R. at 2271a (emphases added); ¶ 4 of Aff. of Judith L. Spanier in Supp. of Pls.' Pet. for an Award of Att'ys' Fees and Reimbursement of Expenses; R.R. at 2287a (emphases added). In contrast, the affidavits for the other firms aver they used their firms' "complex litigation hourly rates" to calculate their lodestars. ¶ 9 of Aff. of Franklin D. Azar in Supp. of Pls.' Pet. for Award of Att'ys' Fees and Reimbursement of Expenses; R.R. at 2306a; ¶ 24 of Aff. of Gerald L. Bader, Jr. in Supp. of Pls.' Pet. for Award of Att'ys' Fees and Reimbursement of Expenses; R.R. at 2331a; ¶ 18 of Aff. of John A. Smalley in Supp. of Pls.' Pet. for an Award of Att'ys' Fees and Reimbursement of Expenses; R.R. at 2343a. Because the instant lodestar was based in part on contingency rates, and not the rates paid by a client regardless of winning or losing, the court should not have enhanced the lodestar to the extent the enhancement double-counted counsel's contingent risk. *See Birth Ctr.*, 727 A.2d at 1161; *see also Perdue*, — U.S. at —, 130 S.Ct. at 1672, 176 L.Ed.2d at 505; *Dague*, 505 U.S. at 559, 112 S.Ct. at 2640, 120 L.Ed.2d at 454–55; *Blum*, 465 U.S. at 895 n. 11, 104 S.Ct. at 1547 n. 11, 79 L.Ed.2d at 905 n. 11.

Indeed, in *Polselli*, the United States Court of Appeals for the Third Circuit accepted without question the calculation of a lodestar based on counsel's hourly rate in "non-contingency matters". *Polselli*, 126 F.3d at 533. The instant trial court erred in applying an enhancement which partially double counts because, according to the affidavits, Donovan Searles, LLC, and Abbey, Spanier, Rodd, Abrams & Paradis, LLP, charged a "premium over their hourly rates" to reflect their contingent risk. *See Birth Ctr.*, 727 A.2d at 1161 (instructing that a fee enhancement, or multiplier, "shall be inappropriate where the factors creating the risk have been … already taken into account in the calculation" of the lodestar); *see also Dague*, 505 U.S. at 562–63, 112 S.Ct. at 2641, 120 L.Ed.2d at 456–57; *Polselli*, 126 F.3d at 535–36. Accordingly, because the trial court misapplied the law, we reverse the fee award and remand for proceedings in accordance with this decision. *See Bedford Downs Mgmt. Corp.*, 592 Pa. at 487, 926 A.2d at 916; *Lucchino*, 570 Pa. at 284, 809 A.2d at 268–69.[46]

Upon remand, the court should explain thoroughly its rationale in approving the lodestar, including the factors set forth by Pa.R.C.P. 1716 and the *Logan* Court. *See* Pa.R.C.P. 1716; *Logan*, 704 A.2d at 674.

We note, however, that in reviewing the court's opinion, we also find its justifications for applying a multiplier insufficient, particularly in light of its application of a 3.7 multiplier, compared to the Third Circuit's prediction that 1.5 would be the outer limit of acceptable multipliers in this Commonwealth. *See Polselli*, 126 F.3d at 536. Accordingly, if the court concludes an enhancement is warranted, then the court shall discuss comprehensively the factors it finds would justify an enhancement. *See, e.g., Krebs*, 893 A.2d at 790; *Birth Ctr.*, 727 A.2d at 1161; *Logan*, 704 A.2d at 674; *see also Delaware Valley*, 478 U.S. at 568, 106 S.Ct. at 3099, 92 L.Ed.2d at 458 (noting, *inter alia*, that "absence of detailed findings" warranted reversal of fee enhancement for superior performance).[47] In considering whether to apply an enhancement, the court should not reconsider factors "subsumed in the lodestar amount[, *e.g.*,]" "a difficult case [requiring] a high number of hours dedicated to research or discovery [or] the skills of someone who ordinarily bills at a high hourly rate." *Polselli*, 126 F.3d at 535; *Birth Ctr.*, 727 A.2d at 1161. The court may wish to apply a second method of calculation as a cross-check. *See In re GM Truck*, 55 F.3d at 820.[48] Because the trial

**46.** Although we do not believe another hearing is required, we defer to the trial court. We agree wholeheartedly with the *Polselli* Court's admonishment that litigation over attorneys' fees should not result in a second major round of litigation. We trust the parties will "resolve amicably the amount of [the] fee." *Polselli*, 126 F.3d at 539 (citation omitted).

**47.** Should the court, on remand, again justify an enhancement, the court has the option of using a different enhancement for each counsel to avoid double-counting any contingent risk. As noted *supra*, in approving the lodestar and 3.7 multiplier, the trial court failed to discuss comprehensively the factors set forth above, including those in Pa.R.C.P. 1716.

Should the court, upon remand, impose a multiplier exceeding the outer limits of what it believes this Commonwealth would accept—which the Third Circuit predicted would be 1.5, although we decline to make any affirmative holding as to the outer limits at this time—then the court shall thoroughly explain its reasoning, including a discussion of all pertinent factors. *See Polselli*, 126 F.3d at 536.

**48.** Because the trial court inadvertently double-counted factors in granting an enhancement, the court, on remand, may not necessarily impose the same 3.7 multiplier. It is well-settled that Pennsylvania "courts should not give answers to academic questions or render advisory opinions or make decisions

court made a patent mathematical error while calculating damages, we also modify the judgment to reflect a WPCL verdict for $49,289,541, instead of $49,568,541. *In re Paxson Trust I*, 893 A.2d 99, 132 (Pa.Super.2006) (modifying amount of judgment to correct mathematical error); *see supra* n. 10. Accordingly, the judgment is affirmed in part as modified, reversed in part, and remanded for further proceedings in accordance with this decision.

Wal–Mart's application to strike Appellees' August 13, 2009 letter brief is denied. Judgment affirmed in part as modified, and reversed in part. Case remanded for further proceedings. Jurisdiction relinquished.

based on assertions as to hypothetical events that might occur in the future." *Phila. Entm't & Dev. Partners, L.P. v. City of Phila.*, 594 Pa. 468, 480, 937 A.2d 385, 392 (2007).

Accordingly, we decline to render an advisory decision on the merits of a 370% enhancement.